## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-1574

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**

  Plaintiff,

**v.**

**CELL>POINT, LLC,**
**GREG RUSSELL COLIP, and**
**TERRY ALLEN COLIP,**

  Defendants.

---

### COMPLAINT

---

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against defendants Cell>Point, LLC ("Cell>Point" or the "Company"), Greg Russell Colip, and Terry Allen Colip (collectively, "Defendants"), alleges as follows:

### <u>SUMMARY OF ALLEGATIONS</u>

1.  This case involves multiple and repeated false statements by Cell>Point, a developmental-stage radiopharmaceutical company, and its executives in connection with its offer and sale of securities. From January 2016 through February 2021 (the "Relevant Period"), Cell>Point, its Chief Executive Officer ("CEO") Greg Colip, and its Chief Financial Officer ("CFO") Terry Colip (with Greg Colip, the "Individual Defendants") defrauded at least 151 investors into purchasing more than $10 million in Cell>Point securities.

2.      During the Relevant Period, Defendants made false and misleading statements to investors about four key aspects of Cell>Point's business, including the status of its clinical trials, the total amount of money raised and the amount the Individual Defendants invested in the business, the Individual Defendants' compensation, and the status of supposed significant investments by third parties.

3.      First, throughout the Relevant Period, and as recently as February 2021, the Defendants represented to investors that Cell>Point was months away from completing clinical trials of its revolutionary product, Oncardia, that would lead to commercialization and, ultimately, substantial returns for investors. In reality, Defendants suspended clinical trials in 2014 because Oncardia, which is a radiopharmaceutical, became unstable, and trials have never resumed.

4.      Second, Defendants falsely represented that Cell>Point's three managing members – Terry Colip, Greg Colip, and the Company's Chief Technology Officer ("CTO") (collectively, the "Founders") – contributed $38 million, and that Cell>Point had raised over $104 million. In reality, the Founders did not invest millions of dollars into Cell>Point, and Cell>Point raised only approximately $56 million from investors since its inception.

5.      Third, Defendants misled investors by claiming that the Founders had deferred 96% of their salaries, and misstating the amounts of the Founders' total deferred compensation. In reality, Cell>Point has paid the Founders $4.3 million in loans or other forms of compensation – or more than $.40 of every dollar of the $10 million raised from investors during the Relevant Period, and owes the Founders much more in deferred compensation that Cell>Point must pay before investors receive returns.

6.      Fourth, Defendants lied to investors about obtaining a purported $15.4 million equity investment from a Chinese private equity firm in November 2019. In reality, the agreement Defendants announced to investors was, in the words of Greg Colip, "not a consummated transaction," since Cell>Point, in Terry Colip's words, "tore up" the agreement in November 2019.

7.      Defendants' fraud was continuous and calculated to enrich the Individual Defendants at the expense of the Company's investors.

8.      As a result of the conduct described herein, Defendants have violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5thereunder [17 C.F.R. § 240.10b-5(b)].

## JURISDICTION AND VENUE

9.      The SEC brings this action pursuant to the authority conferred upon it by Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa].

10.      The SEC seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint from each of the Defendants together with prejudgment interest; civil penalties pursuant to Section 21(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 20(d) of the Exchange Act [15 U.S.C. § 78u(d)] against all Defendants; and, against the Individual Defendants, officer and

director bars pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]. The SEC seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

11.      Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

12.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa]. Throughout the Relevant Period, Defendant Cell>Point was a Delaware Limited Liability Company headquartered in Centennial, Colorado, and Defendant Terry Colip resided in Greenwood Village, Colorado. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of Colorado. For example, the false and misleading statements identified in this Complaint were made in, among other places, this district, and investors in this district received the false and misleading statements in making investment decisions.

13.      Certain of the acts, practices, transactions, and courses of business alleged in this Complaint were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS AND RELIEF DEFENDANTS

14.     **Cell>Point, LLC** is a privately-held radiopharmaceutical company that claims to be developing diagnostic and therapeutic products. It is a Delaware Limited Liability Company headquartered in Centennial, Colorado.

15.     **Greg Russell Colip** is a resident of Spring, Texas. Greg Colip, who is Terry Colip's brother, is a founder, Manager, and the CEO of Cell>Point, and has served in those roles since 2001. Together with Terry Colip, Greg Colip exercises overall executive control over Cell>Point. Greg Colip oversees the Company's intellectual property and efforts to sell the Company or its technology to a strategic partner or investor. Greg Colip is an attorney licensed to practice in Texas.

16.     **Terry Allen Colip** is a resident of Greenwood Village, Colorado. Terry Colip, who is Greg Colip's brother, is a founder, Manager, and the CFO of Cell>Point, and has served in those roles since 2001. Terry Colip oversees Cell>Point's finance and accounting functions and has control over Cell>Point's bank accounts, in which investor funds are pooled for Cell>Point's use. Prior to joining Cell>Point, Terry Colip was a registered representative associated with multiple broker-dealers and held multiple securities industry licenses.

## FACTS

I.      **Background**

        A.      **Cell>Point's Formation and Operations**

17.     Cell>Point is a biotechnology company formed in 2001 to commercialize radiopharmaceutical compounds. It claims to be developing several diagnostic and therapeutic

compounds for applications related to a range of diseases, including cancer and cardiovascular disease.

18.     Cell>Point's main product under development is Oncardia, a radiopharmaceutical compound with applications for lung cancer and cardiovascular disease imaging. Twenty years ago, in 2001, Cell>Point filed an Investigational New Drug ("IND") application with the U.S. Food & Drug Administration ("FDA") for development of Oncardia as a lung cancer imaging agent. In 2010, Cell>Point filed an IND application for development of Oncardia as a cardiovascular disease imaging agent. To have Oncardia approved as a lung cancer or cardiovascular disease imaging agent, Cell>Point must successfully complete separate Phase 1, Phase 2, and Phase 3 clinical trials before filing a New Drug Application ("NDA"). FDA approval of an NDA is the final step that allows a new treatment to be marketed to physicians and patients. All of these steps must be completed before Cell>Point can market or sell Oncardia to the public.

19.     From 2001 to May 2014, Cell>Point developed manufacturing protocols, completed preclinical research, filed the INDs, and successfully completed Phase 1 and 2 lung cancer clinical trials and Phase 1 and 2a cardiovascular clinical trials.

20.     In 2012, Oncardia entered Phase 3 clinical trials—typically the final phase of clinical trials before applying for FDA approval—for lung cancer imaging. In 2013, Oncardia entered Phase 2b clinical trials – the second part of Phase 2 trials - for cardiovascular imaging.

21.     Aside from Oncardia, no Cell>Point product has advanced beyond pre-clinical development, and Cell>Point has never received regulatory approval to market or sell any products.

22.     Cell>Point has primarily financed its operations from funds raised from the sale of membership units and the issuance of notes. Since 2001, Cell>Point has raised at least $56 million from over 500 investors, including at least $10 million from over 150 investors during the Relevant Period.

23.     Cell>Point has never paid a dividend or other distribution to any of its investors.

**B.      The Individual Defendants Were Control Persons of Cell>Point.**

24.     Since the Company's founding in 2001, and throughout the Relevant Period, Cell>Point has been led by its Founders: CEO Greg Colip, CFO Terry Colip, and Cell>Point's CTO. Cell>Point's only other employee during the Relevant Period has been a part-time accountant. The Founders have complete operational control over Cell>Point. During the Relevant Period, Greg Colip and Terry Colip each had control over Cell>Point and its activities. In addition, Greg Colip and Terry Colip each exercised control over the specific, violative activity that is the subject of this Complaint.

25.     According to Cell>Point's Operating Agreement, as Managers, Greg Colip and Terry Colip can bind Cell>Point and possess "the right, power, and authority to do on behalf of the company all things which are necessary, proper, or desirable to carry out its duties and responsibilities."

26.     Among other responsibilities, CEO Greg Colip is responsible for negotiating strategic transactions and intellectual property matters, and, during the Relevant Period, he drafted or reviewed offering materials and investor updates prior to publication.

27.     Among other responsibilities, CFO Terry Colip controls Cell>Point's bank accounts and accounting records and, during the Relevant Period, wrote and revised offering

materials, solicited investments, and acted as the primary point of contact with Cell>Point's investors.

28.    Cell>Point's Founders have caused the Company to incur over $53.4 million in contingent and deferred liabilities to themselves. Cell>Point's Founders also structured the liabilities to themselves to have seniority over other company debt and equity interests such that the liabilities to the Founders must be paid before returns will be distributed to investors.

29.    Investors will not receive a return on their investment until Cell>Point obtains FDA approval for, or sells or licenses, Oncardia or another product, and pays the Company's Founders over $53.4 million.

**C.    Cell>Point Offered and Sold Securities.**

30.    Cell>Point offered and sold investments that are "securities" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

31.    On or about January 13, 2016, Cell>Point filed a Form D for a Rule 506(b) unregistered offering of securities. On or about July 23, 2020, Cell>Point filed a Form D/A amending the 2016 filing.

32.    Beginning in January 2016 and continuing through at least February 2021, Cell>Point offered and sold securities to investors in the form of LLC membership interests ("units") and notes (the "offerings"). These offerings are investment contracts and notes.

33.    Cell>Point investors, whether purchasers of units or noteholders, invested money in a common enterprise, had no rights or power to direct the Company's activities, and were entirely reliant on the Founders to generate returns.

D.     **Cell>Point's Solicitation of and Communications With Investors**

34.     Cell>Point used a variety of means to solicit prospective investors to purchase these securities. First, Terry Colip, who acted as Cell>Point's primary point of contact with investors, directly solicited new investors through email, the telephone, and by hosting investor events.

35.     Second, Cell>Point solicited additional investments, both unit sales and notes, from previous investors through general solicitations contained in investor communications and one-on-one solicitations. As a result of Cell>Point's efforts, Cell>Point generated over $4.25 million from repeat investors during the Relevant Period. Terry Colip induced previous investors to make new investments by, among other things, frequently touting Cell>Point's purported financial prospects or success in attracting strategic partners at or near the same time as offering Cell>Point securities for sale. In many cases, Terry Colip also offered Cell>Point units to existing investors at a discount to the price stated in the offering materials.

36.     Third, Cell>Point relied on existing investors to identify and recruit new investors. Terry Colip frequently used these existing investors to disseminate false and misleading statements to prospective investors.

37.     The existing investors had no source of information about Cell>Point other than Terry Colip, and Terry Colip knew of and encouraged their recruitment of investors.

38.     Referrals from previous investors resulted in dozens of investors investing millions of dollars during the Relevant Period.

39.      During the Relevant Period, Cell>Point used a variety of different documents, and several versions of documents, to solicit prospective investors, and to communicate with

existing investors. These documents include: (1) Private Placement Memoranda ("PPMs"), (2) slide decks ("Investor Decks"), (3) quarterly reports, and (4) ad hoc updates and email communications from Terry Colip.

40.     Defendants have represented that, during the Relevant Period, they destroyed all their communications to investors or prospective investors, and all communications they received from investors or prospective investors, after seven days.

### 1.     Private Placement Memoranda

41.     Cell>Point solicited investments using at least nineteen versions of its PPM during the Relevant Period, including versions dated: January 16, 2016; November 1, 2016; April 3, 2017; July 3, 2017; September 1, 2017; June 1, 2018; October 1, 2018; October 2, 2018; January 2, 2019; February 10, 2019; April 1, 2019; April 2, 2019; June 1, 2019; September 1, 2019; October 1, 2019; January 2, 2020; February 1, 2020, June 1, 2020; and October 21, 2020. These PPMs are nearly identical, with some relevant differences identified below.

42.     Greg Colip wrote the Company's first PPM prior to the Relevant Period. During the Relevant Period, Terry Colip played the predominant role in drafting and making changes to each new version of the PPM and Greg Colip typically reviewed changes from version to version.

43.     While every version of the PPM included as attachments the model subscription agreement and Cell>Point's governing documents, most versions of the PPM that investors received contained only the income statement and balance sheet from Cell>Point's most recent audited financial statements. Most investors did not receive complete audited financial statements before investing.

44.     Because of Defendants' practice of destroying all investor communications after seven days, Cell>Point records do not identify which version of the PPM each investor received or which investors, if any, received the Company's audited financial statements at or before the time they made their investments.

### 2.     Investor Decks

45.     Beginning no later than January 2019, Terry Colip provided prospective investors with Investor Decks that summarized the Company's product development activities, estimated revenue from prospective sales of the Company's technology, and capital-raising activities. Terry Colip was the primary author of each Investor Deck.

46.     Cell>Point and Terry Colip provided prospective investors at least eight different Investor Decks during the Relevant Period, including versions dated January 2019, March 2019, May 2019, September 2019, October 2019, November 2019, March 2020, and May 2020.

47.     Terry Colip also posted videos on Vimeo.com that showed the slideshow version of an Investor Deck with his recorded narration.

48.     Investor Decks were also emailed to several existing investors.

### 3.     Quarterly Reports

49.     Approximately every three months, Terry Colip and Greg Colip drafted reports ("Quarterly Reports") that purportedly updated investors on Cell>Point's business activities and plans for the near future.

50.     Greg Colip wrote sections of the Quarterly Reports related to strategic transactions and had a practice of reviewing the entirety of the Quarterly Reports before publication. Terry Colip wrote the rest of the Quarterly Reports and reviewed the entire report.

51.     Quarterly Reports were one of Cell>Point's and Terry Colip's primary methods of informing investors about Cell>Point's purported product development activities and efforts to sell the Company or its technology and, in several cases, contained explicit offers to sell Cell>Point securities.

52.     Terry Colip disseminated these reports to certain investors by email and published them on a password-protected website.

### 4.     Ad Hoc Updates and Emails from Terry Colip

53.     During the Relevant Period, Terry Colip emailed several stand-alone updates to investors ("Ad Hoc Updates"). These communications purportedly provided updates on developments in the Company's operations. Some of these Ad Hoc Updates included an offer for the sale of securities.

54.     Terry Colip also engaged in email communications with individual investors that included statements about Cell>Point's business. These emails were sent at or around the time Terry Colip solicited additional investments from these investors.

### II.     Defendants Made Materially False and Misleading Statements to Investors and Prospective Investors in Connection with the Cell>Point Offerings.

55.     In raising funds from investors, Defendants made numerous written and oral material false and misleading statements and omissions regarding, among other things, the status of Cell>Point's Oncardia clinical trials, Cell>Point's capital raising activities, Cell>Point's payments to the Founders, and the status of third-party funding.

A.      **False and Misleading Statements Regarding Status of Clinical Trials**

56.      Throughout the Relevant Period, Defendants repeatedly made statements indicating that clinical trials of Oncardia were ongoing. In fact, there were no clinical trials of Oncardia during the Relevant Period, and there had been no clinical trials for years.

57.      To perform the clinical trials, Cell>Point used "test kits," which contained the Oncardia injectable compound used for imaging. In or around 2014, prior to the Relevant Period, Cell>Point determined that the test kits used to perform the Oncardia clinical trials had become unstable because the Oncardia compound within the test kits degraded too quickly, hampering its use. Because of this instability, Cell>Point's Oncardia test kits were not suitable for continued use in the Phase 3 lung cancer and Phase 2b cardiovascular clinical trials.

58.      Lacking suitable Oncardia test kits for the clinical trials, Cell>Point suspended both clinical trials in or around May 2014, after imaging just nine patients of an anticipated 368 patients in the Phase 3 lung cancer and Phase 2b cardiovascular clinical trials combined.

59.      Since May 2014, no patient has been administered Oncardia in a clinical trial.

60.      Cell>Point is developing a reformulated Oncardia imaging product to use in test kits for clinical trials, but it currently has no product to use for clinical trials, and it has not had a product it could use for clinical trials since 2014.

61.      Cell>Point has at least three substantial steps it must complete before it can complete the required clinical trials and apply for FDA approval to market and sell Oncardia.

62.      The first step Cell>Point must take is to complete development, animal testing, human testing, regulatory filings, and kit manufacturing for its reformulated Oncardia test kits. Cell>Point's CTO estimates that this work will take ten to twelve months to complete.

63.     Until this testing and approval is complete, Cell>Point cannot know if its reformulated product is suitable for clinical trials, nor can it resume its clinical trials.

64.     The second step the Company must complete is to identify medical providers and enroll them in the clinical trials, which a Cell>Point consultant estimates will take two to four months once the test kits are approved and trials are ready to resume.

65.     Cell>Point currently has no clinical trial sites enrolled, and it has had no sites enrolled since 2016.

66.     The third step the Company must complete, after completing manufacturing and enrolling clinical trial sites, is enrolling patients, administering Oncardia, and analyzing the resulting images, which Greg Colip estimates will take at least ten to twelve months.

67.     Cell>Point currently has no patients enrolled in its clinical trials, and it has had no patients enrolled in its clinical trials since 2014.

68.     Cell>Point must complete each of the above steps for both the lung cancer and cardiovascular applications.

69.     During the Relevant Period, Defendants made numerous statements to investors about the clinical trials that were false and numerous statements to investors that were misleading because they omitted these and other important facts. Defendants made false statements and misleading statements regarding development of Oncardia in the following documents:

70.     PPMs:

a.     Each PPM identified above, except for the October 21, 2020 version, stated: "The Company's development priority at this time is to complete the cancer and

cardiovascular imaging clinical trials and seek regulatory approval to market both disease applications. . . . The Phase 3 [oncology] study should be completed [by a date 1 to 6 quarters later]. The Phase 2b/3 cardiovascular trial should be completed [by the same date or 1 quarter later]."

       b.     The October 21, 2020 PPM stated: "The Company's development priority at this time is to complete [testing of] sufficient patients in the cancer and cardiovascular imaging clinical trials and license or sell Oncardia."

       c.     PPMs dated January 2, 2019, February 10, 2019, April 1, 2019, April 2, 2019, October 1, 2019, January 2, 2020, February 1, 2020, June 1, 2020, and October 21, 2020 stated in a graphic: "2014-2015: Paused [clinical trials] to adjust dosing from 5mg to 1mg, optimize product stability, and kit manufacturing."

       d.     PPMs dated January 2, 2019, February 10, 2019, April 1, 2019, April 2, 2019, October 1, 2019, January 2, 2020, February 1, 2020, and June 1, 2020 included a timeline that stated: "2019: Resumption of Clinical Trials."

       e.     The October 21, 2020 PPM stated: "2020: Resumption of Clinical Trials."

71.    <u>Investor Decks</u>:

       a.     Investor Decks dated January 2019, March 2019, May 2019, March 2020, and May 2020 stated: "2019 – Resumption of Clinical Trials."

       b.     The October 2019 Investor Deck stated that Cell>Point is "[c]ompleting Phase 3 trials for oncology and cardiology imaging."

c.      Investor Decks dated November 2019, March 2020, and May 2020, stated: "Oncardia imaging trials meeting all endpoints" and "On track to seek FDA approval for Oncardia end of 2020."

d.      Investor Decks dated January 2019, March 2019, May 2019, March 2020, and May 2020 stated: "2014-2015: Paused [clinical trials] to adjust dosing from 5mg to 1mg, optimize product stability, and kit manufacturing;" "2015-2018: Reformulation to single vial cold kit to simplify preparation at radiopharmacy;"

e.      The November 2019 Investor Deck included a timeline without dates titled "Development History" that identified past events including "Reformulation to single vial cold kit to simplify preparation at radiopharmacy" and "Resumption of clinical trials."

72.     Quarterly Reports:

a.      The report for First Quarter 2016 stated: "Lead agent Oncardia completing Phase 3 trials" and "With the additional capital . . . Cell>Point will be expanding the number of clinical trial sites during Q2 to expedite the completion of the Phase 2b and 3 Oncardia trials."

b.      The report for Second Quarter 2016 stated: "Lead agent Oncardia completing Phase 3 trials."

c.      The report for Third Quarter 2016 stated:  "Lead agent Oncardia completing Phase 3 trials" and "Cell>Point completes 1 vial kit of Oncardia. . . . Cell>Point will complete the remaining patients in the trials with the one vial kits."

d.      The report for Fourth Quarter 2016 stated:  "Lead agent Oncardia completing Phase 3 trials."

    e.  The report for Second Quarter 2017 stated:  "Lead agent Oncardia completing Phase 3 trials" and "Cell>Point positioning itself to accelerate Oncardia trials to completion."

    f.  The report for Third Quarter 2017 stated:  "Lead agent Oncardia completing Phase 3 trials."

    g.  The report for Fourth Quarter 2017 stated: "Lead agent Oncardia completing Phase 3 trials" and  "The Company plans to transition into Phase 3 trials for cardiology imaging by mid-2018 and expedite the recruiting and closing of that trial."

    h.  The report for First Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials" and, after discussing plans to manufacture additional Oncardia, "[t]he kits are expected this summer and with the delivery of the kits the Phase 2b and 3 Oncardia trials will expand significantly."

    i.  The report for Second Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials"; "Cell>Point is in the process of adding [a United Kingdom hospital] as a Phase 3 lung cancer imaging site and [a different U.K. hospital] as a Phase 3 cardiology imaging site. We are working towards having these sites up and running by September 2018"; and "Cell>Point plans to complete the Phase 3 lung cancer clinical trial in 2019. In cardiac imaging, Cell>Point is firming plans which should result in an acceleration of the completion of the Phase 2b study during the next three months . . . ."

    j.  The report for Third Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials" and  "With the new 1mg Oncardia kits and the completion of

additional patients, Cell>Point is reaching the point where it is time to sell the [territorial] rights to Oncardia."

        k.      The report for Fourth Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials."

        l.      The report for First Quarter 2019 stated:  "Lead agent Oncardia completing Phase 3 trials";  "Micro dose 1mg Oncardia vials near completion and should be ready for trials in May"; and "Cell>Point is raising an additional $2-4 million in capital . . . to expand our clinical trial sites as we negotiate with pharmas looking to purchase/license Oncardia."

        m.      The report for Second Quarter 2019 stated:  "Lead agent Oncardia completing Phase 3 trials";  "Trial sites expanded to expedite the completion of the Phase 3 lung cancer imaging trial"; and "Now with 12 hospitals and imaging centers, we should be able to close the [Phase 3] trial within four months at full recruitment. During Q3 we will be expanding the sites for the cardiology Phase 2b/3 trial."

        n.      The report for Third Quarter 2019 stated:  "1 vial Oncardia kits past [sic] testing for trials" and "Cell>Point completed the final testing on our 1 vial kits for the FDA. The tests were successful and we filed the final CMC documents with the FDA to complete the Phase 2b/3 cardiology trial and Phase 3 lung cancer imaging trial with the new 1 vial kits."

        o.      The report for Fourth Quarter 2019 stated:  "The $15.4 million plus the license payment of $7.4 million from [Chinese Entity 1] will be used to expedite the closing of the Phase 3 Oncardia imaging trials."  It also included a timeline graph titled "Enterprise Value

Historical" that included an entry prior to 2018 for "1 Vial Oncardia Kit Completed" and in 2018

for "Completing Oncardia Phase 2b/3 Cardiology Trial and Phase 3 Lung Cancer Imaging Trial."

73.     Each of the above disclosures and representations regarding clinical trials was

false when made because (1) the clinical trials were suspended in 2014 and never resumed; (2)

the trials were suspended because Oncardia became unstable and therefore unsuitable for

injection into patients; (3) Cell>Point had not completed testing of the reformulated product;

(4) no Oncardia test kits were manufactured; (5) no clinical sites were enrolled in the trials; and

(6) no patients had been imaged in the trials since 2014.

74.     Defendants knew or were reckless in not knowing, and should have known, that

their statements concerning the status of clinical trials were false and misleading because they

knew (1) the clinical trials were suspended in 2014 and never resumed; (2) the trials were

suspended because Oncardia became unstable and therefore unsuitable for injection into patients;

(3)  Cell>Point had not completed testing of the reformulated product; (4) no Oncardia test kits

were manufactured; (5) no clinical sites were enrolled in the trials; and (6) no patients had been

imaged in the trials since 2014. Defendants were also negligent in making these false and

misleading statements.

75.     Additionally, each of the above disclosures and representations concerning the

expected timeframe in which clinical trials would be completed was false when made because

substantial steps would be required to resume and complete trials, and the substantial costs

associated with those steps were substantially more than Cell>Point could afford at the time,

neither of which was consistent with the above stated timeframes.

76.     Defendants knew or were reckless in not knowing and should have known that their statements concerning the expected timeframe in which clinical trials would be completed were false because they knew substantial steps would be required to resume and complete trials, and the substantial costs associated with those steps were substantially more than Cell>Point could afford at the time, neither of which was consistent with the above stated timeframes. Defendants were also negligent in making these false and misleading statements.

77.     Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the status of clinical trials not misleading. These omissions include (1) the clinical trials were suspended in 2014 and never resumed; (2) the trials were suspended because Oncardia became unstable and therefore unsuitable for injection into patients; (3) Cell>Point had not completed testing of the reformulated product; (4) no Oncardia test kits were manufactured; (5) no clinical sites were enrolled in the trials; (6) no patients had been imaged in the trials since 2014; (7) substantial steps would be required to resume and complete trials; and (8) the substantial costs associated with those steps were substantially more than Cell>Point could afford at the time.

78.     The above misrepresentations and omissions as to the status of clinical trials were material to investors and potential investors because, among other things, investor returns were dependent on Cell>Point's ability to commercialize, sell, or license Oncardia, which, in turn, was dependent on Cell>Point's ability to complete clinical trials.

79.     Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning the suspension of clinical trials and reasons for the suspension, Defendants misled investors about the status of Cell>Point's clinical trials.

**B.** **False and Misleading Statements Regarding Founder Contributions and Capital Investments**

**1. False and Misleading Statements About Founder Contributions**

80.     Defendants also made material misrepresentations and omissions with respect to their contributions and capital investments into Cell>Point by dramatically overstating both the amount of the Founders' personal investments in the Company and the amount of capital Cell>Point raised from investors. While Defendants represented that the Founders had contributed over $30 million, the Founders actually contributed cash of less than $1 million. Defendants also repeatedly represented that Cell>Point had raised more than $104 million in total when, in reality, the amount raised from investors was less than $60 million.

81.     In November 2019, Terry Colip uploaded to Vimeo.com a twenty-three minute video that showed an Investor Deck with Terry Colip's narration. The video solicited investments and showed the following slide:



82.     According to Terry Colip's narration on the video disseminated on Vimeo, "out of the $104.2 million raised to date [since inception], 32% of that has been provided by the Founders."

83.     Similar statements appeared in each PPM and Investor Deck during the Relevant Period:

a.      Nearly all PPMs from November 1, 2016 to June 1, 2020 stated that "capital and contributions from the founders and passive investors have exceeded $[amount] with $[amount] used [for] improving and clinically evaluating [Oncardia]" in the amounts listed below:

| PPM Version(s) | Amount Raised | Amount Used for Oncardia |
|---|---|---|
| November 1, 2016 | $83.1 million | $51 million |
| April 3, 2017<br><br>June 3, 2017<br><br>September 1, 2017 | $84.6 million | $61 million |
| June 1, 2018 | $89.6 million | $63.1 million |
| October 1, 2018 | $91 million | $64.1 million |
| January 2, 2019<br><br>February 10, 2019<br><br>April 1, 2019<br><br>April 2, 2019 | $91 million | $64.1 million |

| PPM Version(s) | Amount Raised | Amount Used for Oncardia |
|---|---|---|
| June 1, 2019<br><br>September 1, 2019<br><br>October 1, 2019<br><br>January 2, 2020<br><br>February 1, 2020 | $91 million | [omitted; statement ends with a period after the contribution amount.] |

b.      Each PPM from January 16, 2016 to April 2, 2019 stated under "Management Compensation" that "the [Founders] have contributed approximately $32.1 million in cash and units to cover clinical trials."

c.      Each PPM from June 1, 2019 to June 1, 2020 stated under Management Compensation that "the [Founders] have contributed approximately $32.1 million to the Company booked as loans to cover clinical trials."

d.      The October 21, 2020 PPM stated under "Management Compensation" that "the [Founders] have contributed approximately $38.9 million in cash and units to the Company booked as loans."

e.      Each Investor Deck also made statements regarding the Company's capital raising history.

f.      The January 2019 Investor Deck stated that "$90.2 million (US) has been contributed and raised to date from Founding Partners [and other investors]. . . . $63.1 million has been invested in our lead agent Oncardia;" "$90.2 million (Provided by Founding Partners, Oncologists, Radiologists, Cardiologists (including pension funds), strategic investors, high net

worth individuals and small private equity funds)" and "Total Contributions by Founding Partners - $38 million."

g.      The March 2019 and May 2019 Investor Decks represented that "Total Contributions by Founding Partners - $38 million."

h.      The September 2019 and October 2019 Investor Decks represented that "Capital Raised to Date: $90.1 Million" and "Capital Spent to date on Oncardia: $81 Million."

i.      The November 2019, March 2020, and May 2020 Investor Decks represented that "Capital Raised to Date: $104.2 Million" and "Contributions by Founders: $37.9 million." These Investor Decks also included the slide from Terry Colip's Vimeo.com video set forth above.

84.     In addition, each Quarterly Report from the first quarter of 2016 through the second quarter of 2019 stated: "Contributions to date from founding and passive members have exceeded" amounts ranging from $83.4 million to $94 million.

85.     These statements regarding the Founders' contributions to Cell>Point were false and misleading because the Founders contributed less than $1 million in cash and the units the Founders "contributed" were units they gave to themselves for no cost when Cell>Point was founded in 2001, and returned to Cell>Point to be sold to new investors. Moreover, the "contributed" units were sold to new investors for less than $38 million.

86.     In exchange for "returning" the units, Cell>Point agreed to pay the Founders the current market value of the units at the time Cell>Point becomes a public company or is sold to a buyer.

87.     The Founders control the market value of units because they unilaterally set the price for units that Cell>Point sells.

88.     For each dollar that the Founders have increased the unit price, Cell>Point owes the Founders approximately $1.1 million more.

89.     As of December 31, 2019, the liability Cell>Point owed the Founders for these units was valued at $38.6 million. This liability has priority over investor distributions, meaning that, if Cell>Point sells or licenses Oncardia in a qualifying transaction, the Founders would be paid $38.6 million before any distributions to investors.

90.     Thus, in actuality, the purported $38 million contribution from the Founders was neither money nor units they contributed, but rather a liability that Cell>Point owes the Founders, and a liability that must be paid before investors can obtain a return on their investment.

91.     The notes to Cell>Point's audited financial statements for each fiscal year during the Relevant Period described Cell>Point's "Contingent Equity-Based Payments" and explained that the Company owes approximately $38 million to the Founders. These notes, however, did not connect these "Contingent Equity-Based Payments" to the "contributions" referenced in the PPMs, Investor Decks, and Quarterly Reports, such that an investor would know that they relate to the same transactions.

92.     Moreover, most investors did not receive the full audited financial statements that contained these notes, and this liability is not included in the abbreviated financial information attached to most PPMs.

93.     Each of the above disclosures and representations regarding the Founders' contributions was false and misleading when made because (1) the Founders had not contributed any material amounts of cash; (2) the units the Founders "returned" were sold for far less than $38 million; and (3) the amounts Defendants represented they had contributed were not contributions but rather a liability imposed on Cell>Point by the Founders.

94.     Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the Founders' contributions and amount of capital raised were false and misleading because they each knew that (1) the Founders had not contributed any material amounts of cash and far less than the amounts represented; (2) the units the Founders "returned" were sold for far less than $38 million; and (3) the amounts they represented the Founders had contributed were not contributions but rather a liability imposed on Cell>Point by the Founders. Defendants were also negligent in making these false and misleading statements.

95.     Defendants omitted to state material facts that were necessary to render their disclosures and representations concerning the Founders' contributions and amounts of capital raised not misleading. These omissions include that (1) the Founders had not contributed any material amounts of cash and far less than the amounts represented; (2) the units the Founders "returned" were worth less than $38 million; and (3) the amounts Cell>Point represented the Founders had contributed were not contributions but rather a liability imposed on Cell>Point.

96.     Defendants' false and misleading statements about the Founders' contributions and amount of money Cell>Point raised were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want to know accurate details concerning the Founders' financial contributions and the extent of the

Company's liability to them, particularly in light of the magnitude of these misstatements, to assess the Founders' personal stake in Cell>Point's success and the ability of the Company to successfully implement its business plan and make returns to investors.

97.     Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning the Founders' contributions and amount of money Cell>Point raised, Defendants misled investors about these purported contributions and the capital available to Cell>Point to effectuate its business plan.

**2.     False and Misleading Statements about the Amount Raised**

98.     Cell>Point did not raise anywhere near the total amounts represented by Defendants.

99.     While as described above Cell>Point represented in various documents provided to investors and prospective investors that it had raised over $100 million, Cell>Point's bank and financial records reflect that, as of February 28, 2021, it has raised only approximately $56 million from investors since its inception.

100.     Each of the above disclosures and representations regarding the Founders' contributions and amounts of capital raised was false and misleading when made because Cell>Point has raised only approximately $56 million since inception.

101.     Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the amount of capital raised were false and misleading because they controlled Cell>Point's bank accounts and finances and each knew that Cell>Point had raised only approximately $56 million since inception. Defendants were also negligent in making these false and misleading statements.

102.     Defendants' false and misleading statements about the amount of money Cell>Point raised were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want to know accurate details concerning the amount of money that was raised.

103.     Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning the amount of money Cell>Point raised, Defendants misled investors about the capital available to Cell>Point to effectuate its business plan.

### C.      **False and Misleading Statements Regarding Manager Compensation**

104.     Defendants also made false and misleading statements to investors that failed to disclose the substantial sums Cell>Point paid the Founders during the Relevant Period.

105.     During the Relevant Period, each Founder received approximately $33,000 per year in salary from Cell>Point, but also accrued millions in deferred compensation plus interest. In addition, each Founder also took substantial loans from Cell>Point against his respective deferred compensation. As a result of these loan payments, in total, Cell>Point paid the three Founders approximately $4.3 million from investor funds during the Relevant Period.

106.     Cell>Point's statements to investors about the Founders' compensation were misleading because they falsely communicated that the Founders had deferred any substantial personal payouts until the Company was successful.

107.     Each PPM dated between January 16, 2016 and June 1, 2020 stated in the Management Compensation section: "Since the formation of the Company in 2001, the

[Founders] have agreed to defer receipt of 96% of their contracted salaries until such time as the Company achieves sustained profitability and a significant cash infusion milestone."

108.    In addition, each PPM dated between November 1, 2016 and June 1, 2020 stated in the same section: "According to the [most recently completed financial statements] the deferred unremitted payroll against loans to officers was" a figure ranging from $6,558,172 in the November 1, 2016 PPM to $13,773,992 in the June 1, 2020 PPM.

109.    These PPM statements were false and misleading because in actuality each Manager accrued an annual salary of approximately $800,000 during the Relevant Period and Cell>Point owed the Founders a significant amount for deferred compensation that was not disclosed.

110.    As of December 31, 2019, Cell>Point's cumulative deferred compensation liability owed to the Founders since Cell>Point's inception, including interest, was $29.3 million -- more than twice the "deferred unremitted payroll against loans to officers" figure set forth in the PPMs.

111.    In addition, the PPM statements were false and misleading because, though omitted from Cell>Point disclosures, the Founders actively drew on their "deferred compensation" by taking substantial sums from the Company each year that were booked as loans.

112.    As of December 31, 2019, the cumulative amount of these "loans" that Cell>Point made to the Founders since its inception, including interest, was $14.7 million – substantially more than the "deferred unremitted payroll against loans to officers" figure disclosed in the PPMs.

113.     These loans accrue interest at the same rate as Cell>Point's deferred compensation obligation to the Founders. In addition, these loans become due upon a qualifying transaction by Cell>Point, which would also trigger Cell>Point's payment of deferred compensation to the Founders. As a result, the deferred compensation liability would net against the loan repayment obligation.

114.     The liability Cell>Point owes to its Founders for deferred compensation has priority over investor distributions. In essence, if Cell>Point sells or licenses Oncardia in a qualifying transaction, then the Founders would be paid at least $14.5 million before any distributions to investors. Combined with the priority obligation to the Founders for their returned units (totaling approximately $38.9 million), Cell>Point owed the Founders more than $53.4 million at the end of the Relevant Period, all of which has priority over the return of money to investors.

115.     Since Cell>Point has no regular source of cash other than investor funds, the money it paid to the Founders as compensation, loans against deferred compensation, or otherwise, came from investor funds.

116.     The approximately $4.3 million Cell>Point paid to the Founders during the Relevant Period represents more than 40% of investor funds Cell>Point obtained during that same time. Bank records during the Relevant Period show a consistent pattern of Cell>Point transferring investor funds to the Founders promptly after receiving them from investors.

117.     Cell>Point made millions in payments to the Founders despite its dire financial condition. Cell>Point had less than $25,000 in its bank accounts as of February 28, 2021.

118.     Each of the above disclosures and representations regarding the Founders'
compensation was false when made, and Defendants knew or were reckless in not knowing, and
should have known, that their statements concerning the Founders' compensation were false and
misleading, as Defendants each knew the amount of money they were owed by the Company, as
well as the amount of money they were taking from the Company despite its dire financial
situation.

119.     Defendants omitted to state material facts that were necessary to render their
disclosures and representations concerning the Founders' compensation not misleading. These
omissions include accurate information about the compensation and loans paid to the Founders.

120.     Defendants' false and misleading statements about the Founders' compensation
were material to investors making investment decisions because they substantially altered the
total mix of information. A reasonable investor would want accurate information about the
amounts of compensation received by the Founders, regardless of its form, as well as the
enormous liabilities Cell>Point accrued for the Founders' benefit that took priority over
payments to investors.

121.     Because of Defendants' false and misleading statements, and the material
information Defendants failed to disclose concerning the amount of money owed to and taken by
Cell>Point Founders, Defendants misled investors about the Founders' compensation.

D.     **False and Misleading Statements Regarding Potential Strategic Transactions**

122.     During the Relevant Period, Cell>Point has attempted to identify possible
strategic transactions that could result in a substantial cash infusion.

123.    Among other efforts, Cell>Point unsuccessfully sought funding from foreign license partners, unsuccessfully contracted with an investment bank to market Oncardia to strategic partners in the pharmaceutical industry, unsuccessfully sought venture capital investments, unsuccessfully pursued private equity investments, and attempted to form partnerships with others that never came to fruition.

124.    Greg Colip led these efforts and wrote the portions of Quarterly Reports that discussed them.

125.    Terry Colip was also actively involved in these efforts and wrote and distributed statements to investors. He also reviewed and distributed portions of Quarterly Reports written by Greg Colip.

126.    From 2019 to 2020, Cell>Point misrepresented the success of one such strategic transaction with a Houston-based Chinese citizen ("Chinese Businessman") and two different shell companies he controlled (both registered to addresses in suburban Houston strip malls).

127.    Since at least 2016, Cell>Point had attempted unsuccessfully to secure funding from various Chinese entities that the Chinese Businessman controlled.

128.    In November 2019, Chinese Entity 1 signed a subscription agreement to buy $15.4 million in Cell>Point units. This amount was significant, as it represented roughly a quarter of all funds Cell>Point previously raised from investors.

129.    In an Ad Hoc Update dated November 6, 2019 and sent to investors, Terry Colip announced that "Cell>Point completed a subscription agreement for $15.4 Million for 4.1% of Cell>Point. The use of funds will be limited to complete the Phase 2b and 3 Oncardia imaging

trials. The funding for the $15.4 Million came from an Asian Private Equity Fund." In the same communication, he offered additional Cell>Point units for sale.

130.    Cell>Point's Investor Decks dated November 2019, March 2020, and May 2020 added $15.4 million to the total capital raised by the Company and specifically highlighted this investment by an "Asian Private Equity Fund."

131.    Subsequent Quarterly Reports also highlighted this investment as follows:

a.    The report for Fourth Quarter 2019 stated: "Cell>Point signs $15.4 million equity purchase agreement funded by a large Asian PE Fund. . . . Cell>Point reaches preliminary terms to expand the $15.4 million investment" and "On November 1, 2019, Cell>Point signed the equity agreement for the funding. The $15.4 million . . . from [Chinese Entity 1] will be used to expedite the closing of the Phase 3 Oncardia imaging trials."

b.    The report for First Quarter 2020 stated:  "Cell>Point executed an equity purchase agreement with [Chinese Entity 1] in late Q4 2019 for the purchase of a 4.1% interest in Cell>Point for $15.4 million, pre-money valuation of $375.6 million. The equity purchase agreement was funded by [Asian Private Equity Fund 1]."

c.    The report for Second Quarter 2020 stated:  "As discussed in the last QR, the Covid-19 virus shut down funding out of China. The two equity purchases are now back on track. The first purchase, just over $15 million has been allocated and is awaiting approval from the China Foreign Currency Exchange to be released to the U.S."

132.    These statements were false and misleading because Cell>Point and the Chinese Businessman terminated the purported November 2019 subscription agreement between Cell>Point and Chinese Entity 1 in late November 2019.

133.     On November 22, 2019, Terry Colip emailed the investment bank Cell>Point had previously used to solicit strategic transactions, and stated that he met with Chinese Entity 1 and they "tore up" the November 1, 2019 subscription agreement.

134.     On November 26, 2019, Greg Colip had a telephone call with the investment bank and stated the signed November 1, 2019 agreement was not a consummated transaction. Rather, it was "structured as a sample agreement, so that the party on the other side could understand what one arm of the contract would look like, so we signed it up and sent it to them. . . . That has not been consummated."

135.     In August 2020, Cell>Point and Chinese Entity 2, also controlled by the Chinese Businessman, signed an agreement for a $15 million investment in Cell>Point, which Cell>Point also then announced to investors, without providing any information about termination of the first purported deal. No equity purchase agreement between Cell>Point and the Chinese Businessman or any Chinese Entity for an equity purchase existed prior to August 2020.

136.     As of February 28, 2021, Cell>Point had received only approximately $1 million from the Chinese Businessman, most of which the Chinese Businessman and/or a Chinese Entity paid directly to a Cell>Point vendor without passing through Cell>Point's bank accounts. Cell>Point received no additional funds from any deal with the Chinese Businessman during the Relevant Period.

137.     Each of the above disclosures and representations regarding purported transactions with the Chinese Businessman was false and misleading when made and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the purported transactions with the Chinese Businessman were false and misleading, as

Defendants each knew that (a) the November 2019 subscription agreement between Cell>Point and Chinese Entity 1 was terminated in late November 2019; and (b) that pursuant to the August 2020 agreement for a purported $15 million investment in Cell>Point, the Company received only approximately $1 million from the Chinese Businessman, most of which the Chinese Businessman and/or a Chinese Entity paid directly to a Cell>Point vendor.

138.    Defendants omitted to state material facts that were necessary to render their disclosures and representations concerning purported transactions with the Chinese Businessman not misleading. These omissions include the facts that Cell>Point had terminated the agreement and had never received the funds.

139.    Defendants' false and misleading statements between November 2019 and August 2020 concerning purported transactions with the Chinese Businessman were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about strategic transactions and substantial fundraising that, according to Cell>Point's statements, would fund the completion of the clinical trials and lead to investor returns.

140.    Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning the agreements actually entered into between Cell>Point and the Chinese Businessman, Defendants misled investors about the purported transactions with the Chinese Businessman.

### E.    **Defendants are Each Liable for Their Misstatements and Omissions.**

141.    All of the misrepresentations and omissions detailed above were made in connection with the offer, purchase, or sale of securities issued by Cell>Point.

142.    Greg Colip and Terry Colip each made or directed each misrepresentation and omission detailed above.

143.    Both Greg Colip and Terry Colip determined the content of and had ultimate authority over the PPMs, as well as the Investor Decks, Quarterly Reports, and Ad Hoc Updates used to solicit prospective investors.

144.    Throughout the Relevant Period, Greg Colip and Terry Colip were acting within the scope of their apparent authority to make representations on behalf of Cell>Point, and did in fact make representations described above on behalf of Cell>Point.

145.    The scienter of Greg Colip and Terry Colip is imputed to Cell>Point.

**F.      Cell>Point, Greg Colip, and Terry Colip Obtained Money or Property From Their Misconduct.**

146.    Defendants each obtained money by means of the misrepresentations and omissions detailed above.

147.    During the Relevant Period, Cell>Point received approximately $10 million in funds from investors from the sale of units and notes.

148.    Terry Colip and Greg Colip received compensation and loans against deferred compensation, both of which were entirely funded by investor capital.

**III.     Defendants Engaged in Deceptive Conduct to Conceal Their Fraud From Investors.**

149.    In addition to creating and disseminating the false and misleading statements identified above, Defendants engaged in other deceptive conduct. After fraudulently inducing investors to fund Cell>Point, Defendants engaged in deceptive acts to prevent investors and investigators from discovering the truth about Cell>Point's fraud.

150.    Terry Colip and Greg Colip wrote, reviewed, and/or disseminated the false and misleading statements described above to current investors. These statements were designed to lull them into believing that Cell>Point was successfully advancing development of Oncardia.

151.    In addition, Terry Colip sent numerous emails and made oral statements to investors that made other false or misleading lulling statements, including, for example:

        a.      an April 2019 statement by Terry Colip to an investor, that the investor circulated to multiple additional investors, stating that "cancer imaging is 2/3 done and 'knocking it out of the park'";

        b.      a March 2020 email from Terry Colip to another investor, that the investor distributed to multiple other investors, stating: "We have wonderful technology with Oncardia and we are meeting our phase 3 clinical trial endpoints"; and

        c.      a recorded August 2020 call with a longtime investor group during which Terry Colip described good progress imaging patients and projected filing for FDA approval within six months.

152.    Terry Colip made false and misleading statements to at least three investors with the knowledge and expectation that they would disseminate the false and misleading statements in connection with soliciting investments in Cell>Point.

153.    On at least two occasions, Terry Colip instructed investors to disregard Cell>Point's audited financial statements as meaningless for a pre-revenue company like Cell>Point, and instead encouraged the investors to focus on Cell>Point's (falsely represented) clinical trials and intellectual property, including, for example:

a.      a March 2019 email to a longtime investor who asked for financial statement information stating "[i]n terms of P&L and B/S it would not tell you much. As with any biotech we are using every dollar of cash to push trials while we sell Oncardia"; and

b.      a July 2019 email to an investor responding to his accountant's concerns about Cell>Point's financial condition stating "[t]he value of pre-revenue biotech is three things. (1) technology, (2) patent life and (3) where you are in clinical trials. On those three value points we are doing well."

## IV.  Greg Colip Aided and Abetted Cell>Point's and Terry Colip's Fraud.

154.    As described above, Greg Colip acted knowingly, or recklessly, and negligently in making false and misleading statements to current and prospective Cell>Point investors and engaged in deceptive acts.

155.    Greg Colip also aided and abetted Cell>Point's and/or Terry Colip's making of false and misleading statements to investors and deceptive acts by providing substantial assistance through the conduct described above.

## FIRST CLAIM FOR RELIEF

### Fraud—Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
(Against All Defendants)

156.    The SEC realleges and incorporates by reference paragraphs 1 to 155 as though fully set forth herein.

157.    By virtue of the foregoing, from no later than 2016 through at least February 2021, Cell>Point, Greg Colip, and Terry Colip, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a

national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon another person.

158.     By reason of the conduct described above, Cell>Point, Greg Colip, and Terry Colip, directly or indirectly, violated, and unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

**Fraud—Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Cell>Point's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Alternatively, against Greg Colip and Terry Colip)**

159.     The SEC realleges and incorporates by reference paragraphs 1 to 155, as though fully set forth herein.

160.     By virtue of the foregoing, from no later than 2016 through at least February 2021, Greg Colip and Terry Colip exercised control over Cell>Point, which, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

161.    Accordingly, Greg Colip and Terry Colip are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Cell>Point's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Fraud—Aiding and Abetting Cell>Point's and Terry Colip's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Alternatively, against Greg Colip)**

162.    The SEC realleges and incorporates by reference paragraphs 1 to 155, as though fully set forth herein.

163.    By virtue of the foregoing, from no later than 2016 through at least February 2021, Greg Colip provided knowing and substantial assistance to Cell>Point and to Terry Colip, who, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

164.    Accordingly, Greg Colip aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities—Violations of Securities Act Section 17(a)
[15 U.S.C. § 77q(a)]
(Against All Defendants)**

165.    The SEC realleges and incorporates by reference paragraphs 1 to 155, as though fully set forth herein.

166.    By virtue of the foregoing, Cell>Point, Greg Colip, and Terry Colip from no later than 2016 through at least February 2021, have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

167.    Accordingly, Cell>Point, Greg Colip, and Terry Colip violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities—Aiding and Abetting Cell>Point's and Terry Colip's Violations of Securities Act Section 17(a)**
**[15 U.S.C. § 77q(a)]**
**(Alternatively, against Greg Colip)**

168.    The SEC realleges and incorporates by reference paragraphs 1 to 155, as though fully set forth herein.

169.    By virtue of the foregoing, from at least 2016 through at least February 2021, Greg Colip provided knowing and substantial assistance to Cell>Point and to Terry Colip, who, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

170.    Accordingly, Greg Colip aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## RELIEF SOUGHT

**WHEREFORE**, the SEC respectfully requests that this Court:

## I.

Find that each of the Defendants committed the violations alleged in this Complaint;

**II.**

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

**III.**

Order that Terry Colip and Greg Colip be permanently prohibited from acting as an officer or director of any public company;

**IV.**

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint, plus post-judgment interest;

**V.**

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], in an amount to be determined by the Court, plus post-judgment interest;

**VII.**

Grant such other relief as this Court may deem just or appropriate.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted this 10th day of June 2021.

By:    s/ Polly Atkinson_____
Polly Atkinson
Mark L. Williams
Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
Denver Regional Office
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000