IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-01574-PAB-KLM

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

CELL>POINT, LLC,
GREG COLIP, and
TERRY COLIP,

Defendants.

---

## ORDER

---

This matter is before the Court on that portion of Plaintiff's Omnibus Motion for Expedited Discovery and Emergency Consideration thereof; Motion for Preliminary Injunction, Asset Freeze, and Other Preliminary Relief; and Motion to Exceed Page Limitations that seeks a preliminary injunction [Docket No. 45]. The Court held a hearing on plaintiff's motion on January 25, 2022. [1]  See Docket No. 89. The Court has jurisdiction over this action pursuant to 15 U.S.C. § 77v(a), 15 U.S.C. § 77t(d), and 15 U.S.C. § 78u(d).

On June 10, 2021, the Securities and Exchange Commission (the "SEC") filed this lawsuit against defendants Cell>Point, L.L.C. ("Cell>Point"), Terry Colip, and Greg

---

[1] The exhibits referenced in this order were admitted at the hearing. *See* Docket No. 89. Exhibits labeled with an A are defendants' exhibits.

Colip, bringing claims for fraud against all defendants in violation of Sections 10(b) and 20(a) of 15 U.S.C. § 78j(b) (the "Exchange Act"), for aiding and abetting violations of the Exchange Act against the individual defendants, for fraud in the offer or sale of securities in violation of Section 17(a) of 15 U.S.C. § 77q(a) (the "Securities Act") against all defendants, and for aiding and abetting violations of the Securities Act against the individual defendants.  Docket No. 1 at 38-42, ¶¶ 156-170.  Plaintiff requests a permanent injunction enjoining defendants from violating securities laws, an order prohibiting the individual defendants from acting as director or officer of any public company, an order that defendants disgorge any ill-gotten gains, and an order that defendants pay civil penalties.  *Id.* at 43.

Plaintiff filed a motion for preliminary injunction pursuant to Fed. R. Civ. P. 65 requesting: (i) that defendants be enjoined from violating the Securities Act and the Exchange Act, (ii) an asset freeze against each defendant, (iii) an order requiring repatriation of assets moved outside the jurisdiction of the Court since the matter was filed, and (iv) an order requiring the defendants to provide an accounting.  Docket No. 45 at 9-10.  Plaintiff's motion also requested that the parties be allowed to conduct limited discovery in advance of a hearing on the preliminary injunction motion.  *Id.* at 6-7.  The Court granted the portion of plaintiff's motion requesting expedited discovery.  *See* Docket No. 54.

## I.  FINDINGS OF FACT

Defendant Cell>Point is a biotech company that was formed in 2001.  Exh. A-2 at 2.  Defendant Terry Colip is a managing member and the chief financial officer of Cell>Point.  Greg Colip is a managing member and the chief executive officer of

2

Cell>Point.  He is also an attorney licensed to practice in the state of Texas.  The only employees of Cell>Point are Terry Colip and Greg Colip as well as a part time accountant.  Docket No. 1 at 7, ¶ 24.[2]  Cell>Point has licensed from the Board of Regents of The University of Texas System on behalf of M.D. Andersen Cancer Center the rights to five platform technologies.  Exh. A-4 at 1.  Cell>Point entered phase two clinical trials of a radiopharmaceutical compound for clinical oncology, but stopped clinical trials in 2014 and has not resumed them.

Greg Colip formed Cell Theranostics, Inc., a Delaware corporation, in 2021.  Exh. A-25.  Cell>Point owns Cell Theranostics, Inc.  Cell>Point granted sublicenses of its platform technologies to Cell Theranostics, Inc. and assigned all the obligations that Cell>Point was under to Cell Theranostics, Inc. regarding the licenses on May 20, 2021.  Exh. A-28 at 1-3.  The sublicense agreement states that, "[b]ecause it is difficult to take a limited liability company public and since Cell>Point is a limited liability company, the decision was made by the management to form a 'C' corporation" which was Cell Theranostics, Inc.  *Id*. at 2.  On May 14, 2021, Terry Colip and Greg Colip formed Cell Theranostics, Ltd., a Cayman Island entity.  Exh. A-30.  Terry Colip represented to Cell>Point investors that Cell Theranostics, Inc. would be the entity that went public several times.  *See* Exh. 37 at 2; Exh. 15 at 3-4.

Cell>Point has no assets outside of its licenses, patents, and a 75% ownership in a biopharmaceutical company.  Exh. A-4 at 1-3.  Cell>Point has no revenue and no

---

[2] The facts in this section that are drawn from plaintiff's complaint, Docket No. 1, and are uncontested by defendants in their answer.  *See* Docket No. 44**.**

money coming in other than the loans it solicits and merchant advances it receives. Neither Cell Theranostics, Inc., Cell Theranostics, Ltd., nor Cell>Point has earned positive net revenue in any year.  Cell>Point sells equity to investors in the form of "units" in the company, receives loans from investors, and takes out merchant advances to operate.  Merchant advances provide cash in exchange for a promise of future receivables at a high interest rate.  For example, Cell Theranostics, Inc., doing business as Cell>Point, entered into a merchant advance on December 10, 2021 borrowing $25,000 for forty days resulting in a total of $36,250 to be paid back, for an effective interest rate of 45%.  Exh. 56.  On January 13, 2022, Terry Colip entered into an agreement on behalf of Cell Theranostics, Inc. to try to resolve outstanding debt on four merchant agreements that totaled $88,385.  Exh. 55 at 1-7.

Terry Colip has solicited several loans from investors, acting in his capacity as a representative of Cell>Point, sometimes stating that Cell>Point needed the funding to prepare for an imminent initial public offering.  These loans are often sold as investments in Cell>Point through units, which are membership interests, or through notes.  Docket No. 1 at 9, ¶ 35.

## A. <u>Young Loan in June 2021</u>

On June 23, 2021, Terry Colip sent an email to a Cell>Point investor, David Young, asking Mr. Young if he was interested in making "a short term loan of $70,000 to $100,000."  Exh. 23 at 3.  He further stated the loan would reach maturity on July 7, 2021 and that it "would pay 10% plus units."  *Id.*  Mr. Young responded that he was "curious about what . . . requires such a loan.  As I recall the previous loan was to satisfy attorney fees for the IPO.  Are they asking for more . . . ?"  *Id.*  Terry Colip

responded that "Cell Theranostics[] is working on a $20 Million pre-IPO investment with the CITIC Group. [3]  The $20 Million got allocated by CITIC, and now we are working on the paperwork.  This is the linchpin for the IPO."  *Id.* at 2.  Terry Colip also stated that "[t]he attorneys are billing me every two weeks and I don't want to slow them down."  *Id.*  Mr. Young then agreed to have Terry Colip send him the loan paperwork.  *Id.* at 1-2.  In a subsequent email, Terry Colip stated, "[b]y [] the time the IPO is completed I am guessing we will spend over $4 Million in legal fees."  *Id.* at 1.  Mr. Young loaned Cell Theranostics, Inc. $100,000 on June 23, 2021.  Exh. 22 at 1.  This loan was to be paid by July 9, 2021 with $110,000 and 400 units in Cell>Point.[4]  *Id.*

When Terry Colip emailed Mr. Young, Cell>Point had not retained outside counsel for an initial public offering and Cell>Point had not been billed for any IPO work.[5]  At that time, Cell>Point was only paying legal fees to the law firm Mayer Brown for its representation in this case and legal fees to another firm for matters unrelated to

---

[3] Plaintiff alleges that "[the] CITIC [Group] is a state-owned investment company of the People's Republic of China."  Docket No. 45 at 15 n.5.

[4] This loan was in default from July 9, 2021 through January 7, 2022.  Exh. 91.  At that time, Mr. Young extended his loan to February 10, 2022 on the condition that an additional $30,000 be paid at maturity of the loan for a total of $140,000.  *Id.*

[5] In response to an interrogatory, Cell>Point stated that one bill from Mayer Brown for $100,000 was for this action and for work on a "potential IPO."  Exh. 80 at 4.  In response to a subpoena, Mayer Brown stated it did not have any records of billing Cell>Point, Cell Theranostics, Inc., or Cell Theranostics, Ltd. for any work on a "contemplated, potential, completed, or actual Initial Public Offering."  Exh. 11 at 1-2. The Court does not find Cell>Point's assertion that the Mayer Brown's bill for work on this case also included work on an imminent IPO to be credible.

an IPO.  *See* Exh. 80 at 4.  Cell>Point could not use a loan from Mr. Young for IPO filing

fees as it did not have attorneys working on an IPO.  In response to a SEC request for

admission, Cell>Point admitted "that a portion of certain funds loaned by David Young

were used for purposes other than to pay attorneys working on the forthcoming IPO."

Exh. 80 at 6.  Additionally, Greg Colip testified at the hearing that in June of 2021 he

had not had any written communications with the CITIC Group.  In response to an

interrogatory asking for contact information for any "individuals who have communicated

to [y]ou that they, or entities they represent, are interested in being part of, or investing

in, [y]our purported forthcoming Initial Public Offering," including persons from the

"CITIC Group," *id.* at 3, Cell>Point did not disclose any contacts from persons from the

CITIC Group.  *Id.*; Exh. 81 at 1.  Greg Colip had not directly communicated with the

CITIC Group at the time Terry Colip emailed Mr. Young.

   **B.  Lockton Loan in June 2021**

      On June 16, 2021, Terry Colip emailed a potential Cell>Point investor, Steve

Lockton, stating that Cell Theranostics, Ltd. "came to terms with the CITIC Group for a

$20 Million pre-IPO investment in Cell Theranostics, Ltd." and that "[a]s part of the deal

CITIC is going to co-manage the IPO."  Exh. 13 at 2.  Additionally, Terry Colip stated

that "legal counsel [was] drafting the IPO doc[uments]."  *Id.*  Terry Colip solicited an

investment from Mr. Lockton the next day asking if he was "interested in the Cell

Theranostic[s], Ltd. shares."  *Id.*  Mr. Lockton stated that he would like to purchase

shares of Cell Theranostics, Ltd.  *Id.* at 1.  On June 18, 2021, Mr. Lockton loaned

defendants $200,000.  Exh. 12.  This loan was converted into an investment.[6]

Cell>Point did not have counsel preparing any IPO documents as of the time Terry Colip told Mr. Lockton that "legal counsel [was] drafting the doc[uments]."  Exh. 13 at 2.  Greg Colip, acting as in house legal counsel, had compiled internal documents in preparation for an IPO, but had not drafted any legal documents.  In response to an SEC interrogatory, Cell>Point admitted it had "not finalized any agreement to engage in an Initial Public Offering with any Chinese . . . entity or company."  Exh. 80 at 5.  Terry Colip made these representations to Mr. Lockton regarding Cell>Point's progress towards an IPO immediately before he asked if Mr. Lockton would like to purchase shares in Cell Theranostics, Inc.

### C.  Doran Solicitations in 2021

Barbara Doran is an investor in Cell>Point.  She is the chief investment officer and CEO of a wealth advisory and asset management firm.  She invested $50,000 in Cell>Point in February 2018.  On October 8, 2019, Terry Colip told Ms. Doran in an email that an "Asian fund, Zhong Cai Jing Fund, received approval from their investment committee, to fund their first investment in Cell>Point.  The first investment will be $15 Million."  Exh. 14 at 1.

Terry Colip solicited a loan from Ms. Doran by email on September 27, 2021, stating that Cell>Point was "looking for a short term loan" of $250,000.  Exh. 15 at 3-4.

---

[6] Steve Lockton stated that he wanted to purchase shares.  Exh. 13 at 1.  Terry Colip testified that Mr. Lockton's initial loan was converted to units and shares based on Mr. Lockton's intentions.

He stated that defendants "have six funds that are working on terms for a $25 Million crossover round investment []one . . . providing us terms later this week." *Id.* at 3. He then stated that he "ha[d] a call . . . to work out a [sic] engagement agreement with CITIC Securities." *Id.* Ms. Doran responded, "[w]hat is the $250k for?" *Id.* at 2. Terry Colip stated, for "[l]egal fees to complete the IPO filings." *Id.* Ms. Doran then asked what law firm needed the fees, since that was "[n]ot usual behavior." *Id.* at 1. Terry Colip responded with an email that said, "Mayor [sic] Brown. Ten years ago it would not have been usual behavior. I am finding it typical behavior today." *Id.* Ms. Doran decided not to provide a loan.

In September 2021, defendants still had not received bills for IPO work from any lawyers. *See* Exh. 80 at 4. Terry Colip did not tell Ms. Doran that Cell>Point owed no legal fees to Mayer Brown for IPO work. Terry Colip did not disclose to Ms. Doran that there was no drafted proposal from the Zhong Cai Jing Fund in October 2019 for $15,000,000, nor did he disclose that Cell>Point had not had any direct contact with the CITIC Group. Terry Colip did not disclose that the loan to Mr. Young was in default at this time.

### D.  Dewhirst Solicitation in October 2021

Miles Dewhirst is an investor in Cell>Point. He invested $150,000 in 2019. His investment included 5,358 units. Exh. 39 at 5. On June 30, 2021, Terry Colip told Mr. Dewhirst that defendants were "working on the paperwork for the $20 Million pre-IPO investment by the CITIC Group. With that we will move forward and complete the filings for the IPO." Exh. 36 at 2. On September 3, 2021, Terry Colip emailed Mr. Dewhirst stating, "[w]e are in the process of an IPO led [b]y UBS and CITIC Securities" and "Cell

Theranostics, Inc. will be the entity going public and our bankers are looking to price the offering at $550 million market cap or higher."  Exh. 37 at 2.  On October 20, 2021, Terry Colip sent Mr. Dewhirst an email soliciting a $250,000 loan for a three-month term that would pay $275,000 at maturity.  Exh. 39 at 5.  The loan was secured by 50,000 warrants in Cell>Point priced at $5, that would be paid out when Cell Theranostics, Inc. went public.  *Id.* at 3-4.  Mr. Dewhirst asked if Mr. Colip had any concerns that the loan would not be paid at maturity.  *Id.* at 2.  Mr. Colip responded that the loan would "have a senior position" and that "[t]he only other loans to the company are from the founders."  *Id.*  Mr. Dewhirst did not loan money to Cell>Point based on that solicitation.  On December 3, 2021, Mr. Dewhirst asked if there was any hope of getting his investment back.  Exh. 46 at 9.  The next day he asked if the SEC's allegations in this case were true.  *Id.* at 8.  On December 5, 2021, Terry Colip told Mr. Dewhirst that "[o]ur counsel and D&O carrier" were working on a motion to dismiss in this case.  *Id.* at 2.

At the time of Terry Colip's representations to Mr. Dewhirst, Cell>Point did not have counsel retained for an IPO or any confirmation of an imminent investment. Additionally, when Terry Colip stated that Cell>Point only had outstanding loans to himself and Greg Colip, Cell>Point's loan from Mr. Young was in default.  Terry Colip did not disclose the existence of this loan to Mr. Dewhirst.  Terry Colip also testified he did not disclose to Mr. Dewhirst that Cell>Point had begun to take out merchant advances for cash when he solicited this loan.  Cell>Point did not have a directors and officers ("D&O") insurance carrier in October 2021.  Cell>Point had D&O insurance in 2016 and 2017, but as of the hearing no expenses for this action had been covered by D&O insurance.  Terry Colip admitted Cell>Point has not created any legal documents

for an IPO.  Terry Colip did not disclose to Mr. Dewhirst that Cell>Point had not drafted

any legal documents for an IPO.

## II. LEGAL STANDARD

A preliminary injunction is not meant to "remedy past harm but to protect plaintiffs

from irreparable injury that will surely result without [its] issuance" and "preserve the

relative positions of the parties until a trial on the merits can be held."  *Schrier v. Univ. of

Colo.*, 427 F.3d 1253, 1258, 1267 (10th Cir. 2005); *see also Hale v. Ashcroft*, 683 F.

Supp. 2d 1189, 1197 (D. Colo. 2009) ("injunctive relief can only be obtained for current

or prospective injury and cannot be conditioned on a past injury that has already been

remedied").  "[C]ourts generally will refuse to grant injunctive relief unless plaintiff

demonstrates that there is no adequate legal remedy."  Charles Alan Wright, et al., 11A

*Fed. Prac. & Proc. Civ.* § 2944 (3rd ed. 2021).

In order to obtain a preliminary injunction, a movant must show four elements:

"(1) he is likely to succeed on the merits of his claim; (2) he will suffer irreparable harm if

the injunction is denied; (3) his threatened injury outweighs the harm the grant of the

injunction will cause the opposing party; and (4) if issued, the injunction will not

adversely affect the public interest.  Because the grant of a preliminary injunction is an

extraordinary remedy, the movant must make a clear showing that he is entitled to the

injunction."  *S.E.C. v. Scoville*, 913 F.3d 1204, 1213 (10th Cir. 2019) (citations and

internal quotations omitted).

In cases involving SEC enforcement action, courts have reformulated the

traditional requirements (the "SEC test").  *See S.E.C. v. Unifund SAL,* 910 F.2d 1028,

1035-40 (2d Cir. 1990).  Courts have not required the SEC to show irreparable injury, *id.*

at 1036, but rather require the SEC to show that defendant's actions violate the defendant's statutory obligations.  *See S.E.C. v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *7 (S.D.N.Y. July 29, 2011) (citing *Unifund SAL,* 910 F.2d at 1035).  This showing is "analogous to the traditional likelihood of success standard regularly applied to private litigants."  *Id.* (citations and internal quotations omitted).  The burden of proof changes as the requested relief changes; the more the injunction would change the status quo, the stronger the showing must be.  *Id.*  For example, when the SEC seeks to prohibit future violations of securities laws, there must be a showing of two elements: (i) that a violation has occurred and (ii) a substantial showing that the violation is likely to occur again.  *Id.* at *10.  In contrast, when the relief sought is an asset freeze, the SEC does not need to show a likelihood that the violation will occur again because this injunctive relief maintains the status quo.  *Id.* at *11.

Courts in this circuit have applied the SEC test when the SEC seeks injunctive relief.  *See S.E.C. v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1296 (D. Utah 2017), *aff'd sub nom. S.E.C. v. Scoville*, 913 F.3d at 1204 ("When the SEC seeks a preliminary injunction pending trial, it must show a likelihood of prevailing on the merits and a reasonable likelihood that the wrong will be repeated."); *S.E.C. v. Curshen*, 372 F. App'x 872, 882 (10th Cir. 2010) (unpublished) (upholding the grant of a permanent injunction where the court found a violation of securities law and demonstrated a substantial likelihood of another violation); *S.E.C. v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) *S.E.C. v. Smart* ("*Smart I*"), 2011 WL 2297659, at *20 (D. Utah June 8, 2011), *aff'd S.E.C. v. Smart* ("*Smart II*"), 678 F.3d 850 (10th Cir. 2012) (using the violation and future violation test to grant a permanent injunction at the summary

11

judgment stage); *S.E.C. v. Shields*, No. 11-cv-02121-REB, 2011 WL 3799061, at *1 (D.

Colo. Aug. 26, 2011) (requiring a showing of a violation and a likelihood of a future

violation for a temporary restraining order); *S.E.C. v. Art Intellect, Inc.*, 2013 WL

840048, at *21 (D. Utah Mar. 6, 2013) (using the SEC test for a permanent injunction).

Accordingly, this Court will apply the SEC test.[7]

      Under the SEC test, enjoining future violations of securities laws requires a

substantial showing of a likelihood of future violations.  *S.E.C. v. Aragon Capital*

*Advisors, LLC*, 2011 WL 3278642, *5-6 (S.D.N.Y. July 26, 2011).  Accordingly, plaintiff

must make a showing that violations have occurred and a substantial showing that

violations will occur in the future in order to obtain injunctive relief.

## III. ANALYSIS

### A. <u>Past Violations</u>

#### 1. Elements

      In order to show a violation of section 10(b) of the Exchange Act and section

17(a)(1) of the Securities Act, "the SEC must prove that [defendants] made: (1) a

misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection

---

[7] Even if the Court were to use the traditional test the outcome would be the same.  The Court would find that continued violations of securities laws constitute irreparable harm to investors, that the balance of the equities tips in plaintiff's favor given the need to protect future investors, and that a prohibition on future violations will not adversely affect the public interest.  In addition, to the extent a prohibition on future violations constitutes a change to the status quo that results in a disfavored injunction requiring "a strong showing" on the merits and balance of the harms, *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc), *aff'd on other grounds*, *Gonzales v. O Centro Espirita Beneficente Unaio Do Vegetal*, 546 U.S. 418 (2006), the Court would find plaintiff has made a strong showing on the merits of its claim sufficient to grant the injunction.

with the purchase or sale of securities, and (5) by means of interstate commerce."
*Smart II*, 678 F. 3d at 856 (citation, quotation, and brackets omitted).  The requirements
under §§ 17(a)(2) and (3) are almost the same; the primary "difference between § 17(a)
and § 10(b) lies in the element of scienter."  *Id.* at 857.  "Section 10(b) and § 17(a)(1)
require the SEC to establish at least recklessness, whereas negligence is sufficient for
§ 17(a)(2) and § 17(a)(3)."  *Id.* (citing *SEC v. Wolfson*, 539 F.3d 1249, 1256-57 (10th
Cir. 2008); *C.E. Carlson, Inc. v. S.E.C.,* 859 F.2d 1429, 1435 (10th Cir. 1988)).
Defendants do not contest whether the SEC has satisfied the fourth and fifth elements,
and for the reasons below, the Court finds they are not at issue.

The fourth element, requiring that a misstatement be made in connection with the
purchase or sale of a security, "should be construed flexibly, not technically and
restrictively."  *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002).  "[A]n instrument
denominated a 'note' . . . is presumed to be a 'security,' and that presumption may be
rebutted" by a showing that the note resembles a different category of instrument.
*Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990).  Additionally, securities include
investment contracts.  *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1090
(10th Cir. 2020).  An investment contract has "three parts: '(1) an investment, (2) in a
common enterprise, (3) with a reasonable expectation of profits to be derived from the
entrepreneurial or managerial efforts of others.'"  *Id.* (quoting *Scoville*, 913 F.3d at
1220).  Defendants offered membership interests and shares with the expectation that
profits would be disbursed after an initial public offering.  The Court is satisfied that
defendants' offerings of shares and membership interests are investment contracts.

Additionally, where defendants offered loans in the form of notes, the Court is satisfied the presumption that notes are securities has not been rebutted.

The fourth element also requires that the misstatement be made in connection with the sale of a security.  This "require[s] a causal connection between the allegedly deceptive act or omission and the alleged injury."  *Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir. 1996) (ruling that misstatements made after a sale could not meet this requirement).  The misstatements plaintiff proved at the hearing that did not result in the sale of a security cannot satisfy this element, but are considered here as evidence of scienter and future violations.  For instance, Ms. Doran and Mr. Dewhirst declined to loan defendants money or to purchase securities after defendants made misstatements and so these instances do not satisfy this element.  Plaintiff, however, demonstrated that Mr. Lockton and Mr. Young purchased securities immediately after Terry Colip made misrepresentations to them.  Mr. Young entered into an investment contract for units, expecting his loan to return a profit when an IPO happened.  Mr. Lockton invested directly in units by converting his loan into shares.  The Court is satisfied that where plaintiff has proved misstatements were made that resulted in a sale of membership interests or a note, this element is satisfied.

For the fifth element, use of the telephone and internet to sell securities can establish that interstate commerce was used.  *See Smart I*, 2011 WL 2297659 at *18 (ruling use of mails, the internet, and telephones sufficient to establish the element of interstate commerce).  Plaintiff introduced evidence defendants used email and phone calls to solicit investments.  The Court finds that the SEC has proved this element.

14

To demonstrate the first three elements, the SEC must show that defendants made material misstatements with scienter.  To demonstrate a misstatement or omission, "the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (quoting *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994)).  A statement or omission is material if a reasonable investor would consider it important in determining whether to buy or sell stock or a security.  *Id.* at 1119. Misrepresentations regarding the use of investor funds are material.  *Smart I*, 2011 WL 2297659, at *16.  Scienter has been defined as "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  The Tenth Circuit has ruled that "willful or reckless behavior satisfies the scienter requirement."  *Edward J. Mawod & Co. v. S.E.C.*, 591 F.2d 588, 596 (10th Cir. 1979).  Recklessness occurs "where the defendant had acted with reckless indifference []to a  . . . set of facts."  *Id.*

### 2. Incidents

#### a. Email to David Young on June 23, 2021

As noted in Section I.A. above, Terry Colip stated to Mr. Young that "Cell Theranostics[] is working on a $20 Million pre-IPO investment with the CITIC Group. The $20 Million got allocated by CITIC, and now we are working on the paperwork. This is the linchpin for the IPO."  Exh. 23 at 2.  Terry Colip also stated that "[t]he attorneys are billing me every two weeks and I don't want to slow them down."  *Id*. These were misstatements.  Terry Colip did not disclose that Cell>Point had no counsel working on an IPO.  First, Terry Colip misrepresented how Mr. Young's investment

would be used.  Terry Colip intentionally mislead Mr. Young by stating that Cell>Point

needed money for IPO lawyers when the only lawyers Cell>Point was paying were

lawyers working on this case.  This misstatement was material as it addressed how the

funds provided by Mr. Young would be used.  Second, Terry Colip misrepresented

Cell>Point's progress on an IPO.  Cell>Point had never directly communicated with the

CITIC Group and to represent that Cell>Point and the CITIC Group were at a stage of

negotiation involving paperwork was a misstatement.  Greg Colip and Terry Colip knew

that they did not have any reliable commitments for an investment at this time, but Terry

Colip still communicated that an investment was imminent to Mr. Young to secure a

loan.  This information would be material to a reasonable investor as it suggested the

future viability of Cell>Point.

### b. Emails to Steve Lockton June 2021

As noted in Section I.B. above, Terry Colip stated that Cell Theranostics, Ltd. had

come to terms "with the CITIC Group for a $20 Million pre-IPO investment in Cell

Theranostics, Ltd." and that Cell>Point's "legal counsel [was] drafting the IPO

doc[uments]."  Exh. 13 at 2.  These were misstatements because Cell>Point did not

have counsel and did not have any drafted IPO documents.  Terry Colip omitted the fact

that Cell>Point had never had direct contact with the CITIC Group.  This omission

related to the use of Mr. Lockton's funds as an investor and so it is material.  Moreover,

the omission was willful; the Court finds that Terry Colip knew Cell>Point had not

retained external legal counsel to work on the IPO at the time he made the statement to

Mr. Lockton about legal counsel drafting legal documents.  Terry Colip also intentionally

omitted the fact that no agreement with the CITIC Group existed.

Plaintiff has proved that, as to the two incidents discussed above, defendants made material misrepresentations and omissions with scienter.  Mr. Lockton and Mr. Young both purchased securities after the misrepresentations were made to them and therefore plaintiff has shown that these incidents were connected to the sale of a security.  The misrepresentations were made via email, a means of interstate commerce.  Accordingly, the Court finds that plaintiff has proved that defendants have violated the Securities Act and the Exchange Act.

**B.  Future Violations**

Plaintiff argues that an injunction is necessary to prevent future violations of security law.  Docket No. 45 at 28.  Determining the likelihood of future violations requires analysis of factors such as "the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations."  *S.E.C. v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).  Plaintiff argues that violations that occurred after the SEC's filing of this lawsuit on June 10, 2021 support a finding the violations are likely to continue.  As noted in Section III.A.2. above, defendants made misstatements after June 10, 2021 to Cell>Point investors.  These misstatements included (i) Terry Colip telling Ms. Doran Cell>Point needed money to pay lawyers at Mayer Brown when Cell>Point had not retained counsel to prepare an initial public offering; (ii) telling Mr. Dewhirst that Cell>Point was working on an initial public offering led by the CITIC Group when Cell>Point had not had direct contact with the CITIC Group; (iii) telling Mr. Dewhirst in October 2021 that Cell>Point did not have any outstanding loans to anyone but the

17

Colips when Mr. Young's loan to Cell>Point had not been repaid; and (iv) telling Mr. Dewhirst that Cell>Point had D&O insurance when it did not.  These misstatements, made after the filing of the lawsuit, demonstrate that, without further intervention, defendants are likely to continue to violate the law.  The Court also finds that Terry Colip acted intentionally.  Terry Colip testified that he did not make any misstatements, stating only that he could have been clearer in communications with investors.  The Court does not find this testimony credible.  Cell>Point has accumulated debt from merchant advances and loans from investors.  Terry Colip made misstatements as he solicited loans and investments knowing Cell>Point's financial status.  Given that Terry Colip did not admit at the hearing he has made misstatements, the Court finds that Terry Colip, acting on behalf of Cell>Point, refuses to "recognize[] his wrongful conduct." *Pros Int'l, Inc.*, 994 F.2d at 769.  Given that the Court finds that Greg Colip has acted in concert with Terry Colip and that the Colips are managing members of Cell>Point who are positioned to continue to commit violations, the Court finds that plaintiff has successfully made a substantial showing of a likelihood of future violations.

As plaintiff has carried its burden of proving that defendants violated the Securities Act and the Exchange Act and has made a substantial showing of a likelihood of future violations, the Court concludes plaintiff has met its burden to demonstrate that enjoining future violations is warranted.

### C. Additional Relief Requested

In addition to an order enjoining defendants from future violations of the

securities law, plaintiff requests an asset freeze.[8]  However, the Court finds that the

SEC has failed demonstrate the justification for an asset freeze.  Plaintiff argued that

defendants' ability to pay back investors who may have been defrauded should not

depend on defendants' ability to defraud more investors.  However, defendants do not

currently have any significant assets that could be frozen.  Cell>Point's only apparent

assets are licenses for patents that do not generate revenue.  Instead, plaintiff has

shown that defendants have significant debts on outstanding loans and merchant

advances.  While the standard required for an asset freeze is less than that of other

injunctive relief, "[t]he essence of equity jurisdiction has been the power of the

Chancellor to do equity and to mould each decree to the necessities of the particular

case."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  Finding no necessity for an

asset freeze in this case, the Court will decline to grant one.

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that the portion of Plaintiff's Omnibus Motion for Expedited Discovery

---

[8] Plaintiff's sample order contains several additional requests including leave to file a notice of *lis pendens* on property Cell>Point owns**,** an accounting, and a repatriation of any assets defendants have removed from the Court's jurisdiction.  *See* Docket No. 91 at 3-6.  Plaintiff did not request this relief at the hearing.  The Court will decline to consider the request for leave to file a notice of *lis pendens* because defendants had no opportunity to respond to this request as it did not appear in plaintiff's briefing.  The Court will deny plaintiff's request for an accounting as plaintiff has not demonstrated why this is necessary at this stage of the case, especially given the discovery that has already taken place.  The Court will decline to order a repatriation of assets because plaintiff has not shown any tangible assets, outside of Cell>Point's sublicenses to Cell Theranostics, Ltd., that have been moved abroad.

and Emergency Consideration thereof; Motion for Preliminary Injunction, Asset Freeze, and Other Preliminary Relief; and Motion to Exceed Page Limitations [Docket No. 45] seeking preliminary injunction is **GRANTED** in part and **DENIED** in part.  It is further

      **ORDERED** that, pending further action by this Court, defendant Cell>Point, L.L.C. and its subsidiaries, including, but not limited to, Cell Theranostics, Inc. and Cell Theranostics, Ltd.; defendant Terry A. Colip; and defendant Greg R. Colip (collectively, "Defendants") and their agents, servants, employees, attorneys, and those persons in active concert or participation with any of them, who receive actual notice of this Order, by personal service or otherwise, and each of them, are enjoined from, directly or indirectly, in connection with the purchase or sale of any security, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

      A.  Employing any device, scheme, or artifice to defraud;

      B.  Making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      C.  Engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. It is further

      **ORDERED** that, pending further action by this Court, defendant Cell>Point, L.L.C. and its subsidiaries, including, but not limited to, Cell Theranostics, Inc. and Cell Theranostics, Ltd.; defendant Terry A. Colip; and defendant Greg R. Colip; and their

agents, servants, employees, attorneys, and those persons in active concert or participation with any of them, who receive actual notice of this Order, by personal service or otherwise, and each of them, are enjoined from, directly or indirectly, in the offer or sale of any securities, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails:

A.  Employing any device, scheme, or artifice to defraud;

B.  Obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

C.  Engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).  It is further

**ORDERED** that Defendants' Unopposed Motion for Leave to Exceed Page Limitations in Their Response to Plaintiff's "Omnibus Motion" [Docket No. 57] is **GRANTED**.  It is further

**ORDERED** that Defendants' Motion for Leave to Substitute for Exhibit 2 (Docket No. 56-2) to their Response to Plaintiff's Omnibus Motion [Docket No. 58] is **GRANTED**. It is further

**ORDERED** that Plaintiff's Unopposed Motion to Exceed Page Limitations in it

Reply in Support of its Motion for Preliminary Injunction [Docket No. 67] is **GRANTED**.


DATED February 14, 2022.

BY THE COURT:

Philip A. Brimmer
Chief United States District Judge