IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-01574-PAB-KLM

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

CELL>POINT, LLC,
GREG COLIP, and
TERRY COLIP,

     Defendants.

---

## ORDER

This matter is before the Court on Plaintiff's Emergency Motion for an Order to Show Cause Why Defendants Should Not be Held in Civil Contempt [Docket No. 107], which plaintiff United States Securities and Exchange Commission (the "SEC") filed on May 9, 2022.  The Court ordered defendants to show cause why they should not be held in civil contempt based on the allegations in the SEC's motion and held a hearing on the motion on May 18, 2022.  Docket No. 111 at 3; Docket No. 127.  The Court has jurisdiction over this action pursuant to 15 U.S.C. § 77v(a), 15 U.S.C. § 77t(d), and 15 U.S.C. § 78u(d).

On June 10, 2021, the SEC filed this lawsuit against defendants Cell>Point, L.L.C. ("Cell>Point"), Greg Colip, and Terry Colip, bringing claims against all defendants for fraud under Sections 10(b) and 20(a) of the "Exchange Act," 15 U.S.C. § 78j(b), against the individual defendants for aiding and abetting violations of the Exchange Act,

against all defendants for fraud in the offer or sale of securities under Section 17(a) of the "Securities Act," 15 U.S.C. § 77q(a), and against the individual defendants for aiding and abetting violations of the Securities Act.  Docket No. 1 at 38-42, ¶¶ 156-170.

On November 24, 2021, the SEC filed a motion seeking a preliminary injunction against defendants.  Docket No. 45 at 13.  The Court held a hearing on the SEC's motion on January 25, 2022.  Docket No. 89.  On February 14, 2022, the Court entered a preliminary injunction enjoining defendants from violating securities laws.  Docket No. 93 at 19-22.  The Court found that Cell>Point is a biotech company that is developing a radiopharmaceutical compound for clinical oncology.  *Id.* at 2-3.  Defendant Greg Colip is the chief executive officer of Cell>Point, and defendant Terry Colip is the chief financial officer of Cell>Point.  *Id.*  Cell Theranostics, Inc. and Cell Theranostics, Ltd. are subsidiaries of Cell>Point.  *Id.* at 3.

The Court found that Terry Colip made material misstatements to two Cell>Point investors in June 2021 in violation of the Securities and Exchange Acts.  *Id.* at 15-17. Terry Colip told the investors that capital investments in Cell>Point were imminent when he and Greg Colip knew that no reliable commitments to invest capital in Cell>Point had been made.  *Id.* at 16.  Terry Colip represented to them that defendants had insurance to cover expenses related to this litigation, but defendants have not had directors and officers ("D&O") insurance since 2017.  *Id.* at 9.  Additionally, the Court found that Cell>Point has not conducted clinical trials since 2014.  *Id.* at 3.

As a result of finding that the SEC met its burden of showing its entitlement to a preliminary injunction, the Court ordered that

defendant Cell>Point, L.L.C. and its subsidiaries, including, but not limited

2

to, Cell Theranostics, Inc. and Cell Theranostics, Ltd.; defendant Terry A. Colip; and defendant Greg R. Colip (collectively, "Defendants") . . . are enjoined from, directly or indirectly, in connection with the purchase or sale of any security, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange: A. Employing any device, scheme, or artifice to defraud; B. Making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or C. Engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

*Id.* at 20.  The Court also enjoined defendants, Cell Theranostics, Inc. and Cell Theranostics, Ltd. from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

*Id.* at 20-21.

## I.  FINDINGS OF FACT

The Court held an evidentiary hearing on the SEC's motion for an order to show cause on May 18, 2022.[1]  Docket No. 127.  At the hearing, the Court heard the testimony of the SEC witnesses Rehan Chaudhri, from Altan Capital, Jordan Bonicelli, and Wayne Wong.  Based upon this testimony and upon the exhibits admitted, the Court makes the following findings of facts:

On November 5, 2021, Terry Colip applied for a $500,000 loan from the Small Business Administration (the "SBA") on behalf of Cell>Point.  Ex. 5 at 1.  The SBA notified Terry Colip that the SBA approved Cell>Point's loan on December 1, 2021.  Ex.

---

[1] The exhibits referenced in this order were admitted at the hearing.  *See* Docket No. 127.  Exhibits labeled with numbers are plaintiff's exhibits, while exhibits labeled with letters are defendants' exhibits.

3

9 at 3.  SBA records indicate that Terry Colip provided the wrong bank account information on his original loan, causing a delay in the disbursement of the loan.  Ex. B at 1.  After correcting the bank information in December, Terry Colip contacted the SBA thirty-four times between January 2022 and April 26, 2022 to inquire about disbursement of the loan.  *Id*.  However, the SBA placed a hold on the funds on January 6, 2022 based on "[p]ending [l]itigation."  *Id*. at 13.  The SBA did not inform Terry Colip of the hold.  *See id.* at 1-13.  Terry Colip called the SBA on March 15, 2022 and March 16, 2022.  Exs. 15, 16.  In his call on March 15, the SBA representative told Terry Colip that Cell>Point's application did not have an "estimated time frame."  Ex. 15 at 2.  In Terry Colip's call on March 16th, the SBA representative did not tell Terry Colip when he could expect the SBA loan and instead informed Terry Colip that the bank information was still listed incorrectly.  *See* Ex. 16 at 4.  At the time of the hearing, Cell>Point had not received the SBA loan.

Jordan Bonicelli is an investor in Cell Theranostics.  On January 26, 2022, Mr. Bonicelli loaned Cell>Point $200,000 that required Cell>Point to repay the loan by February 15, 2022 with 10% annual interest and 50,000 shares in Cell Theranostics, Ltd.  Ex. 9 at 1.  The loan was "secured" by the SBA loan Cell>Point was to receive.  *Id*.  Mr. Bonicelli expected that the biggest benefit he would receive from the loan would come from the shares in Cell Theranostics.  Mr. Bonicelli's loan to Cell>Point was in default at the time of the show cause hearing.

On February 22, 2022, Terry Colip emailed Mr. Bonicelli asking for a loan to Cell>Point of $50,000 as a "simmilar [sic] deal" to Mr. Bonicelli's January loan to Cell>Point.  Ex. 1.  Mr. Bonicelli did not provide a loan to Cell>Point at that time.  In the

4

email to Mr. Bonicelli soliciting the $50,000 loan, Terry Colip stated that Cell>Point would receive the funds from the SBA to pay Mr. Bonicelli's January loan back "before the end of February." *Id.* Terry Colip also told Mr. Bonicelli that he had "a call with Altan Capital this week to work on final terms on the pre-IPO/crossover round investment" and that this call was "the last linchpen [sic] to going public" for Cell Theranostics. *Id.*

Terry Colip did not disclose to Mr. Bonicelli the Court's February 14, 2022 order enjoining defendants from violating securities laws or even the existence of this litigation until April 2022. On April 21, 2022, Terry Colip wrote in an email to Mr. Bonicelli informing him that "[t]he SEC . . . filed a complaint against Cell[>]Point . . . and said we did not disclose to our investors enough information that we paused Phase 3 Oncardia trials in late 2014." Ex. 13. He also stated that "the SEC litigation . . . does not involve Cell Theranostics." *Id.*

On May 3, 2022, Terry Colip emailed Michael Ricks, the interim president of Cell Theranostics, Ltd., and asked him to speak to Mr. Bonicelli. Ex. 38 at 1-2. In his email, Terry Colip advised that Mr. Ricks should "not mention Altan" and stated that Mr. Bonicelli had "drunk the SEC Cool Aid" and "needs to understand the IPO is going forward." *Id.* at 2.

On March 14, 2022, Terry Colip emailed Wayne Wong, who had been an investor in Cell>Point for eight to ten years, stating that "Cell Theranostics is working on completing its $25 Million pre-IPO institutional round and plans to be a public company before the end of the year." Ex. 27 at 2. Terry Colip told Mr. Wong that he could purchase additional shares of Cell Theranostics, Ltd. on the same terms as institutions

at "approximately 50% of the IPO price."  *Id.*  Terry Colip attached an "institutional memorandum" dated January 5, 2022 to his email to Mr. Wong.  *Id.* at 1, 3.  The institutional memorandum stated that "Cell>Point is currently [] the subject of an SEC investigation."  *Id.* at 10.  The memorandum continued by stating that Cell Theranostics, Ltd. was not named in the complaint and that defendants' D&O insurance carriers "believe they have strong defenses to all of the SEC's claims and plan to mount a vigorous defense and seek dismissal of the complaint."  *Id.*

On March 14, 2022, Mr. Wong responded to Terry Colip's email, asking for additional information on Cell Theranostics, Ltd., and asking about the risk of an investment in Cell Theranostics, Ltd., and the stage the company was at in clinical trials. *Id.* at 1.  Terry Colip replied that "[t]he plan is to complete the Phase 3 lung cancer trial before the IPO later this year" and stated that "[t]he risk would be the IPO price is lower than expected, however, I don't see it being 50% lower."  *Id.*

On March 15, 2022, Terry Colip emailed Mr. Wong stating that he "received a message from the Greystone Group that they would like to take us public on the London AIM exchange."  Ex. 28.  On April 28, 2022, an executive at Pantheon International Advisors emailed Terry Colip stating that Pantheon could have a role in listing Cell Theranostics on the London Stock Exchange after Cell Theranostics paid a retainer fee and entered into a formal engagement with Pantheon.  Ex. G at 3.  On May 5, 2022, Andrew Greystoke from Pantheon emailed Terry Colip stating that Pantheon would be "clos[ing] the file" with Cell Theranostics given that Cell Theranostics could not pay Pantheon's fee.  *Id.* at 1.  Terry Colip testified that, when he told Mr. Wong he had a call with Greystone, he meant Andrew Greystoke of Pantheon.  Defendants provided no

6

evidence that Pantheon ever reached or ever drafted a formal engagement with defendants.

On March 16, 2022, Terry Colip sent Mr. Wong an email soliciting a loan to Cell>Point of up to $100,000 for a term of "at most" two and a half weeks that Cell>Point would repay with the proceeds of its SBA loan.  Ex. 29 at 2.  Mr. Colip stated the loan would have "a kicker of 10,000 Cell Theranostics shares."  *Id*.  Mr. Wong asked if there was any chance that his loan would not be repaid in two weeks.  *Id*. at 1.  Terry Colip replied that "[w]hen [he] called the SBA this morning the[y] confirmed [he] should have the wire before April 1st" and that "[t]he only risk . . . is the SBA takes an extra week to fund."  *Id*.  Mr. Wong provided a $100,000 loan to Cell>Point on March 16, 2022 to be repaid by April 1, 2022.  Ex. 19 at 1.  The loan was secured by the SBA loan to Cell>Point.  *Id*.  Upon maturity of the loan, Mr. Wong was to receive 10% annual interest and 10,000 shares of Cell Theranostics, Ltd.  *Id*.  Mr. Wong expected that this loan would help fund an initial public offering ("IPO") for Cell>Point that would support a return on his past investment and in the shares he would receive with the loan.

At the time of the hearing, Cell>Point was in default on Mr. Wong's loan.   No one at Cell>Point told Mr. Wong what his loan would be used for.  Mr. Wong believed that Cell>Point would use the loan to support clinical trials and an IPO.  Cell>Point used $75,000 of Mr. Wong's loan to settle litigation against Cell>Point.

Altan Capital ("Altan") is a private investment firm.  At the hearing, Rehan Chaudhri, an executive chairman at Altan, testified that the firm has a multi-step process to provide investment capital to a company like Cell>Point that takes one to two and a half years to complete.  The first step in the process consists of informal meetings

between Altan and the company, followed by the two companies signing a nonbinding letter of intent that outlines various steps necessary to reach a binding memorandum of understanding.  After the companies sign a binding memorandum of understanding, Altan drafts and negotiates a term sheet.  Only then would Altan provide investment capital to the company.

Altan engaged in informal discussions with Terry and Greg Colip about investing in Cell>Point or Cell Theranostics, Ltd., but had not completed any of the steps described above in regard to investing in Cell>Point.  Mr. Chaudhri testified that it would be inaccurate to state that Altan was working on the final terms of a pre-IPO crossover round of investment with Cell>Point in February 2022 because none of the steps in Altan's process had been completed.  Mr. Chaudhri testified that it would be inaccurate to state that Altan and Cell>Point were finishing up work on a round of crossover funding for $30,000,000 in March 2022.

## II.  LEGAL STANDARD

"Civil contempt is an appropriate remedy for the enforcement of a judicial decree, but it is a severe one which should be used only when necessary to sustain the authority of the court."  *N.L.R.B. v. Shurtenda Steaks, Inc.*, 424 F.2d 192, 194 (10th Cir. 1970).  "[I]n the civil contempt context, a plaintiff must prove liability by clear and convincing evidence."  *F.T.C. v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004).  The court in *Kuykendall* explained that the movant "has the burden of proving, by clear and convincing evidence, (1) that a valid court order existed, (2) that the defendants had knowledge of the order, and (3) that the defendants disobeyed the order."  *Id.* at 756–57 (citation and alteration marks omitted).  "The contemnor's disobedience need not be

willful to constitute civil contempt." *Bad Ass Coffee Co. of Hawaii v. Bad Ass Coffee Ltd. P'ship*, 95 F. Supp. 2d 1252, 1256 (D. Utah 2000) (quotations omitted).  However, defendants may assert a defense to a finding of contempt with a "showing by clear and convincing evidence that all reasonable steps were taken in good faith to ensure compliance with the court order and that there was substantial compliance, or relatedly by proving plainly and unmistakably defendants were unable to comply with the court order."  *Id.* at n. 8. (quotations omitted).

Defendants do not challenge the validity of the preliminary injunction order.  *See* Docket No. 118-1 at 1-2.  Rather, defendants argue that they did not knowingly violate the Court's preliminary injunction order.  *Id.*

## III. ANALYSIS

### A.  Violations

The Court's February 14, 2022 order prohibited defendants from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).  Docket No. 93 at 20-21.  In order to demonstrate a violation of the Court's order, and that defendants should be held in contempt, the SEC must show defendants committed a violation of Section 17(a) or Section 10(b) by clear and convincing evidence.  *Kuykendall*, 371 F.3d at 756-57.

#### 1. Elements

To show a violation of Section 10(b) of the Exchange Act and Section 17(a)(1) of the Securities Act, "the SEC must prove that [defendants] made: (1) a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by means of interstate commerce."  *S.E.C. v. Smart* ("*Smart*

*II*"), 678 F. 3d 850, 856 (10th Cir. 2012) (citation, quotation, and brackets omitted).  The requirements of §§ 17(a)(2) and (3) are almost the same; the primary "difference between § 17(a) and § 10(b) lies in the element of scienter."  *Id.* at 857.  "Section 10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3)."  *Id.* (citing *S.E.C v. Wolfson*, 539 F.3d 1249, 1256-57 (10th Cir. 2008); *C.E. Carlson, Inc. v. S.E.C.,* 859 F.2d 1429, 1435 (10th Cir. 1988)).  Additionally, while Section 10(b) relates to the purchase or sale of securities, Section 17(a) also relates to the offer of securities.  *Id.*

To demonstrate the first three elements, the SEC must show that defendants made material misstatements or omissions.  In the case of violations of Sections 10(b) and 17(a)(1), the SEC must also demonstrate scienter.  To demonstrate a misstatement or omission, "the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (quoting *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994)).  A statement or omission is material if a reasonable investor would consider it important in determining whether to buy or sell stock or a security.  *Id.* at 1119.  "Material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."  *S.E.C. v. GenAudio Inc.,* 32 F.4th 902, 933 (10th Cir. 2022) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)).  Misrepresentations regarding the use of investor funds are material.  *S.E.C. v. Smart* ("*Smart I*"), 2011 WL 2297659, *16 (D. Utah June 8, 2011).  Scienter has been defined as "a mental state embracing intent to

deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). For Sections 10(b) and 17(a)(1), the Tenth Circuit has ruled that "willful or reckless behavior satisfies the scienter requirement." *Edward J. Mawod & Co. v. S.E.C.*, 591 F.2d 588, 596 (10th Cir. 1979). Recklessness occurs "where the defendant had acted with reckless indifference []to a  . . . set of facts." *Id.*

The fourth element, requiring that a misstatement be made in connection with the purchase or sale of a security, "should be construed flexibly, not technically and restrictively." *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002). "[A]n instrument denominated a 'note' . . . is presumed to be a 'security,' and that presumption may be rebutted" by a showing that the note resembles a different category of instrument. *Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990). Generally, a note is "[a] written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer." *Note*, Black's Law Dictionary (11th ed. 2019). Additionally, securities include investment contracts. *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1090 (10th Cir. 2020). An investment contract has "three parts: '(1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *Id.* (quoting *S.E.C v. Scoville*, 913 F.3d 1204, 1220 (10th Cir. 2019)).

Defendants argue that the loans provided and solicited from Mr. Bonicelli and Mr. Wong were not securities because they were to be paid by the SBA loan and not funded by the efforts of others. Docket No. 118-1 at 7 (citing *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)). The Supreme Court, however, has rejected a definition of notes and securities that only encompasses the test used in *Howey*. *Reves,* 494 U.S. at 56.

11

That test determines whether funding is based on the effort of others.  *Id.*  While *Howey* defined investment contracts, the Court has acknowledged that a note may not be an investment contract while still being a security.  *Id.*  Moreover the Tenth Circuit has recognized that notes are presumed to be securities[2] unless they fall within the following list of exceptions:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] . . . notes evidencing loans by commercial banks for current operations.

*S.E.C. v. Thompson*, 732 F.3d 1151, 1159 (10th Cir. 2013) (alteration in original).

In deciding whether a note resembles some other category of instrument, the Supreme Court has identified four factors (the "*Reves* factors") to consider:

> (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]"; (2) "the 'plan of distribution' of the instrument," with an eye on "whether it is an instrument in which there is common trading for speculation or investment"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."

---

[2] Although this presumption is for notes with a maturity of more than nine months, the Tenth Circuit has ruled that the "exception for short-term notes is limited to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public."  *Holloway v. Peat, Marwick, Mitchell & Co.*, 900 F.2d 1485, 1489 (10th Cir. 1990).  Greg Colip testified the loans were commercial, but defendants did not prove that the loans were prime quality negotiable commercial paper.  The short-term exception does not apply to these facts, and the Court finds that defendants have not overcome the presumption that the loans are notes.

*Id.* at 1160 (quoting *Reves,* 494 U.S. at 66-67). The factors are considered as a whole; a single factor is not dispositive. *Id.* Here, defendants have presented no argument or evidence that the loans resemble notes that are not securities, nor do the *Reves* factors point to the loans functioning as an instrument that should not be considered a note. Shares in Cell Theranostics, Ltd. were included as the "kicker" for these loans. Ex. 29 at 2. Mr. Bonicelli and Mr. Wong were motivated to provide the loans by receiving shares and not by the small amount of interest on a short-term loan. Their reasonable expectations indicate that these loans were notes. Additionally, these loans were of the same type that the Court found to be securities in its preliminary injunction order. *See* Docket No. 93 at 14. Based on the inclusion of shares of Cell Theranostics, Ltd. that were included as an incentive for the loans, the Court finds that the loans were notes that are securities.

The fourth element for proving a violation of Section 10(b) also requires that the misstatement be made in connection with the sale of a security or, in the case of Section 17(a), the offer or sale of a security. This "require[s] a causal connection between the allegedly deceptive act or omission and the alleged injury." *Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir. 1996) (ruling that misstatements made after a sale could not meet this requirement). The SEC argues that, although Mr. Bonicelli made a loan before the Court entered a preliminary injunction against defendants, misstatements made after his loan can be considered "lulling activity" designed to conceal fraud that relates to the same scheme, thereby satisfying the "in connection with" requirement. Docket No. 107 at 23-25 (citing *S.E.C. v. Holschuh*, 694 F.2d 130,

144 (7th Cir. 1982); *United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2006)).  The cases the SEC cites, however, are inapposite.  In *Holschuh*, the Seventh Circuit ruled that activities designed to lull an investor after a fraudulent sale of securities were properly considered as part of the same scheme and are "relevant to the question of intent" where "conduct prior to the sale clearly satisfied the 'in connection with' requirement."  694 F.2d at 143-44.  *Evans*, does not discuss the requirements under the Securities or Exchange Acts.  473 F.3d at 1120.  It states that lulling activities can be considered a continuation of a scheme to defraud, but does not hold that lulling activity alone can establish fraud.  *Id.*  Neither of these cases demonstrate that a violation of the Court's order can be based solely on actions that predate the order even if lulling activity continues after the order.  Any actions by defendants that do not relate to the sale or offer of securities after the Court's order cannot be evidence of a violation of 10(b) or 17(a) on their own.  However, the Court will consider statements by defendants before the Court's order to the extent that they bear on the question of scienter for statements made after the Court's order.

For the fifth element, use of the telephone and the internet to sell securities can establish that interstate commerce was used.  *See Smart I*, 2011 WL 2297659, at *18 (ruling use of mails, the internet, and telephones sufficient to establish the element of interstate commerce).  The SEC introduced evidence that defendants used email to solicit investments.  The Court finds that the SEC has proven this element by clear and convincing evidence.

### 2. Incidents

#### a.  February 22 Solicitation

On February 22, 2022, Terry Colip solicited a loan from Mr. Bonicelli.  Ex. 1.  In his solicitation, Terry Colip stated he "ha[d] a call with Altan Capital this week to work on final terms on the pre-IPO/crossover round investment" and that this call was "the last linchpen [sic] to going public."  *Id.*  However, as Mr. Chaudhri explained, neither Cell Theranostics nor Cell>Point had progressed through even the most preliminary steps to obtain investment capital from Altan.  Terry Colip testified at the hearing that he was surprised Altan was not ready to invest, Unofficial Transcript, May 18, 2022, 135:2-5, but "no matter how heartfelt their subjective beliefs, corporate executives, . . . cannot make material representations to shareholders in disregard or contravention of obvious facts."  *GenAudio*, 32 F.4th at 924.  Mr. Bonicelli testified that he would have wanted to know that Cell>Point was not at the final stages of reaching a deal with Altan in deciding whether to invest in Cell Theranostics.  The Court finds that Terry Colip's statement that he was working on final terms with Altan was a misrepresentation of material fact in connection with the offer of a security and finds that he acted with scienter.

Additionally, Greg Colip testified he told Terry Colip that Altan was working on the final details of a round of funding for an IPO.  Although the SEC does not claim that Greg Colip himself made misstatements to investors, the Tenth Circuit has held that whether someone who did not make a misrepresentation can also be held liable for the misrepresentation depends on "whether he can fairly be said to have caused [the speaker] to make the relevant statements, and whether he knew or should have known that the statements would reach investors."  *Wolfson*, 539 F.3d at 1261.   Greg Colip

15

testified that he did not see why Terry Colip should not state that defendants were in the final stages of an IPO with Altan.  The Court finds that Greg Colip is also liable for this misstatement based on his testimony.  Greg Colip caused this misstatement in violation of the Court's order prohibiting violations of Section 17(a).

### b.  March 16 Loan

On March 16, 2022, Mr. Wong provided a loan to Cell>Point.  Ex. 19 at 1.  In the email thread soliciting this loan, Terry Colip stated "Cell Theranostics is working on completing its $25 Million pre-IPO institutional round and plans to be a public company before the end of this year."  Ex. 27 at 2.  The Court finds that it was a material misrepresentation to state defendants were working on completing a round of funding for an IPO.  Terry Colip did not tell Mr. Wong that defendants had not progressed beyond preliminary stages of obtaining investment capital from any firm.  *See id.*  Terry Colip made this statement in "contravention of obvious fact[]" that Altan and Pantheon had not signed any legal documents with Cell>Point or any of the Cell Theranostics entities.  *GenAudio*, 32 F.4th at 924.  Defendants point to no evidence that they were close to completing an IPO.  The Court finds that Terry Colip made this misstatement with scienter, and in doing so, violated the Court's order prohibiting violations of Section 10(b).

When Mr. Wong asked Terry Colip about the risk of the loan not being repaid, Terry Colip replied that "[t]he only risk . . . is the SBA takes an extra week to fund."  Ex. 29 at 1.  Mr. Colip did not disclose to Mr. Wong that Cell>Point's loan to Mr. Bonicelli was in default.  *See id.*  Terry Colip did not disclose that the SBA had not given him a definitive date for when the loan would be provided.  *See id.*  Both of these facts are

material to the risk that the loan would not be repaid.  Mr. Wong asked about the risk as a prerequisite to investing, indicating that the information was important in making his decision to invest.  The Court finds that failing to disclose these risks was a material omission.  Terry Colip's only explanation at the hearing for omitting both of these facts from his emails was that the emails were "short."  The Court finds Terry Colip omitted material information regarding the risk of Mr. Wong's loan in violation of the Court's order prohibiting violations of Sections 10(b) and 17(a) and did so with scienter.

Finally, the institutional memorandum Terry Colip provided to Mr. Wong stated that "Cell>Point is currently [] the subject of an SEC investigation."  Ex. 27 at 10.  The memorandum also states that defendants' D&O insurance carriers "believe they have strong defenses to all of the SEC's claims and plan to mount a vigorous defense and seek dismissal of the complaint."  *Id.*  The memorandum is dated January 5, 2022, but Terry Colip sent it to Mr. Wong on March 14, 2022.  *Id.* at 1, 3.  As the Court found in its previous order, it was a misstatement to claim the defendants had D&O insurance.  *See* Docket No. 93 at 9.  Terry Colip admitted to sending the memorandum with incorrect information to Mr. Wong on March 14, but claimed it was an oversight not to edit this memorandum.  The Court finds it was at least reckless to fail to update materials that were sent to investors after the Court found that defendants misrepresented to investors that Cell>Point had D&O insurance.  Sending this false information to Mr. Wong on March 14, 2022 was a violation of the Court's order enjoining violations of Sections 10(b) and 17(a).

The Court finds that both Terry and Greg Colip are in contempt of the Court's order of February 14, 2022.

## B.  Sanctions

The SEC seeks sanctions against Cell>Point, Greg Colip, Terry Colip, and Cell Theranostics, Inc. in the form of a court order that (a) the Colips repay the amount of the loan made by Mr. Wong or, in the alternative, the Colips provide an accounting to the SEC demonstrating why they cannot repay the loan, (b) the Colips notify all of their investors of this action, and (c) defendants' assets are frozen.[3]  Docket No. 107 at 5.

"A district court has broad discretion in using its contempt power to require adherence to court orders."  *United States v. Riewe*, 676 F.2d 418, 421 (10th Cir. 1982). A court, however, "must exercise 'the least possible power adequate to the end proposed.'"  *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)).  "Sanctions for civil contempt may only be employed for either or both of two distinct remedial purposes: '(1) to compel or coerce obedience to a court order . . .; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]'"[4] *Id.* (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983)).

---

[3] The SEC requested an asset freeze in its motion requesting a preliminary injunction.  Docket No. 45 at 29-30.  The Court denied this request.  Docket No. 93 at 19.  The SEC acknowledged at the show cause hearing that an asset freeze would be properly requested in a motion for reconsideration, which the SEC has not filed.

[4] The Tenth Circuit has ruled that the Federal Trade Commission is authorized to seek compensatory sanctions on behalf of consumers, based on its statutory authority to seek injunctions and the traditional use of contempt as a means to enforce an injunction.  *See Kuykendall*, 371 F.3d at 764.  Defendants provide no reason, and the

The Court finds that there is an appropriate remedial purpose to ordering defendants Terry Colip, Greg Colip, and Cell>Point to repay the $100,000 loan from Mr. Wong that they obtained in violation of this Court's order and finds that this is an appropriate sanction.  The sanction is compensatory and is meant to compensate Mr. Wong for the damages incurred as a result of the actions taken by defendants in violation of the Court's order.  Within ninety days of this order, defendants shall pay into the Court registry the amount they borrowed from Mr. Wong ($100,000) and shall include 10% annual interest.  Although Mr. Wong entered into the loan agreement with Cell>Point, this sanction is appropriately entered against the Colips as well as Cell>Point.  "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs.  If they . . . prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt."  *Wilson v. United States*, 221 U.S. 361, 376 (1911).  As Greg and Terry Colip are both found to be in contempt of the Court's order, they will be jointly and severally responsible for the compensatory sanction along with Cell>Point.  If defendants claim that they do not have the financial ability to pay this sanction, they must each provide an accounting and explanation for why he or Cell>Point cannot pay it.

---

Court independently sees no reason, why this ruling should not be extended to the SEC seeking to enforce an injunction.

Additionally, as a coercive measure to ensure defendants comply with the Court's order from February 14, 2022, and to pay the sanction without using fraudulent means, defendants shall inform any person who defendants ask to provide a loan or investment to Cell>Point, Cell Theranostics, Inc., or Cell Theranostics, Ltd., or any person who intends to invest or loan money to such entities, for any purpose, of this litigation and shall provide copies of the Court's order from February 14, 2022 and this order. Defendants shall continue to inform such investors, or would be investors, in this manner until the Court finds the defendants' contempt has been purged by paying the sanction.

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that Plaintiff's Emergency Motion for an Order to Show Cause Why Defendants Should Not be Held in Civil Contempt [Docket No. 107] is **GRANTED** in part. It is further

**ORDERED** that Defendants' Motion for Leave to File a Revised and Supplemented Response in Opposition to Plaintiff's Emergency Motion for an Order to Show Cause why Defendants Should Not be Held in Civil Contempt [Docket No. 118] is **GRANTED**. It is further

**ORDERED** that Plaintiff's Motion to Exceed Page Limitations in its Emergency Motion for an Order to Show Cause Why Defendants Should Not be Held in Civil Contempt [Docket No. 109] is **GRANTED**. It is further

**ORDERED** that Terry Colip and Greg Colip are held in contempt of the Court's order dated February 14, 2022. It is further

20

**ORDERED** that, until the Court finds that the contempt is purged, Terry Colip and Greg Colip shall not solicit any investments or loans without providing such would be investors or loan providers with copies of this order and the Court's order from February 14, 2022.  It is further

**ORDERED** that, to purge the contempt, Terry Colip, Greg Colip, and Cell>Point, jointly and severally, shall pay $100,000.00 including 10% annual interest, to the Court Registry, **within ninety days of this order**.  Payment shall be made in the form of a cashier's check.  It is further

**ORDERED** that plaintiff shall provide, filing under restriction, the Court with Mr. Wong's mailing address for the purpose of disbursing funds **within thirty days of this order**.  It is further

**ORDERED** that, if defendants cannot repay the entire sanction within ninety days of this order, defendants shall each file with the Court a signed accounting:

(1) explaining why he or it cannot comply with the Court's order,

(2) producing documentation reflecting all assets and funds, including, but not limited to, real and personal property, held jointly or individually, for each defendant's direct, indirect, beneficial, or other interest, or over which each defendant maintains control, stating the location, value, and disposition of each such asset, fund, or other property;

(3) identifying all accounts (including, but not limited to, bank accounts, savings

accounts, securities accounts, and deposits of any kind, wherever situated) in

which each defendant, whether jointly or individually, directly or indirectly, has

an interest or over which any defendant has the power or right to exercise

control and identifying all funds, whether in the form of compensation,

commissions, income (including payments for assets and shares or property

of any kind), and other benefits (including the provision of services of a

personal or mixed business and personal nature) transferred from defendants

to any person or entity in excess of $3,000, directly or indirectly, on or after

June 10, 2021.

DATED July 13, 2022.

BY THE COURT:

Philip A. Brimmer
Chief United States District Judge