**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-1574

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**

Plaintiff,

**v.**

**CELL>POINT, LLC,
CELL THERANOSTICS, LTD,
CELL THERANOSTICS, INC,
GREG RUSSELL COLIP, and
TERRY ALLEN COLIP,**

Defendants.

---

AMENDED COMPLAINT

---

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against defendants Cell>Point, LLC ("Cell>Point" or the "Company"); Cell Theranostics, Inc. ("CT Inc.") and Cell Theranostics, Ltd. ("CT Ltd.") (together, the "Cell Theranostics Entities," and together with "Cell>Point," the "Cell>Point Companies"); Greg Russell Colip; and Terry Allen Colip (together, the "Individual Defendants," and, collectively, with the Cell>Point Companies, the "Defendants"), alleges as follows:

## <u>SUMMARY OF ALLEGATIONS</u>

1.      This case involves multiple and repeated false statements by the Cell>Point Companies, a developmental-stage radiopharmaceutical enterprise, and its executives in connection with its offer and sale of securities. From January 2016 through April 2022 (the

"Relevant Period"), the Cell>Point Companies, under the control of Greg Colip and Terry Colip (together, the "Individual Defendants"), defrauded more than 150 investors into purchasing more than $10 million in Cell>Point securities. The Defendants defrauded some of these investors after the SEC initiated this enforcement action. Indeed, following the filing of the SEC's action, and following the Court's Order that found Defendants were engaging in fraud and enjoined them from continuing to engage in fraud, the Defendants continued to make statements to investors designed to induce additional investments as well as conceal the fraud and convince investor-victims that they had not been defrauded and would soon see a return on their investment to lull them into inaction.

2.      During the Relevant Period, Defendants made false and misleading statements to investors about key aspects of the Cell>Point Companies' business, including the status of its clinical trials, the total amount of money raised and the amount the Individual Defendants invested in the business, the Individual Defendants' compensation, and purported strategic transactions.

3.      First, throughout the Relevant Period, and as recently as February 2021, the Defendants represented to investors that Cell>Point was months away from completing clinical trials of its revolutionary product, Oncardia, that would lead to commercialization and, ultimately, substantial returns for investors. In reality, Defendants suspended clinical trials in 2014 because Oncardia, which is a radiopharmaceutical, became unstable, and trials have never resumed.

4.      Second, Defendants falsely represented that Cell>Point's three managing members – Terry Colip, Greg Colip, and the Company's Chief Technology Officer ("CTO") (collectively, the "Founders") – contributed $38 million, and that Cell>Point had raised over

$104 million. In reality, the Founders did not invest millions of dollars into Cell>Point, and Cell>Point raised only approximately $56 million from investors since its inception.

5.      Third, Defendants misled investors by claiming that the Founders had deferred 96% of their salaries, and misstating the amounts of the Founders' total deferred compensation. In reality, Cell>Point has paid the Founders $4.3 million in loans or other forms of compensation – or more than $.40 of every dollar of the $10 million raised from investors during the Relevant Period, and owes the Founders much more in deferred compensation that Cell>Point must pay before investors receive returns.

6.      Fourth, Defendants lied to investors about obtaining a purported $15.4 million equity investment from a Chinese private equity firm in November 2019. In reality, the agreement Defendants announced to investors was, in the words of Greg Colip, "not a consummated transaction," since Cell>Point, in Terry Colip's words, "tore up" the agreement in November 2019.

7.      Additionally, after Defendants Cell>Point, Terry Colip, and Greg Colip were notified by SEC staff in December 2020 that the staff intended to recommend the Commission authorize this enforcement action, Terry Colip and Greg Colip created the Cell Theranostics Entities, transferred assets from Cell>Point to the Cell Theranostics Entities, and continued making false and misleading statements to investors, this time about purported work being performed on a supposed initial public offering ("IPO") for the Cell Theranostics Entities that would bring large returns to investors.  Defendants also made false and misleading statements regarding investment interest in funding an IPO, investment banks working on an IPO, how investor monies would be or

were being used, and made misleading statements and omissions about the substantial risk the Cell>Point Companies could not repay their obligations.

8.      Further, after the Court found Defendants were engaging in securities fraud between approximately June 2021 and January 2022, and after each Defendant was enjoined by Court order from continuing to engage in securities fraud, Defendants continued raising money concealing the Court's findings and injunction, and again making false and misleading statements to investors about supposed negotiations with an investment firm to fund a purported IPO, a Small Business Administration ("SBA") loan that was supposedly imminent, and how money raised from investors would be used.

9.      Defendants' fraud was continuous and calculated to enrich the Individual Defendants at the expense of the Company's investors.

10.     As a result of the conduct described herein, Defendants have violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5thereunder [17 C.F.R. § 240.10b-5(b)].

## JURISDICTION AND VENUE

11.     The SEC brings this action pursuant to the authority conferred upon it by Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa].

12.     The SEC seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint;

disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint from each of the Defendants together with prejudgment interest; civil penalties pursuant to Section 21(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 20(d) of the Exchange Act [15 U.S.C. § 78u(d)] against all Defendants; and, against the Individual Defendants, officer and director bars pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]. The SEC seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

13.     Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

14.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa]. Throughout the Relevant Period, Defendants Cell>Point and CT Inc. were Delaware Limited Liability Companies headquartered in Centennial, Colorado; CT Ltd. is also headquartered in Centennial, Colorado; and Defendant Terry Colip resided in Greenwood Village, Colorado. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of Colorado. For example, the false and misleading statements identified in the Complaint, as well as those made after the SEC initiated this enforcement action, were made in, among other places, this district, and investors in this district received the false and misleading statements in making investment decisions.

15.     Certain of the acts, practices, transactions, and courses of business alleged in this Complaint were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS AND RELIEF DEFENDANTS

16.     **Cell>Point, LLC** is a privately-held radiopharmaceutical company that claims to be developing diagnostic and therapeutic products. It is a Delaware Limited Liability Company headquartered in Centennial, Colorado. Cell>Point transferred, or sublicensed, the bulk of its assets to the Cell Theranostics Entities in or around May 2021. Defendants have recently stated it is their intention to transfer out the remainder of Cell>Point's assets and shut the company down.

17.     **Cell Theranostics, Inc.**, ("CT Inc.") is a Delaware corporation incorporated in or around February 2021, with its principal place of business in Centennial, Colorado. Greg Colip is CT Inc.'s Executive Chairman, and Terry Colip is CT Inc.'s CEO. CT Inc. is a wholly-owned subsidiary of Cell>Point. CT Inc. acts as a nominee of Cell>Point.

18.     **Cell Theranostics, Ltd.**, ("CT Ltd.") is a Cayman Islands corporation registered in or around May 2021, with its registered office in George Town, Grand Cayman. Defendants represent that CT Ltd.'s corporate address is in Centennial, Colorado. Terry Colip is CEO of CT Ltd., and, on information and belief, Greg Colip is an executive of CT Ltd. CT Ltd. acts as a nominee of Cell>Point.

19.     **Greg Russell Colip** is a resident of Spring, Texas. Greg Colip, who is Terry Colip's brother, is a founder, Manager, and the CEO of Cell>Point, and has served in those roles since 2001. Greg Colip is also a founder of and, along with his brother Terry Colip, controls the

Cell Theranostics Entities. Together with Terry Colip, Greg Colip exercises overall executive control over the Cell>Point Companies. Greg Colip oversees the Cell>Point Companies' intellectual property and efforts to sell the companies or its technology to a strategic partner or investor or obtain funding for a purported IPO. Greg Colip is an attorney licensed to practice in Texas.

20.     **Terry Allen Colip** is a resident of Greenwood Village, Colorado. Terry Colip, who is Greg Colip's brother, is a founder, Manager, and the CFO of Cell>Point, and has served in those roles since 2001. Terry Colip is also a founder of and, along with his brother Greg Colip, controls the Cell Theranostics Entities. Terry Colip oversees the Cell>Point Companies' finance and accounting functions and has control over the Cell>Point Companies' bank accounts, in which investor funds are pooled for the Cell>Point Companies' use. Prior to joining Cell>Point, Terry Colip was a registered representative associated with multiple broker-dealers and held multiple securities industry licenses.

## FACTS

## I.     Background

### A.     Cell>Point's Formation and Operations

21.     Cell>Point is a biotechnology company formed in 2001 to commercialize radiopharmaceutical compounds. It claims to be developing several diagnostic and therapeutic compounds for applications related to a range of diseases, including cancer and cardiovascular disease.

22.     Cell>Point's main product under development is Oncardia, a radiopharmaceutical compound with applications for lung cancer and cardiovascular disease imaging. Twenty years

ago, in 2001, Cell>Point filed an Investigational New Drug ("IND") application with the U.S. Food & Drug Administration ("FDA") for development of Oncardia as a lung cancer imaging agent. In 2010, Cell>Point filed an IND application for development of Oncardia as a cardiovascular disease imaging agent. To have Oncardia approved as a lung cancer or cardiovascular disease imaging agent, Cell>Point must successfully complete separate Phase 1, Phase 2, and Phase 3 clinical trials before filing a New Drug Application ("NDA"). FDA approval of an NDA is the final step that allows a new treatment to be marketed to physicians and patients. All of these steps must be completed before Cell>Point can market or sell Oncardia to the public.

23.     From 2001 to May 2014, Cell>Point developed manufacturing protocols, completed preclinical research, filed the INDs, and successfully completed Phase 1 and 2 lung cancer clinical trials and Phase 1 and 2a cardiovascular clinical trials.

24.     In 2012, Oncardia entered Phase 3 clinical trials—typically the final phase of clinical trials before applying for FDA approval—for lung cancer imaging. In 2013, Oncardia entered Phase 2b clinical trials – the second part of Phase 2 trials - for cardiovascular imaging.

25.     Aside from Oncardia, no Cell>Point product has advanced beyond pre-clinical development, and Cell>Point has never received regulatory approval to market or sell any products.

26.     Cell>Point has primarily financed its operations from funds raised from the sale of membership units and the issuance of notes. Since 2001, Cell>Point has raised at least $56 million from over 500 investors, including at least $10 million from over 150 investors during the Relevant Period.

27.     Cell>Point has never paid a dividend or other distribution to any of its investors.

**B.**     **The Cell Theranostics Entities Formation and Operations**

28.     Greg Colip formed CT, Inc., a Delaware corporation, in or around February 2021.

29.      In or around May 2021, Cell>Point allegedly granted sublicenses of its platform technologies to CT, Inc. and assigned all the obligations that Cell>Point was under to CT, Inc. regarding the licenses.

30.     Beginning no later than June 2021, Terry Colip and Greg Colip began representing that CT Inc. would be the entity that pursued an IPO that would supposedly bring profits to Cell>Point investors, and began soliciting investments into CT Inc. to pay for costs supposedly associated with the forthcoming IPO.

31.     In or around May 2021, Terry Colip and Greg Colip formed CT, Ltd., a Cayman Island entity. This entity was created for the express purpose of Cell>Point pursuing a public offering on the Hong Kong Exchange.

32.     50,000 shares of CT Ltd. were authorized upon formation, of which Terry Colip and Greg Colip each received 25,000.

33.     On or about December 20, 2021, Terry Colip and Greg Colip transferred their respective 25,000 shares to Cell>Point.

34.     Since the creation of the Cell Theranostics Entities, Defendants have continually represented that "[e]ventually each member of Cell>Point will receive approximately 5.64 shares in Cell Theranostics per each unit owned by the member in Cell>Point."

**C.**     **The Individual Defendants Were Control Persons of the Cell>Point Companies.**

35.     Since the Company's founding in 2001, and throughout the Relevant Period, Cell>Point has been led by its Founders: CEO Greg Colip, CFO Terry Colip, and Cell>Point's CTO. Cell>Point's only other employee during the Relevant Period has been a part-time accountant. The Founders have complete operational control over Cell>Point. During the Relevant Period, Greg Colip and Terry Colip each had control over Cell>Point and its activities. In addition, Greg Colip and Terry Colip each exercised control over the specific, violative activity that is the subject of this Complaint.

36.     According to Cell>Point's Operating Agreement, as Managers, Greg Colip and Terry Colip can bind Cell>Point and possess "the right, power, and authority to do on behalf of the company all things which are necessary, proper, or desirable to carry out its duties and responsibilities."

37.     Among other responsibilities, CEO Greg Colip is responsible for negotiating strategic transactions and intellectual property matters, and, during the Relevant Period, he drafted or reviewed offering materials and investor updates prior to publication.

38.     Among other responsibilities, CFO Terry Colip controls Cell>Point's bank accounts and accounting records and, during the Relevant Period, wrote and revised offering materials, solicited investments, and acted as the primary point of contact with Cell>Point's investors.

39.     Cell>Point's Founders have caused the Company to incur over $53.4 million in contingent and deferred liabilities to themselves. Cell>Point's Founders also structured the

liabilities to themselves to have seniority over other company debt and equity interests such that the liabilities to the Founders must be paid before returns will be distributed to investors.

40.    Investors will not receive a return on their investment until the Cell>Point Companies obtain FDA approval for, or sells or licenses, Oncardia or another product, and pays the Company's Founders over $53.4 million.

41.    Terry Colip and Greg Colip created the Cell Theranostics Entities and have always maintained control over them.

**D.    The Cell>Point Companies Offered and Sold Securities.**

42.    The Cell>Point Companies offered and sold investments that are "securities" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

43.    On or about January 13, 2016, Cell>Point filed a Form D for a Rule 506(b) unregistered offering of securities. On or about July 23, 2020, Cell>Point filed a Form D/A amending the 2016 filing.

44.    Beginning in January 2016 and continuing through at least April 2022, Cell>Point offered and sold securities to investors in the form of LLC membership interests ("units") and notes (the "offerings"). These offerings are investment contracts and notes.

45.    Beginning in or around June 2021 and continuing through April 2022, the Cell Theranostics Entities sold securities to investors in the form of units, loans (i.e. notes), and a combination of the two whereby an investor would receive units or shares, along with fixed interest, in exchange for loaning money to the Cell>Point Companies.

46.     The Cell>Point Companies' investors, whether purchasers of units or notes or a combination of the two, invested money in a common enterprise, had no rights or power to direct the Company's activities, and were entirely reliant on the Founders to generate returns.

**E.     The Cell>Point Companies' Solicitation of and Communications With Investors**

47.     The Cell>Point Companies used a variety of means to solicit prospective investors to purchase these securities. First, Terry Colip, who acted as the Cell>Point Companies' primary point of contact with investors, directly solicited new investors through email, the telephone, and by hosting investor events.

48.     Second, the Cell>Point Companies solicited additional investments, both unit sales and notes and a combination of the two, from previous investors through general solicitations contained in investor communications and one-on-one solicitations. As a result of the Cell>Point Companies' efforts, Cell>Point generated over $5 million from repeat investors during the Relevant Period. Terry Colip induced previous investors to make new investments by, among other things, frequently touting the Cell>Point Companies' purported financial prospects, success in attracting strategic partners, and securing financing to take the company public at or near the same time as offering Cell>Point Companies' securities for sale. In many cases, Terry Colip also offered the Cell>Point Companies' units or shares to existing investors at a discount to the price stated in the offering materials, or at a discount to the price at which the shares would be purportedly offered in the claimed imminent IPO, and at or around the same discounted price that investment firms would supposedly purchase shares to fund that IPO.

49.     Third, the Cell>Point Companies relied on existing investors to identify and recruit new investors, relay false and misleading information about the Cell>Point Companies

and inaccurate information about this SEC enforcement action to other existing and prospective investors. Terry Colip frequently used these existing investors to disseminate false and misleading statements to other investors about purported negotiations with investment firms to fund a supposed IPO in order to lull those investors into believing they had not been defrauded and would soon see a return on their investment.

50.     The existing investors had no source of information about the Cell>Point Companies other than Terry Colip, and Terry Colip knew of and encouraged both their recruitment of investors and their dissemination of false and misleading statements about the Cell>Point Companies.

51.     Referrals from previous investors resulted in dozens of investors investing millions of dollars during the Relevant Period.

52.      During the Relevant Period, Cell>Point used a variety of different documents, and several versions of documents, to solicit prospective investors, and to communicate with existing investors. These documents include: (1) Private Placement Memoranda ("PPMs"), (2) slide decks ("Investor Decks"), (3) quarterly reports, and (4) ad hoc updates and email communications from Terry Colip.

53.     Defendants have represented that, during much of the Relevant Period, they destroyed all their communications to investors or prospective investors, and all communications they received from investors or prospective investors, after seven days.

54.     On July 24, 2020, the SEC provided Defendants with a preservation letter in an effort to put an end to their document destruction, which included communications with investors.

55.     On December 17, 2021, the Court enjoined Cell>Point, Terry Colip, and Greg Colip from destroying certain documents, including investor communications.

56.     After December 17, 2021, Defendants continued to direct that at least one investor destroy their communications with Defendants.

### 1.      Private Placement Memoranda

57.     Cell>Point solicited investments using at least nineteen versions of its PPM during the Relevant Period, including versions dated: January 16, 2016; November 1, 2016; April 3, 2017; July 3, 2017; September 1, 2017; June 1, 2018; October 1, 2018; October 2, 2018; January 2, 2019; February 10, 2019; April 1, 2019; April 2, 2019; June 1, 2019; September 1, 2019; October 1, 2019; January 2, 2020; February 1, 2020, June 1, 2020; and October 21, 2020. These PPMs are nearly identical, with some relevant differences identified below.

58.     Greg Colip wrote the Company's first PPM prior to the Relevant Period. During the Relevant Period, Terry Colip played the predominant role in drafting and making changes to each new version of the PPM and Greg Colip typically reviewed changes from version to version.

59.     While every version of the PPM included as attachments the model subscription agreement and Cell>Point's governing documents, most versions of the PPM that investors received contained only the income statement and balance sheet from Cell>Point's most recent audited financial statements. Most investors did not receive complete audited financial statements before investing.

60.     Because of Defendants' practice of destroying all investor communications after seven days, Cell>Point records do not identify which version of the PPM each investor received

or which investors, if any, received the Company's audited financial statements at or before the time they made their investments.

61.     Defendants also used a CT Ltd. PPM dated January 5, 2022 – that was purportedly seeking $30,000,000 for a "Pre-IPO Crossover Round Investment" – in connection with the offer and sale of a $100,000 security in March 2022.

### 2.     Investor Decks

62.     Beginning no later than January 2019, Terry Colip provided prospective investors with Investor Decks that summarized the Company's product development activities, estimated revenue from prospective sales of the Company's technology, and capital-raising activities. Terry Colip was the primary author of each Investor Deck.

63.     Cell>Point and Terry Colip provided prospective investors at least eight different Investor Decks during the Relevant Period, including versions dated January 2019, March 2019, May 2019, September 2019, October 2019, November 2019, March 2020, and May 2020.

64.     Defendants also provided certain investors and prospective investors with a CT Ltd. Investor Deck dated February 2022

65.     Terry Colip also posted videos on Vimeo.com that showed the slideshow version of an Investor Deck with his recorded narration.

66.     Investor Decks were also emailed to several existing investors.

### 3.     Quarterly Reports

67.     Approximately every three months, Terry Colip and Greg Colip drafted reports ("Quarterly Reports") that purportedly updated investors on the Cell>Point Companies' business activities and plans for the near future.

68.     Greg Colip wrote sections of the Quarterly Reports related to strategic transactions and had a practice of reviewing the entirety of the Quarterly Reports before publication. Terry Colip wrote the rest of the Quarterly Reports and reviewed the entire report.

69.     Quarterly Reports were one of the Cell>Point Companies' and Terry Colip's primary methods of informing investors about the Cell>Point Companies' purported product development activities, efforts to sell the Company or its technology, purported interest from and negotiations with investment firms to fund a supposed IPO. These Quarterly Reports, in several cases, contained explicit offers to sell Cell>Point Companies' securities.

70.     Terry Colip disseminated these reports to certain investors by email and published them on a password-protected website.

**4.      Ad Hoc Updates and Emails from Terry Colip**

71.     During the Relevant Period, Terry Colip emailed several stand-alone updates to investors ("Ad Hoc Updates"). These communications purportedly provided updates on developments in the Company's operations. Some of these Ad Hoc Updates included an offer for the sale of securities.

72.     Terry Colip also engaged in email communications with individual investors that included statements about Cell>Point's business, work being performed on a supposed IPO, and purported interest from and negotiations with investment firms to fund an IPO, how investor monies would be or were used, and risks associated with investing. These emails were sent at or around the time Terry Colip solicited additional investments from these investors.

II.     **Defendants Made Materially False and Misleading Statements to Investors and Prospective Investors in Connection with the Cell>Point Offerings.**

73.     In raising funds from investors, Defendants made numerous written and oral material false and misleading statements and omissions regarding, among other things, the status of Cell>Point's Oncardia clinical trials, Cell>Point's capital raising activities, Cell>Point's payments to the Founders, the status of third-party funding, interest in funding an IPO and investment banks work on an IPO, and how investor monies would be or were being used. Defendants continually omitted facts that would have alerted investors to the substantial risk that the Cell>Point Companies could not pay their obligations.

A.     **False and Misleading Statements Regarding Status of Clinical Trials**

74.     Throughout the Relevant Period, Cell>Point, Terry Colip, and Greg Colip repeatedly made statements indicating that clinical trials of Oncardia were ongoing. In fact, there were no clinical trials of Oncardia during the Relevant Period, and there had been no clinical trials for years.

75.     To perform the clinical trials, Cell>Point used "test kits," which contained the Oncardia injectable compound used for imaging. In or around 2014, prior to the Relevant Period, Cell>Point determined that the test kits used to perform the Oncardia clinical trials had become unstable because the Oncardia compound within the test kits degraded too quickly, hampering its use. Because of this instability, Cell>Point's Oncardia test kits were not suitable for continued use in the Phase 3 lung cancer and Phase 2b cardiovascular clinical trials.

76.     Lacking suitable Oncardia test kits for the clinical trials, Cell>Point suspended both clinical trials in or around May 2014, after imaging just nine patients of an anticipated 368 patients in the Phase 3 lung cancer and Phase 2b cardiovascular clinical trials combined.

77.     Since May 2014, Cell>Point  has not administered Oncardia to any patient in the Phase 3 lung cancer and Phase 2b cardiovascular clinical trials.

78.     Cell>Point is developing a reformulated Oncardia imaging product to use in test kits for clinical trials, but it currently has no product to use for clinical trials, and it has not had a product it could use for clinical trials since 2014.

79.     Cell>Point has at least three substantial steps it must complete before it can complete the required clinical trials and apply for FDA approval to market and sell Oncardia.

80.     The first step Cell>Point must take is to complete development, animal testing, human testing, regulatory filings, and kit manufacturing for its reformulated Oncardia test kits. Cell>Point's CTO estimates that this work will take ten to twelve months to complete.

81.     Until this testing and approval is complete, Cell>Point cannot know if its reformulated product is suitable for clinical trials, nor can it resume its clinical trials.

82.     The second step the Company must complete is to identify medical providers and enroll them in the clinical trials, which a Cell>Point consultant estimates will take two to four months once the test kits are approved and trials are ready to resume.

83.     Cell>Point currently has no clinical trial sites enrolled, and it has had no sites enrolled since 2016.

84.     The third step the Company must complete, after completing manufacturing and enrolling clinical trial sites, is enrolling patients, administering Oncardia, and analyzing the resulting images, which Greg Colip estimates will take at least ten to twelve months.

85.     Cell>Point currently has no patients enrolled in its clinical trials, and it has had no patients enrolled in its clinical trials since 2014.

86.     Cell>Point must complete each of the above steps for both the lung cancer and cardiovascular applications.

87.     During the Relevant Period, Cell>Point, Terry Colip, and Greg Colip made numerous statements to investors about the clinical trials that were false and numerous statements to investors that were misleading because they omitted these and other important facts. Cell>Point, Terry Colip, and Greg Colip made false statements and misleading statements regarding development of Oncardia in the following documents:

88.     <u>PPMs:</u>

a.     Each PPM identified above, except for the October 21, 2020 version, stated: "The Company's development priority at this time is to complete the cancer and cardiovascular imaging clinical trials and seek regulatory approval to market both disease applications. . . . The Phase 3 [oncology] study should be completed [by a date 1 to 6 quarters later]. The Phase 2b/3 cardiovascular trial should be completed [by the same date or 1 quarter later]."

b.     The October 21, 2020 PPM stated: "The Company's development priority at this time is to complete [testing of] sufficient patients in the cancer and cardiovascular imaging clinical trials and license or sell Oncardia."

c.     PPMs dated January 2, 2019, February 10, 2019, April 1, 2019, April 2, 2019, October 1, 2019, January 2, 2020, February 1, 2020, June 1, 2020, and October 21, 2020 stated in a graphic: "2014-2015: Paused [clinical trials] to adjust dosing from 5mg to 1mg, optimize product stability, and kit manufacturing."

      d.     PPMs dated January 2, 2019, February 10, 2019, April 1, 2019, April 2, 2019, October 1, 2019, January 2, 2020, February 1, 2020, and June 1, 2020 included a timeline that stated: "2019: Resumption of Clinical Trials."

      e.     The October 21, 2020 PPM stated: "2020: Resumption of Clinical Trials."

89.   <u>Investor Decks</u>:

      a.     Investor Decks dated January 2019, March 2019, May 2019, March 2020, and May 2020 stated: "2019 – Resumption of Clinical Trials."

      b.     The October 2019 Investor Deck stated that Cell>Point is "[c]ompleting Phase 3 trials for oncology and cardiology imaging."

      c.     Investor Decks dated November 2019, March 2020, and May 2020, stated: "Oncardia imaging trials meeting all endpoints" and "On track to seek FDA approval for Oncardia end of 2020."

      d.     Investor Decks dated January 2019, March 2019, May 2019, March 2020, and May 2020 stated: "2014-2015: Paused [clinical trials] to adjust dosing from 5mg to 1mg, optimize product stability, and kit manufacturing;" "2015-2018: Reformulation to single vial cold kit to simplify preparation at radiopharmacy;"

      e.     The November 2019 Investor Deck included a timeline without dates titled "Development History" that identified past events including "Reformulation to single vial cold kit to simplify preparation at radiopharmacy" and "Resumption of clinical trials."

90.     <u>Quarterly Reports</u>:

a.     The report for First Quarter 2016 stated: "Lead agent Oncardia completing Phase 3 trials" and "With the additional capital . . . Cell>Point will be expanding the number of clinical trial sites during Q2 to expedite the completion of the Phase 2b and 3 Oncardia trials."

b.     The report for Second Quarter 2016 stated: "Lead agent Oncardia completing Phase 3 trials."

c.     The report for Third Quarter 2016 stated:  "Lead agent Oncardia completing Phase 3 trials" and "Cell>Point completes 1 vial kit of Oncardia. . . . Cell>Point will complete the remaining patients in the trials with the one vial kits."

d.     The report for Fourth Quarter 2016 stated:  "Lead agent Oncardia completing Phase 3 trials."

e.     The report for Second Quarter 2017 stated:  "Lead agent Oncardia completing Phase 3 trials" and "Cell>Point positioning itself to accelerate Oncardia trials to completion."

f.     The report for Third Quarter 2017 stated:  "Lead agent Oncardia completing Phase 3 trials."

g.     The report for Fourth Quarter 2017 stated: "Lead agent Oncardia completing Phase 3 trials" and  "The Company plans to transition into Phase 3 trials for cardiology imaging by mid-2018 and expedite the recruiting and closing of that trial."

h.     The report for First Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials" and, after discussing plans to manufacture additional Oncardia, "[t]he

kits are expected this summer and with the delivery of the kits the Phase 2b and 3 Oncardia trials will expand significantly."

        i.      The report for Second Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials"; "Cell>Point is in the process of adding [a United Kingdom hospital] as a Phase 3 lung cancer imaging site and [a different U.K. hospital] as a Phase 3 cardiology imaging site. We are working towards having these sites up and running by September 2018"; and "Cell>Point plans to complete the Phase 3 lung cancer clinical trial in 2019. In cardiac imaging, Cell>Point is firming plans which should result in an acceleration of the completion of the Phase 2b study during the next three months . . . ."

        j.      The report for Third Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials" and  "With the new 1mg Oncardia kits and the completion of additional patients, Cell>Point is reaching the point where it is time to sell the [territorial] rights to Oncardia."

        k.      The report for Fourth Quarter 2018 stated:  "Lead agent Oncardia completing Phase 3 trials."

        l.      The report for First Quarter 2019 stated:  "Lead agent Oncardia completing Phase 3 trials";  "Micro dose 1mg Oncardia vials near completion and should be ready for trials in May"; and "Cell>Point is raising an additional $2-4 million in capital . . . to expand our clinical trial sites as we negotiate with pharmas looking to purchase/license Oncardia."

        m.      The report for Second Quarter 2019 stated:  "Lead agent Oncardia completing Phase 3 trials";  "Trial sites expanded to expedite the completion of the Phase 3 lung

cancer imaging trial"; and "Now with 12 hospitals and imaging centers, we should be able to close the [Phase 3] trial within four months at full recruitment. During Q3 we will be expanding the sites for the cardiology Phase 2b/3 trial."

n.       The report for Third Quarter 2019 stated:  "1 vial Oncardia kits past [sic] testing for trials" and "Cell>Point completed the final testing on our 1 vial kits for the FDA. The tests were successful and we filed the final CMC documents with the FDA to complete the Phase 2b/3 cardiology trial and Phase 3 lung cancer imaging trial with the new 1 vial kits."

o.       The report for Fourth Quarter 2019 stated:  "The $15.4 million plus the license payment of $7.4 million from [Chinese Entity 1] will be used to expedite the closing of the Phase 3 Oncardia imaging trials."  It also included a timeline graph titled "Enterprise Value Historical" that included an entry prior to 2018 for "1 Vial Oncardia Kit Completed" and in 2018 for "Completing Oncardia Phase 2b/3 Cardiology Trial and Phase 3 Lung Cancer Imaging Trial."

91.     Each of the above disclosures and representations regarding clinical trials was false when made because (1) the clinical trials were suspended in 2014 and never resumed; (2) the trials were suspended because Oncardia became unstable and therefore unsuitable for injection into patients; (3) Cell>Point had not completed testing of the reformulated product; (4) no Oncardia test kits were manufactured; (5) no clinical sites were enrolled in the trials; and (6) no patients had been imaged in the trials since 2014.

92.     Cell>Point, Terry Colip, and Greg Colip knew or were reckless in not knowing, and should have known, that their statements concerning the status of clinical trials were false and misleading because they knew (1) the clinical trials were suspended in 2014 and never resumed; (2) the trials were suspended because Oncardia became unstable and therefore

unsuitable for injection into patients; (3)  Cell>Point had not completed testing of the

reformulated product; (4) no Oncardia test kits were manufactured; (5) no clinical sites were

enrolled in the trials; and (6) no patients had been imaged in the trials since 2014. Cell>Point,

Terry Colip, and Greg Colip were also negligent in making these false and misleading

statements.

93.     Additionally, each of the above disclosures and representations concerning the

expected timeframe in which clinical trials would be completed was false when made because

substantial steps would be required to resume and complete trials, and the substantial costs

associated with those steps were substantially more than Cell>Point could afford at the time,

neither of which was consistent with the above stated timeframes.

94.     Cell>Point, Terry Colip, and Greg Colip knew or were reckless in not knowing

and should have known that their statements concerning the expected timeframe in which

clinical trials would be completed were false because they knew substantial steps would be

required to resume and complete trials, and the substantial costs associated with those steps were

substantially more than Cell>Point could afford at the time, neither of which was consistent with

the above stated timeframes. Cell>Point, Terry Colip, and Greg Colip were also negligent in

making these false and misleading statements.

95.     Cell>Point, Terry Colip, and Greg Colip omitted to state material facts that were

necessary to render their disclosures and representations regarding the status of clinical trials not

misleading. These omissions include (1) the clinical trials were suspended in 2014 and never

resumed; (2) the trials were suspended because Oncardia became unstable and therefore

unsuitable for injection into patients; (3) Cell>Point had not completed testing of the

reformulated product; (4) no Oncardia  test kits were manufactured; (5) no clinical sites were enrolled in the trials; (6) no patients had been imaged in the trials since 2014; (7) substantial steps would be required to resume and complete trials; and (8) the substantial costs associated with those steps were substantially more than Cell>Point could afford at the time.

96.     The above misrepresentations and omissions as to the status of clinical trials were material to investors and potential investors because, among other things, investor returns were dependent on Cell>Point's ability to commercialize, sell, or license Oncardia, which, in turn, was dependent on Cell>Point's ability to complete clinical trials.

97.     Because of Cell>Point, Terry Colip, and Greg Colip's false and misleading statements, and the material information theyfailed to disclose concerning the suspension of clinical trials and reasons for the suspension, Cell>Point, Terry Colip, and Greg Colip misled investors about the status of Cell>Point's clinical trials.

**B.     False and Misleading Statements Regarding Founder Contributions and Capital Investments**

**1.   False and Misleading Statements About Founder Contributions**

98.     Cell>Point, Terry Colip, and Greg Colip also made material misrepresentations and omissions with respect to their contributions and capital investments into Cell>Point by dramatically overstating both the amount of the Founders' personal investments in the Company and the amount of capital Cell>Point raised from investors. While Cell>Point, Terry Colip, and Greg Colip represented that the Founders had contributed over $30 million, the Founders actually contributed cash of less than $1 million. Cell>Point, Terry Colip, and Greg Colip also repeatedly represented that Cell>Point had raised more than $104 million in total when, in reality, the amount raised from investors was less than $60 million.

99.     In November 2019, Terry Colip uploaded to Vimeo.com a twenty-three minute video that showed an Investor Deck with Terry Colip's narration. The video solicited investments and showed the following slide:



100.     According to Terry Colip's narration on the video disseminated on Vimeo, "out of the $104.2 million raised to date [since inception], 32% of that has been provided by the Founders."

101.     Similar statements appeared in each PPM and Investor Deck during the Relevant Period:

a.      Nearly all PPMs from November 1, 2016 to June 1, 2020 stated that "capital and contributions from the founders and passive investors have exceeded $[amount] with $[amount] used [for] improving and clinically evaluating [Oncardia]" in the amounts listed below:

| PPM Version(s) | Amount Raised | Amount Used for Oncardia |
|---|---|---|
| November 1, 2016 | $83.1 million | $51 million |
| April 3, 2017<br><br>June 3, 2017<br><br>September 1, 2017 | $84.6 million | $61 million |
| June 1, 2018 | $89.6 million | $63.1 million |
| October 1, 2018 | $91 million | $64.1 million |
| January 2, 2019<br><br>February 10, 2019<br><br>April 1, 2019<br><br>April 2, 2019 | $91 million | $64.1 million |
| June 1, 2019<br><br>September 1, 2019<br><br>October 1, 2019<br><br>January 2, 2020<br><br>February 1, 2020 | $91 million | [omitted; statement ends with a period after the contribution amount.] |

   b.  Each PPM from January 16, 2016 to April 2, 2019 stated under "Management Compensation" that "the [Founders] have contributed approximately $32.1 million in cash and units to cover clinical trials."

   c.  Each PPM from June 1, 2019 to June 1, 2020 stated under Management Compensation that "the [Founders] have contributed approximately $32.1 million to the Company booked as loans to cover clinical trials."

d.      The October 21, 2020 PPM stated under "Management Compensation" that "the [Founders] have contributed approximately $38.9 million in cash and units to the Company booked as loans."

e.      Each Investor Deck also made statements regarding the Company's capital raising history.

f.      The January 2019 Investor Deck stated that "$90.2 million (US) has been contributed and raised to date from Founding Partners [and other investors]. . . . $63.1 million has been invested in our lead agent Oncardia;" "$90.2 million (Provided by Founding Partners, Oncologists, Radiologists, Cardiologists (including pension funds), strategic investors, high net worth individuals and small private equity funds)" and "Total Contributions by Founding Partners - $38 million."

g.      The March 2019 and May 2019 Investor Decks represented that "Total Contributions by Founding Partners - $38 million."

h.      The September 2019 and October 2019 Investor Decks represented that "Capital Raised to Date: $90.1 Million" and "Capital Spent to date on Oncardia: $81 Million."

i.      The November 2019, March 2020, and May 2020 Investor Decks represented that "Capital Raised to Date: $104.2 Million" and "Contributions by Founders: $37.9 million." These Investor Decks also included the slide from Terry Colip's Vimeo.com video set forth above.

102.    In addition, each Quarterly Report from the first quarter of 2016 through the second quarter of 2019 stated: "Contributions to date from founding and passive members have exceeded" amounts ranging from $83.4 million to $94 million.

103.     These statements regarding the Founders' contributions to Cell>Point were false and misleading because the Founders contributed less than $1 million in cash and the units the Founders "contributed" were units they gave to themselves for no cost when Cell>Point was founded in 2001, and returned to Cell>Point to be sold to new investors. Moreover, the "contributed" units were sold to new investors for less than $38 million.

104.     In exchange for "returning" the units, Cell>Point agreed to pay the Founders the current market value of the units at the time Cell>Point becomes a public company or is sold to a buyer.

105.     The Founders control the market value of units because they unilaterally set the price for units that Cell>Point sells.

106.     For each dollar that the Founders have increased the unit price, Cell>Point owes the Founders approximately $1.1 million more.

107.     As of December 31, 2019, the liability Cell>Point owed the Founders for these units was valued at $38.6 million. This liability has priority over investor distributions, meaning that, if Cell>Point sells or licenses Oncardia in a qualifying transaction, the Founders would be paid $38.6 million before any distributions to investors.

108.     Thus, in actuality, the purported $38 million contribution from the Founders was neither money nor units they contributed, but rather a liability that Cell>Point owes the Founders, and a liability that must be paid before investors can obtain a return on their investment.

109.     The notes to Cell>Point's audited financial statements for each fiscal year during the Relevant Period described Cell>Point's "Contingent Equity-Based Payments" and explained

that the Company owes approximately $38 million to the Founders. These notes, however, did not connect these "Contingent Equity-Based Payments" to the "contributions" referenced in the PPMs, Investor Decks, and Quarterly Reports, such that an investor would know that they relate to the same transactions.

110.    Moreover, most investors did not receive the full audited financial statements that contained these notes, and this liability is not included in the abbreviated financial information attached to most PPMs.

111.    Each of the above disclosures and representations regarding the Founders' contributions was false and misleading when made because (1) the Founders had not contributed any material amounts of cash; (2) the units the Founders "returned" were sold for far less than $38 million; and (3) the amounts Cell>Point, Terry Colip, and Greg Colip represented they had contributed were not contributions but rather a liability imposed on Cell>Point by the Founders.

112.    Cell>Point, Terry Colip, and Greg Colip knew or were reckless in not knowing, and should have known, that their statements concerning the Founders' contributions and amount of capital raised were false and misleading because they each knew that (1) the Founders had not contributed any material amounts of cash and far less than the amounts represented; (2) the units the Founders "returned" were sold for far less than $38 million; and (3) the amounts they represented the Founders had contributed were not contributions but rather a liability imposed on Cell>Point by the Founders. Cell>Point, Terry Colip, and Greg Colip were also negligent in making these false and misleading statements.

113.    Cell>Point, Terry Colip, and Greg Colip omitted to state material facts that were necessary to render their disclosures and representations concerning the Founders' contributions

and amounts of capital raised not misleading. These omissions include that (1) the Founders had not contributed any material amounts of cash and far less than the amounts represented; (2) the units the Founders "returned" were worth less than $38 million; and (3) the amounts Cell>Point represented the Founders had contributed were not contributions but rather a liability imposed on Cell>Point.

114.    Cell>Point, Terry Colip, and Greg Colip false and misleading statements about the Founders' contributions and amount of money Cell>Point raised were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want to know accurate details concerning the Founders' financial contributions and the extent of the Company's liability to them, particularly in light of the magnitude of these misstatements, to assess the Founders' personal stake in Cell>Point's success and the ability of the Company to successfully implement its business plan and make returns to investors.

115.    Because of Cell>Point, Terry Colip, and Greg Colip false and misleading statements, and the material information theyfailed to disclose concerning the Founders' contributions and amount of money Cell>Point raised, Cell>Point, Terry Colip, and Greg Colip misled investors about these purported contributions and the capital available to Cell>Point to effectuate its business plan.

### 2.    False and Misleading Statements about the Amount Raised

116.    Cell>Point did not raise anywhere near the total amounts represented by Cell>Point, Terry Colip, and Greg Colip.

117.     While as described above Cell>Point represented in various documents provided to investors and prospective investors that it had raised over $100 million, Cell>Point's bank and financial records reflect that, as of February 28, 2021, it has raised only approximately $56 million from investors since its inception.

118.     Each of the above disclosures and representations regarding the Founders' contributions and amounts of capital raised was false and misleading when made because Cell>Point has raised only approximately $56 million since inception.

119.     Cell>Point, Terry Colip, and Greg Colip knew or were reckless in not knowing, and should have known, that their statements concerning the amount of capital raised were false and misleading because they controlled Cell>Point's bank accounts and finances and each knew that Cell>Point had raised only approximately $56 million since inception. Cell>Point, Terry Colip, and Greg Colip were also negligent in making these false and misleading statements.

120.     Cell>Point, Terry Colip, and Greg Colip's false and misleading statements about the amount of money Cell>Point raised were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want to know accurate details concerning the amount of money that was raised.

121.     Because of Cell>Point, Terry Colip, and Greg Colip's false and misleading statements, and the material information they failed to disclose concerning the amount of money Cell>Point raised, Cell>Point, Terry Colip, and Greg Colip misled investors about the capital available to Cell>Point to effectuate its business plan.

**C.**     **False and Misleading Statements Regarding Manager Compensation**

122.     Cell>Point, Terry Colip, and Greg Colip also made false and misleading statements to investors that failed to disclose the substantial sums Cell>Point paid the Founders during the Relevant Period.

123.     During the Relevant Period, each Founder received approximately $33,000 per year in salary from Cell>Point, but also accrued millions in deferred compensation plus interest. In addition, each Founder also took substantial loans from Cell>Point against his respective deferred compensation. As a result of these loan payments, in total, Cell>Point paid the three Founders approximately $4.3 million from investor funds during the Relevant Period.

124.     Cell>Point's statements to investors about the Founders' compensation were misleading because they falsely communicated that the Founders had deferred any substantial personal payouts until the Company was successful.

125.     Each PPM dated between January 16, 2016 and June 1, 2020 stated in the Management Compensation section: "Since the formation of the Company in 2001, the [Founders] have agreed to defer receipt of 96% of their contracted salaries until such time as the Company achieves sustained profitability and a significant cash infusion milestone."

126.     In addition, each PPM dated between November 1, 2016 and June 1, 2020 stated in the same section: "According to the [most recently completed financial statements] the deferred unremitted payroll against loans to officers was" a figure ranging from $6,558,172 in the November 1, 2016 PPM to $13,773,992 in the June 1, 2020 PPM.

127.     These PPM statements were false and misleading because in actuality each Manager accrued an annual salary of approximately $800,000 during the Relevant Period and

Cell>Point owed the Founders a significant amount for deferred compensation that was not disclosed.

128.    As of December 31, 2019, Cell>Point's cumulative deferred compensation liability owed to the Founders since Cell>Point's inception, including interest, was $29.3 million -- more than twice the "deferred unremitted payroll against loans to officers" figure set forth in the PPMs.

129.    In addition, the PPM statements were false and misleading because, though omitted from Cell>Point disclosures, the Founders actively drew on their "deferred compensation" by taking substantial sums from the Company each year that were booked as loans.

130.    As of December 31, 2019, the cumulative amount of these "loans" that Cell>Point made to the Founders since its inception, including interest, was $14.7 million – substantially more than the "deferred unremitted payroll against loans to officers" figure disclosed in the PPMs.

131.    These loans accrue interest at the same rate as Cell>Point's deferred compensation obligation to the Founders. In addition, these loans become due upon a qualifying transaction by Cell>Point, which would also trigger Cell>Point's payment of deferred compensation to the Founders. As a result, the deferred compensation liability would net against the loan repayment obligation.

132.    The liability Cell>Point owes to its Founders for deferred compensation has priority over investor distributions. In essence, if Cell>Point sells or licenses Oncardia in a qualifying transaction, then the Founders would be paid at least $14.5 million before any

distributions to investors. Combined with the priority obligation to the Founders for their returned units (totaling approximately $38.9 million), Cell>Point owed the Founders more than $53.4 million at the end of the Relevant Period, all of which has priority over the return of money to investors.

133.    Since Cell>Point has no regular source of cash other than investor funds, the money it paid to the Founders as compensation, loans against deferred compensation, or otherwise, came from investor funds.

134.    The approximately $4.3 million Cell>Point paid to the Founders during the Relevant Period represents more than 40% of investor funds Cell>Point obtained during that same time. Bank records during the Relevant Period show a consistent pattern of Cell>Point transferring investor funds to the Founders promptly after receiving them from investors.

135.    Cell>Point made millions in payments to the Founders despite its dire financial condition. Cell>Point had less than $25,000 in its bank accounts as of February 28, 2021.

136.    Each of the above disclosures and representations regarding the Founders' compensation was false when made, and Cell>Point, Terry Colip, and Greg Colip knew or were reckless in not knowing, and should have known, that their statements concerning the Founders' compensation were false and misleading, as Cell>Point, Terry Colip, and Greg Colip each knew the amount of money they were owed by the Company, as well as the amount of money they were taking from the Company despite its dire financial situation.

137.    Cell>Point, Terry Colip, and Greg Colip omitted to state material facts that were necessary to render their disclosures and representations concerning the Founders' compensation

not misleading. These omissions include accurate information about the compensation and loans paid to the Founders.

138.    Cell>Point, Terry Colip, and Greg Colip's false and misleading statements about the Founders' compensation were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about the amounts of compensation received by the Founders, regardless of its form, as well as the enormous liabilities Cell>Point accrued for the Founders' benefit that took priority over payments to investors.

139.    Because of Cell>Point, Terry Colip, and Greg Colip's false and misleading statements, and the material information they failed to disclose concerning the amount of money owed to and taken by Cell>Point Founders, Cell>Point, Terry Colip, and Greg Colip misled investors about the Founders' compensation.

### D.    False and Misleading Statements Regarding Potential Strategic Transactions

140.    During the Relevant Period, Cell>Point has attempted to identify possible strategic transactions that could result in a substantial cash infusion.

141.    Among other efforts, Cell>Point unsuccessfully sought funding from foreign license partners, unsuccessfully contracted with an investment bank to market Oncardia to strategic partners in the pharmaceutical industry, unsuccessfully sought venture capital investments, unsuccessfully pursued private equity investments, and attempted to form partnerships with others that never came to fruition.

142.    Greg Colip led these efforts and wrote the portions of Quarterly Reports that discussed them.

143.    Terry Colip was also actively involved in these efforts and wrote and distributed statements to investors. He also reviewed and distributed portions of Quarterly Reports written by Greg Colip.

144.    From 2019 to 2020, Cell>Point misrepresented the success of one such strategic transaction with a Houston-based Chinese citizen ("Chinese Businessman") and two different shell companies he controlled (both registered to addresses in suburban Houston strip malls).

145.    Since at least 2016, Cell>Point had attempted unsuccessfully to secure funding from various Chinese entities that the Chinese Businessman controlled.

146.    In November 2019, Chinese Entity 1 signed a subscription agreement to buy $15.4 million in Cell>Point units. This amount was significant, as it represented roughly a quarter of all funds Cell>Point previously raised from investors.

147.    In an Ad Hoc Update dated November 6, 2019 and sent to investors, Terry Colip announced that "Cell>Point completed a subscription agreement for $15.4 Million for 4.1% of Cell>Point. The use of funds will be limited to complete the Phase 2b and 3 Oncardia imaging trials. The funding for the $15.4 Million came from an Asian Private Equity Fund." In the same communication, he offered additional Cell>Point units for sale.

148.    Cell>Point's Investor Decks dated November 2019, March 2020, and May 2020 added $15.4 million to the total capital raised by the Company and specifically highlighted this investment by an "Asian Private Equity Fund."

149.    Subsequent Quarterly Reports also highlighted this investment as follows:

a.    The report for Fourth Quarter 2019 stated: "Cell>Point signs $15.4 million equity purchase agreement funded by a large Asian PE Fund. . . . Cell>Point reaches preliminary

terms to expand the $15.4 million investment" and "On November 1, 2019, Cell>Point signed the equity agreement for the funding. The $15.4 million . . . from [Chinese Entity 1] will be used to expedite the closing of the Phase 3 Oncardia imaging trials."

      b.    The report for First Quarter 2020 stated: "Cell>Point executed an equity purchase agreement with [Chinese Entity 1] in late Q4 2019 for the purchase of a 4.1% interest in Cell>Point for $15.4 million, pre-money valuation of $375.6 million. The equity purchase agreement was funded by [Asian Private Equity Fund 1]."

      c.    The report for Second Quarter 2020 stated: "As discussed in the last QR, the Covid-19 virus shut down funding out of China. The two equity purchases are now back on track. The first purchase, just over $15 million has been allocated and is awaiting approval from the China Foreign Currency Exchange to be released to the U.S."

150.    These statements were false and misleading because Cell>Point and the Chinese Businessman terminated the purported November 2019 subscription agreement between Cell>Point and Chinese Entity 1 in late November 2019.

151.    On November 22, 2019, Terry Colip emailed the investment bank Cell>Point had previously used to solicit strategic transactions, and stated that he met with Chinese Entity 1 and they "tore up" the November 1, 2019 subscription agreement.

152.    On November 26, 2019, Greg Colip had a telephone call with the investment bank and stated the signed November 1, 2019 agreement was not a consummated transaction. Rather, it was "structured as a sample agreement, so that the party on the other side could understand what one arm of the contract would look like, so we signed it up and sent it to them. . . . That has not been consummated."

153.  In August 2020, Cell>Point and Chinese Entity 2, also controlled by the Chinese Businessman, signed an agreement for a $15 million investment in Cell>Point, which Cell>Point also then announced to investors, without providing any information about termination of the first purported deal. No equity purchase agreement between Cell>Point and the Chinese Businessman or any Chinese Entity for an equity purchase existed prior to August 2020.

154.  As of February 28, 2021, Cell>Point had received only approximately $1 million from the Chinese Businessman, most of which the Chinese Businessman and/or a Chinese Entity paid directly to a Cell>Point vendor without passing through Cell>Point's bank accounts. Cell>Point received no additional funds from any deal with the Chinese Businessman during the Relevant Period.

155.  Each of the above disclosures and representations regarding purported transactions with the Chinese Businessman was false and misleading when made and Cell>Point, Terry Colip, and Greg Colip knew or were reckless in not knowing, and should have known, that their statements concerning the purported transactions with the Chinese Businessman were false and misleading, as Cell>Point, Terry Colip, and Greg Colip each knew that (a) the November 2019 subscription agreement between Cell>Point and Chinese Entity 1 was terminated in late November 2019; and (b) that pursuant to the August 2020 agreement for a purported $15 million investment in Cell>Point, the Company received only approximately $1 million from the Chinese Businessman, most of which the Chinese Businessman and/or a Chinese Entity paid directly to a Cell>Point vendor.

156.  Cell>Point, Terry Colip, and Greg Colip omitted to state material facts that were necessary to render their disclosures and representations concerning purported transactions with

the Chinese Businessman not misleading. These omissions include the facts that Cell>Point had

terminated the agreement and had never received the funds.

157.     Cell>Point, Terry Colip, and Greg Colip's false and misleading statements

between November 2019 and August 2020 concerning purported transactions with the Chinese

Businessman were material to investors making investment decisions because they substantially

altered the total mix of information. A reasonable investor would want accurate information

about strategic transactions and substantial fundraising that, according to Cell>Point's

statements, would fund the completion of the clinical trials and lead to investor returns.

158.     Because of Cell>Point, Terry Colip, and Greg Colip'sfalse and misleading

statements, and the material information they failed to disclose concerning the agreements

actually entered into between Cell>Point and the Chinese Businessman, Defendants misled

investors about the purported transactions with the Chinese Businessman.

**E.      Defendants Continued Defrauding Investors After Learning of the SEC
          Enforcement Action.**

159.     After Cell>Point, Terry Colip, and Greg Colip learned of the SEC's impending

enforcement action, they formed the Cell Theranostics Entities and represented to investors that

they had transferred the bulk of Cell>Point's assets into the Cell Theranostics Entities in

preparation of an initial public offering. Defendants told investors in person and by email that the

SEC's enforcement action would not have an effect on the IPO because of the asset transfer, and

then continued soliciting investments and raising money while making a series of material

misstatements and omissions.  These misstatements include that (1) large foreign investment

firms were vying to invest tens-of-millions of dollars into the Cell>Point Companies to fund an

IPO that would allegedly occur in the coming months and net the company hundreds-of-millions

of dollars, Defendants had reached agreements with some of those firms for an investment, and investment banks were working on the IPO; (2) investor monies would be or were being used to, among other things, pay fees associated with the IPO; and (3) the Cell>Point Companies had D&O insurance coverage that was paying for Defendants' costs associated with this action. When making these and other statements concerning the Cell>Point Companies and notes they were offering, Defendants did not disclose the Cell>Point Companies' dire finances, including its inability to repay earlier note holders and that it was taking on obligations at usurious rates through cash advances that further saddled the company with debt.

> ### 1. The Cell Theranostics Entities are Nominees of Cell>Point and were Created to Continue Defrauding Cell>Point Investors.

160.    Defendants repeatedly represented to investors that they created the Cell Theranostics Entities to pursue an IPO on the Hong Kong exchange, and that these entities are separate from Cell>Point.  However, Defendants knew the Cell Theranostics Entities did not qualify under the Hong Kong Listing Rules so could not be used for an IPO on that exchange in the time period they represented.  Moreover, Defendants were treating Cell>Point and Cell Theranostics Entities as one enterprise. Defendants created the Cell Theranostics Entities to further Defendants' fraud through misstatements regarding a purported IPO and to lull investors into believing an IPO was realistic and imminent and that they had not been defrauded

161.    In December 2020, the SEC staff notified Defendants Cell>Point, Terry Colip, and Greg Colip that the SEC staff anticipated recommending that the SEC initiate this enforcement action.

162.    In or around February 2021, Greg Colip and Terry Colip formed CT Inc. Greg Colip and Terry Colip controlled CT Inc. at all times thereafter.

163.     Between April 2021 and April 2022, Defendants have repeatedly stated to investors (and the Court) that they created both CT Inc. and CT Ltd. to pursue an IPO on the Hong Kong exchange in the coming months.

a.     In a June 27, 2021 email to investor D.M., Terry Colip stated "One question you may be asking is do [the SEC enforcement action] impact your investment. My answer is no. In 2014 we received a vote exceeding 85% of our investors to move our assets into a C Corp for an IPO. We did that last month and are moving forward to IPO the company and close the IPO before the end of this year. In the next 30 days your will be receiving your shares in the C Corp."

b.     On a July 1, 2021, investor call, Terry Colip stated that "the new C-Corp is Cell Theranostics Limited, and it's a Cayman Islands corporation of which we have transferred all of the biotech assets Cell Point to, except the Vyripharm asset. . . . So our, our course of action on the IPO front has been to move forward to close with [CITIC], and then file all our documents, to first go public on the Hong Kong Exchange…."

c.     In the 2021 second quarter Quarterly Report dated July 9, 2021, Defendants represented, "On May 27, 2014 Cell>Point received a majority vote from our investors to move our biotech assets into a new C Corp (Cell Theranostics) and go public. We have completed that process and we are focusing on conducting the public offering before the end of this year."

d.     In a September 27, 2021 email to P.G., Terry Colip stated that "[w]e are in a position to take Cell Theranostics public before the end of the year. Our goal is to IPO in the $600 Million range."

e.     In December 2021, Defendants stated in a court filing that "the creation and use of Cell Theranostics, Ltd, a Cayman Islands entity, [wa]s for the purpose of achieving the long-term business goal of becoming a public company," which "Cell>Point ha[d] intended…since 2014."

f.     In a March 14, 2022 email to W.W., Terry Colip stated "Cell Theranostics, Ltd. "(Cell Theranostics") [is] the company that has arranged to license the use of the Cell>Point biotech assets and go public. As part of that license each member of Cell>Point will receive 5.64 shares of Cell Theranostics for each unit owned in Cell>Point. Cell Theranostics is working on completing its $25 Million pre-IPO institutional round and plans to be a public company before the end of this year."

164.     Terry Colip and Greg Colip were notified by attorneys in April 2021 that CT Inc. would not qualify under the Hong Kong Listing Rules because the entity that went public would need to "reflect all the track (operating) record of Cell>Point (from audit perspective)" and "[t]he mere licensing of all IP rights" would not qualify. As a result, neither entity could be taken public on the Hong Kong exchange in the time period represented by Defendants.

165.     Despite this, the following month, in or around May 2021, Greg Colip and Terry Colip formed CT Ltd, which they controlled at all times thereafter, and began representing to investors that it was the entity that Defendants would take public on the Hong Kong exchange in the coming months without disclosing they had already been alerted that CT Inc. would not qualify to go public in this timeframe under the Hong Kong Listing Rules, and that CT Ltd. would not qualify for the same reasons.

166.     Between April 2021 and April 2022, Defendants repeatedly told Cell>Point Companies' investors that through this IPO shares the investors were to receive in the Cell Theranostics Entities would increase in value and could be sold so they would finally see a return on their investment.

167.     On or about May 20, 2021, Defendants purport to have transferred the bulk of Cell>Point's assets to CT Inc. by granting CT Inc. sublicenses of its platform technologies through a "Patent and Technology Sublicense Agreement and Assumption of Liabilities" agreement.

168.     On or about June 29, 2021, less than three weeks after the SEC initiated this case, Terry Colip emailed a group of approximately forty investors representing that, pursuant to a supposed shareholder vote in 2014, Cell>Point was permitted to move its assets into a C Corp for an IPO. Defendants then represented that the "asset transfer" had been completed "last month."

169.     In that same email, despite Cell>Point having transferred or sublicensed its assets to CT Inc., Defendants represented that "[t]he new company is Cell Theranostics, Ltd.," and that investors "w[ould] be receiving shares in the new  company shortly…. equal [to] [their] percentage shares in Cell>Point."

170.     Defendants treated the Cell>Point and the CT Entities as a single enterprise.

171.     On June 23, 2021, Terry Colip sent a prospective investor an email that stated "Cell>Point, which is now Cell Theranostics, is working on a $20 Million pre-IPO investment with the CITIC Group." At that same time, Cell>Point's website redirected to https://celltheranostics.com, which had a banner stating "CELL THERANOSTICS A CELL>POINT LLC COMPANY."

172.    Between July and August 2021, Defendants sold units in Cell>Point to at least four investors, but deposited the money into CT Inc.'s bank account.

173.    From its creation through no earlier than January 2022, CT Ltd. did not have a bank account and, during this period, all expenses of CT Ltd, CT Inc., and Cell>Point were paid out of CT Inc.'s bank account.

### 2.  False and Misleading Statements About Investment Interest in Funding an IPO and Investment Banks Working on an IPO

174.    To induce investment into the Cell>Point Companies, in emails to certain existing investors, Defendants routinely misrepresented that multi-million dollar cash investments from large foreign institutional investors were imminent, that those funds would be available to fund a purported IPO and repay investors who purchased notes from the Cell>Point Companies, and that investment banks were working with Cell>Point to secure this funding and preparing for its IPO.

175.    Terry Colip sent a series of emails, with the knowledge and assistance of Greg Colip and on behalf of the Cell>Point Companies, about negotiations with foreign investment firms to provide tens-of-millions of dollars to fund the IPO and that investment banks were working on the IPO:

a.      On June 16, 2021, Terry Colip sent an email to S.L. soliciting an investment. It stated: "We came to terms with the CITIC Group for a $20 Million pre-IPO investment in Cell Theranostics, Ltd. As part of the deal CITIC is going to co-manage the IPO. I have attached a draft memorandum on Cell Theranostics and the pre-IPO and post-IPO balance sheet. Our legal counsel is now drafting the IPO docs." Terry Colip followed up the next day with an email stating "[a]re you still interested in the Cell Theranostic [sic], Ltd. shares?"

b.      On June 21, 2021, Terry Colip sent an email to P.G. soliciting an investment. It stated: "I just wanted to follow-up and see if you were going to make a $70K investment this week. . . . On a side note, CITIC has received the approvals from their committee to invest $20 Million in a crossover round invest in us.  I am hoping to have the fully documented [sic] before the end of June."

c.      On June 23, 2021, Terry Colip sent an email to D. Y. soliciting an investment. It stated: Cell>Point, which is now Cell Theranostics, is working on a $20 Million pre-IPO investment with the CITIC Group. The $20 Million got allocated by CITIC, and now we are working on the paperwork. That is the linchpin for the IPO. . . . Do you want me to send you a short term loan document?? I would appreciate that. Also if so, what amount should I put on it?"

d.      On June 30, 2021, in response to an email asking for an update from M.D. who had invested $150,000 into Cell>Point in our around 2019, Terry Colip responded that "[w]e are working on the paper work for the $20 Million pre-IPO investment by the CITIC Group. With that we will move forward and complete the filings for the IPO."

e.      On September 3, 2021, in response to an email from M.D. asking for the status of Cell>Point and inquiring whether his "$150k investment [was] in jeopardy," Terry Colip responded that "[w]e are in the process of an IPO led my [sic] UBS and CITIC Securities" and "Cell Theranostics, Inc. will be the entity going public and our bankers are looking to price the offering at $550 million market cap or higher."

f.      On September 27, 2021, Terry Colip sent an email to B.D. It stated: "… we have six funds that are working on terms for a $25 Million crossover round investment [one

is a Hong Kong SPAC that is providing us terms later this week], (3) I have my public management team ready to come in (4) I have a call with the head of UBS investment banking Wednesday at 9 AM to work out a engagement agreement with CITIC Securities. If we go the SPAC route we can close in 60 days." The email went on to state that "Cell Point is in a $250 Million cash crunch" and is "looking for a short term loan" that will be paid off with "$5 Million in Pre-IPO funding" that was "coming in [the] next week."

    g. On September 27, 2021, Terry Colip sent an email to S.W. who was an existing investor that requested information about the timetable for the purported IPO and foreign investment interest.  It stated "one of the largest Asian funds Zhong Cai Jing approached us to provide a $30 Million Pre-IPO crossover round investment and to lead the IPO on the Hong Kong Exchange" and "[w]e are working on completing the final terms of the investment in the next four days."

    h. On September 28, 2021, Terry Colip sent an email to P.G. who was an existing investor and someone Defendants were soliciting to make additional investments. It stated: "I have a call with the SPAC tomorrow. I also have a call with head of UBS Global Equity Sales tomorrow at 9 AM along with CITIC Securities to bring the whole group together and start to file all the paperwork for the IPO."

    i. On October 18 and 20, 2021, Terry Colip sent emails to M.D. soliciting investments that stated the last step to the purported IPO was an "the institutional Pre-IPO (crossover) round investment" and that there were "two funds…negotiating with [the Cell>Point Companies] to provide the $25 Million investment" and the "plan [wa]s to have that fully funded by mid-November" when the IPO would then be launched. The emails stated "I have been

raising some pre-IPO capital to pay the securities attorneys. . . . If you are looking for more information, please don't hesitate to call me," before the solicitation became more explicit: "Cell Theranostics is seeking a $250,000 loan. It would have a three month term, a 10% kicker at maturity (it would pay $275,000 at maturity) and would carry 50,000 $5 dollar warrants. If you know of anyone that would be interested let me know."

        j.     On October 21, 2021, Terry Colip sent an email to M.G. soliciting an investment. It stated:  "The Zhong Cai Jing Fund is in the process of tendering a proposal that mirrors the letter attached. They would take the lead in funding the institutional pre-IPO capital of $25-$30 Million and leading the IPO work with CITIC capital. I know the proposal has been drafted for our signature. A certified English copy is being prepared today for us to sign. As with any institutional investor I would not expects [sic] the funds for at least 3 weeks. We need to obtain a $250,000 loan fast, i.e., I need the funds tomorrow. For this reason, I am offering a $250,000 loan (it can be in parts). The loan would have a 3-month term (however, I see it being paid off in one month) , guaranteed by the company, have a 10% kicker at maturity (for example a $250,000 loan would pay $275,000 at maturity) and come with 50,000 $5 warrants. We plan to IPO at $10 to $12 per share.

        k.     On November 24, 2021, Terry Colip sent an email to R.T., a Cell>Point investor, that stated "Zhong Cai Jing is funding $15 Million from their general fund. They want to fund the other $15 Million from their LP's. I am now working directly with the CITIC office in Hong Kong."

        176.     These statements were false and misleading because neither Terry Colip, Greg Colip, nor the Cell>Point Companies had any direct contact with the CITIC Group, the Zhong

Cai Jing Fund, or other foreign entities that Defendants claimed to be in negotiations with or had reached agreements with regarding a large investment.

177.    With respect to the CITIC Group, the Cell>Point Companies' first contact came in November 2021 when Terry Colip sent an email to "contact@citic.com" introducing the company and stating "I am interested in speaking with one of your biotech investment bankers regarding a public offering on the Hong Kong Exchange. Please let me know who I can speak with."

178.    With respect to the Zhong Cai Jing Fund, no documents, emails, text messages, or records evidencing any communication with the entity exist despite the claim that the Zhong Cai Jing Fund had supposedly drafted a signature-ready proposal to invest "$25-$30 Million" into the Cell>Point Companies. Defendants could not even provide a phone number for the fund when such information was subpoenaed by the SEC.

179.    These statements were also false and misleading because the Cell>Point Companies were not working with UBS on negotiating funding for an IPO, as UBS had communicated to the Cell>Point Companies that it was not interested in participating in its purported IPO. No IPO involving any of the Cell>Point Companies has been announced or completed.

180.    Each of the above representations regarding purported negotiations and agreements with foreign investment firms to fund an IPO, and work performed by investment banks on this pre-IPO funding and IPO, were false and misleading when made and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the purported negotiations, agreements, and work performed were false and misleading, as

Defendants each knew that (a) they had no direct contact with CITIC Group, Zhong Cai Jing Fund, or other foreign entities they claimed to nearing a deal with and (b) they were not working with UBS or any other investment bank in either negotiating a pre-IPO investment or pursuing an IPO. Defendants were also negligent in making these false and misleading statements.

181.    Defendants omitted to state material facts that were necessary to render their disclosures and representations concerning purported foreign investment interest in funding an IPO and investment banks working on an IPO not misleading. These omissions include the facts that Defendants had no direct contact with these foreign entities, had not shared any documents between them nor even had introductory email communications, and that UBS had communicated to Defendants that they were not interested in participating in Cell>Point's purported IPO.

182.    Defendants' false and misleading statements between June 2021 and February 2022 concerning purported foreign investment interest in funding an IPO and investment banks working on an IPO were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about whether large investments would be made into the company, especially when those funds would supposedly allow the company to repay investor notes and initiate an IPO that would bring large returns for investors.

183.    Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning purported foreign investment interest in funding an IPO and investment banks working on an IPO, Defendants misled investors.

184.     Following Defendants' false and misleading statements, and because of these false and misleading statements, the Cell>Point Companies induced investments from P.G., D.Y., S.L., and others.

### 3.   False and Misleading Statements about How Investor Monies Would be or Were Being Used.

185.     To induce investment into the Cell>Point Companies, especially note investments for which the principle was to be repaid in weeks or months, Defendants misrepresented why the company needed money and how an investor's money would be used.

186.     Terry Colip sent a series of emails, with the knowledge and assistance of Greg Colip and on behalf of the Cell>Point Companies, about how investor monies would be or were being used.

a.     On June 23, 2021, Terry Colip sent an email to D.Y. soliciting an investment. D.Y. responded that he was "curious about what . . . requires such a loan. As I recall the previous loan was to satisfy attorney fees for the IPO. Are they asking for more . . . ?" Terry Colip responded that "$20 Million got allocated by CITIC, and now we are working on the paperwork.  This is the linchpin for the IPO" and that "[t]he attorneys are billing me every two weeks and I don't want to slow them down." After D.Y agreed to loan money to the Cell>Point Companies, Terry Colip stated in a subsequent email, "[b]y [] the time the IPO is completed I am guessing we will spend over $4 Million in legal fees."

b.     On June 23, 2021, Terry Colip sent an email to B.D. soliciting a $250,000 investment. After B.D. inquired "[w]hat is the $250k for?", Terry Colip responded "[l]egal fees to complete the IPO filings."

c.      As noted above, on October 18 and 20, 2021, Terry Colip sent emails to M.D. soliciting investments. In relevant part those emails stated "I have been raising some pre-IPO capital to pay the securities attorneys. Their partners charge $800 an hour. Not cheap. If you are looking for more information, please don't hesitate to call me." Terry Colip then sent another solicitation offering a $250,000 note investment, and M.D. inquired what the loan funds would be used for after signaling he was not interested in the investment. Terry Colip responded "IPO Exchange filings."

d.      As noted above, on October 21, 2021, Terry Colip sent an email to M.K. soliciting an investment. It stated: "We need to obtain a $250,000 loan fast, i.e., I need the funds tomorrow. For this reason, I am offering a $250,000 loan (it can be in parts). . . . I am in a predicament to pay an IPO fee Monday while at the same time my IPO funds will not be in until early November."

187.     These statements were false and misleading because Defendants did not have any IPO fees, or IPO attorneys' bills or fees, and no such fees needed to be or were paid.

188.     Although D.Y. purchased a $100,000 note following the above representations, his money was not used to pay IPO attorneys' fees, but was instead used to pay Cell>Point, Terry Colip and Greg Colip's attorneys in this case.

189.     Each of the above disclosures and representations regarding purported IPO fees and IPO attorneys' bills or fees, were false and misleading when made and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading, as Defendants each knew that (a) they had no IPO fees; and (b) they had no IPO

attorneys' bills or fees because they had not hired any attorneys to work on a purported IPO. Defendants were also negligent in making these false and misleading statements.

190.     Defendants omitted to state material facts that were necessary to render their disclosures and representations concerning purported foreign investment interest in funding an IPO and investment banks working on an IPO not misleading. These omissions include the facts that none of these fees were in existence and were not due and owing.

191.     Defendants' false and misleading statements between June 2021 and February 2022 concerning purported IPO fees and IPO attorneys' bills or fees were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about how their funds will be used and whether the company actually has IPO fees and attorney fees that would need be paid to pursue an IPO.

192.     Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning purported IPO fees and IPO attorneys' bills or fees, Defendants misled investors.

### 4.   False and Misleading Statements about Cell>Point's Claimed D&O Insurance Policy and Carrier

193.     Defendants represented to Cell>Point Companies' investors that Cell>Point had a D&O insurance policy that was covering the defense costs in this case, and that the D&O insurance carrier had communicated to Cell>Point that it believed all of the SEC's claims are false and that Cell>Point should not settle.  No such D&O policy exists and no insurance company communicated to any Defendant that the SEC's claims are all false or commented on whether Cell>Point should settle.

194.     Terry Colip sent a series of emails, with the knowledge and assistance of Greg Colip and on behalf of the Cell>Point Companies, about a claimed D&O insurance policy and the insurance policy's carrier's belief that the SEC's claim in this case are false.

a.     On July 27, 2021, Terry Colip sent an email to D.M.., a Cell>Point investor, that stated "[t]he SEC called us in January with some claims witch [sic] we and our attorneys and insurance carrier felt were false and asked us to settle. In most cases your D&O carrier will want to settle to clean out the case. In our case they felt every claim was false."

b.     On December 5, 2021, Terry Colip sent an email to M.D., a Cell>Point investor, that stated the SEC "do[es] not know their numbers are wrong. . . . Our counsel and D&O carrier plan to provide all of this information in a motion to dismiss."

c.     On November 24, 2021, Terry Colip sent an email to R.T., a Cell>Point investor, that stated "[l]ike any SEC invitation [sic] they want to find something. They found a few confusing sentences in our PPMs and stale dates. They wanted us to pay a fine, but our D&O carrier said no. They filed a complaint on June 10th . . . . . We and our D&O carrier are comfortable we will win the case and we expect the case to be dismissed in the next 2-3 months"

d.     On November 29, 2021, Terry Colip sent another email to R.T. that stated "[w]e discussed the SEC complaint in our QR back in July. We also had D&O coverage. . . . . Both our counsel and D&O carrier feel we can get this dismissed."

195.     Additionally, as outlined above, D.Y. purchased a $100,000 note following representations that his money needed to pay IPO attorneys' fees, but his money was not used for this purpose, as Defendants had not even hired IPO attorneys. Rather, it was used to pay Cell>Point, Terry Colip and Greg Colip's attorneys in this case.

196.    After the Cell>Point Companies defaulted on D.Y.'s note, D.Y. learned of this enforcement action and that his money appeared to have been used to defend Cell>Point, Terry Colip and Greg Colip in this action.

197.    On August 26, 2021, D.Y. sent an email to Terry Colip confronting him about his misstatement and misuse of funds: "When you asked me to speak with Alex Lakatos in early June you indicated to me that he was with the law firm that was handling the IPO. However, according to the Reuters article, they are actually defending you and Greg in the SEC lawsuit. Which leads me to suspect that my $100K loan, originally due on July 9th, has actually been used part of their fee for your and Greg's defense. Is that correct?"

198.    Terry Colip responded the same day falsely claiming that an insurance policy was funding Cell>Point, Terry Colip, and Greg Colip's defense in this case: "We are using our insurance for the defense."

199.    In addition, through a PPM that was distributed to W.W. just before he invested $100,000 in a Cell>Point note on or about March 18, 2021, as outlined below, Defendants represented "Cell>Point, Greg R. Colip and Terry A. Colip and their D&O insurance carriers believe they have strong defenses to all of the SEC's claims and plan to mount a vigorous defense and seek dismissal of the complaint."

200.    These statements were false and misleading because Defendants did not have a D&O insurance policy or a D&O insurance carrier during the years of the SEC investigation or at the time (or after) this enforcement action was initiated.

201.    There has been no D&O insurance policy paying for the defense costs in this SEC enforcement action, nor was there a D&O insurance policy that paid for defense costs during the SEC's investigation that preceded this case.

202.    Because Cell>Point did not have an active D&O insurance policy, there was not an active D&O insurance carrier that commented on the accuracy of the SEC's allegations or encouraged Defendants to challenge or dispute these allegations.

203.     Each of the above disclosures and representations regarding purported IPO fees and IPO attorneys' bills or fees, were false and misleading when made and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading, as Defendants each knew that they did not have an active D&O insurance policy (and had not for several years) and there was no D&O insurance company advising them on whether to litigate this case or commenting on the accuracy of the SEC's allegations. Defendants were also negligent in making these false and misleading statements.

204.    Defendants omitted to state material facts that were necessary to render their disclosures and representations concerning a purported D&O insurance policy and carrier not misleading. These omissions include the fact that no policy was in existence.

205.    Defendants' false and misleading statements between June 2021 and April 2022 concerning a purported D&O insurance were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about whether defenses costs in this case were being paid by an insurance carrier, especially because the Cell>Point Companies do not have revenue and therefore investor monies would be (and are being) used to fund the defense absent an insurance policy.

206.    Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning a purported D&O insurance policy, Defendants misled investors.

### 5.    Misleading Statements and Omissions about the Substantial Risk that the Cell>Point Companies Would be Unable to Repay Obligations.

207.    To induce investment into the Cell>Point Companies, including note investments the principle of which was usually to be repaid in weeks or months, Defendants misrepresented the Cell>Point Companies' ability to repay future obligations and omitted facts that would have disclosed the substantial risk that the Cell>Point Companies would not be able to pay its obligations because (1) it was taking on large amounts of debt from quick cash companies charging usurious rates that needed to be paid down on a daily basis; and (2) it had defaulted on earlier obligations including earlier note holders.

208.    Beginning in or around August 2021, because they were having difficulty raising new monies from investors, the Cell>Point Companies started obtaining money from selling claimed future receivables at a large discount. These lenders are often referred to as quick cash companies, and the agreements required the Cell>Point Companies to make payments on a daily basis.

209.    These quick cash transactions were not structured as loans because the interest rates would have violated Colorado's usury laws that make it illegal to "exceed an annual percentage rate of forty-five percent." C.R.S. 18-15-104.

210.    Instead, these quick cash transactions involved the Cell>Point Companies selling future revenues or receivables – which they did not have because the Cell>Point Companies are at the pre-revenue stage and do not have receivable or revenues – at a significant discount.

211.    To induce the quick the quick cash companies into providing them with cash, Defendants falsely stated they had revenues or receivables to sell and then sold those revenues or receivables for cash. Examples of these agreements include:

a.    On or about August, 11, 2021, Defendants entered into an agreement with Fiji Funding whereby the Cell>Point Companies received $57,480 in exchange for the obligation to pay $89,940 in 60 days in $1,499 increments.

b.    On or about September, 15, 2021, Defendants entered into an agreement – that states the agreement was on behalf of "Cell Point LLC doing business as Cell Theranostics – with Wellen Capital whereby the Cell>Point Companies received $50,000 in exchange for the obligation to pay $74,500 in the next 200 days in $373 per day increments.

c.    On or about November 29, 2021, Defendants entered into an agreement with Madison Advance whereby the Cell>Point Companies received $25,000 in cash in exchange for the obligation to pay $37,475.00 in 40 days, in daily installments of $937.

d.    On or about December 10, 2021, Defendants entered into an agreement with Tip Top Capital whereby the Cell>Point Companies received $25,000 in cash in exchange for the obligation to pay $36,250 in 40 days, in daily installments of $906.25.

212.    During the solicitations outlined above, including those where investors inquired about the risk of the investment, Defendants did not disclose that it was obtaining money from these quick cash companies, or that it could only obtain these monies by misrepresenting revenues and receivables.

213.    As noted above, investor D.Y. purchased a $100,000 note from the Cell>Point Companies on June 23, 2021, which was to be repaid by July 9, 2021.

214.     On or before July 9, 2021, Cell>Point did not make any repayment on D.Y.'s note and it went into default.

215.     As outlined above, Defendants solicited a note investment from M.D. on October 20, 2021: "Cell Theranostics is seeking a $250,000 loan. It would have a three month term, a 10% kicker at maturity (it would pay $275,000 at maturity) and would carry 50,000 $5 dollar warrants. If you know of anyone that would be interested let me know."

216.     M.D. responded by inquiring about the risk of the investment: "So, Loan $250,000 for 3 months and get $275,000 return? Explain the 50,000 $5 warrants to me? What is the risk?"

217.     After additional back-and-forth emails, Terry Colip stated that Cell>Point did not have other loans aside from those of the Founders: "The $275K will have a senior position. I can do the following for you: 1. Provide a senior guarantee on our 5 technology platforms and 148 patents, [sic] The only other loans to the company are from the founders and we can make you pari passu with us on the guarantee."

218.     Each of the above disclosures and representations regarding outstanding loans, and the risk that the Cell>Point Companies could repay new loans, were false and misleading when made and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading, as Defendants each knew that the Cell>Point Companies had defaulted on prior obligations and had to resort to obtaining quick cash through false statements in order to keep the company afloat. Defendants were also negligent in making these false and misleading statements.

219.    Defendants' statement that the "only other loans to the company are from the founders" was false because the Cell>Point Companies did have other loans aside from those from the Founders, including D.Y.'s note that was in default at that time.

220.    Defendants omitted to state material facts that were necessary to render their disclosures and representations concerning their ability and intention to repay loans in a timely manner not misleading. These omissions include the fact that they were selling receivables they did not have to obtain quick cash that saddled the company with obligations it could not meet, that it had defaulted on prior obligations including D.Y.'s $100,000 note, and that it had no realistic way of repaying a note entered into by M.D. absent engaging in more fraud to induce more quick cash or investments.

221.    Similarly, when P.G. purchased a $50,000 note from Defendants on October 8, 2021, there was no disclosure that the Cell>Point Companies were obtaining quick cash or that D.Y.'s $100,000 note was in default at that time despite a multitude of emails and oral communications between Defendants and P.G. concerning the company, its outlook, and its finances.

222.    Defendants' false and misleading statements, and omissions, between June 2021 and April 2022 concerning their purported ability repay loans in a timely manner were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about how whether the company had defaulted on near identical loans, or had to resort to obtaining quick cash – that it got and could only get through false statements –  to keep the company afloat.

223.    Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose concerning their purported ability to take on new obligations through note investments and repay them in a timely manner, Defendants misled investors.

F.      **Defendants Continued to Defraud Investors After the SEC Sought and Obtained an Injunction from Defendants' Continuing Fraud.**

224.    After the SEC sought a preliminary injunction to stop Defendants' ongoing fraud on Cell>Point Companies investors, and after the Court found Defendants were engaging in securities fraud and enjoined them from continuing to engage in securities fraud, Defendants continued to make false and misleading statements in connection with securities offerings.

225.    On November 24, 2021, the SEC moved for a preliminary injunction, asset freeze, and other relief in this case "in order to…put a stop to [ ] Defendants' ongoing fraud…"

226.    On January 25, 2022, the Court held a preliminary injunction hearing. Terry Colip and Greg Colip testified at the hearing regarding their conduct at issue.

227.    On February 14, 2022, the Court entered an order finding Defendants were engaging in securities fraud and granting the SEC's motion for a preliminary injunction that enjoined Defendants from continuing their fraud, namely a prohibition on violating (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and (2) Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### 1. Defendants Apply for an SBA Loan

228.    On or about December 1, 2021, Defendant applied for an SBA 7(b) COVID-19 Economic Injury Disaster Loan, which was to "provide funding to help small businesses recover from the economic impacts of the COVID-19 pandemic."

229.    Defendants represented to the SBA that Cell>Point had "Actual 2019 Gross Revenues" of $263,064.00, which dropped to zero in 2020 with the onset of the COVID-19 pandemic.

230.    Cell>Point's pledged "collateral" for the loan was the same patents that it had allegedly transferred into the name of Cell>Theranostics Inc. months earlier.

231.    The SBA loan was initially approved because of these and other representations.

### 2.  Misleading Statements and Omissions to J.B.

232.    On January 4, 2022, Terry Colip sent an email to J.B. soliciting an investment on behalf of the Cell>Point Companies and with the knowledge and assistance of Greg Colip.

233.    The email stated that "Cell Point received an approval for a $500,000 SBA Covid Relief Loan in early December" that was "scheduled to fund mid to late January," that Defendants had agreed to another investor's request to "provide a $ 100,000 loan to Cell> Point secured by 100,000 of the SBA loan and receive and [sic] extra 5,000 shares of Cell Theranostics as the kicker." In the same email, J.B. was offered the same investment: "If you are interested in providing a short term loan to be paid off on or before January 30th with a similar kicker please let me know."

234.    On January 17, 2022, Terry Colip sent an email to J.B. that stated "[o]n a side note, we have a meeting arranged in Soul South Korea Friday with the Altan fund to work out the final terms for their pre-IPO investment."

235.    On January 26, 2022, one day after the hearing on the SEC motion for a preliminary injunction and other relief, Terry Colip entered into a loan agreement on behalf of the Cell>Point Companies with investor J.B. Pursuant to that agreement, J.B. provided $200,000

to Cell>Point, which agreed to repay the money in 20 days with "10% annual interest plus 50,000 shares of Cell Theranostics, Ltd which Cell> Point, LLC currently owns."

236.    Defendants communicated to J.B. that the Cell>Point Companies needed the funds because they were meeting with a foreign investment firm about a pre-IPO crossover round of investment and the company needed to look stronger financially. On information and belief, Defendants did not have a meeting with a foreign investment firm that was looking at the Cell>Point Companies' finances.

237.    Although Cell>Point was the borrower, and although the investment was purportedly to make the Cell>Point Companies stronger financially, and unbeknownst to J.B., Defendants inserted Terry Colip's personal bank account as the account to which the funds should be wired along with the words "Terry Colip further credit to Cell Theranostics."

238.    On January 27, 2022, Terry Colip's personal bank account received J.B.'s $200,000 investment. That same day $65,000 was wired to other accounts belonging to Terry and Greg Colip, and $50,000 was wired to an attorney representing them in this case.

239.    On February 15, 2022, Cell>Point did not make any repayment and defaulted on the loan from investor J.B.

240.    On February 22, 2022, Terry Colip emailed investor J.B. claiming to have spoken with the SBA who indicated a $500,000 loan "was in the process of being sent" and solicited an additional $50,000 investment, claiming to be nearing a deal with an investment group to fund a purported IPO: "If you would be interested in another $50,000 I can work a simmilar [sic] deal. It would still be guaranteed by the SBA loan. On the Cell Theranostics front I have a call with

Altan Capital this week to work on the final terms on the pre-IPO/ crossover round investment. That is the last lichpen [sic] to going public."

241.    On April 21, 2022, one day after disclosing J.B.s' $200,000 investment to the SEC pursuant to a discovery request, Terry Colip sent an email to J.B. with the subject line "Update" and for the first time disclosed to J.B. that the SEC had initiated this enforcement action, though he claimed the "SEC litigation…does not involve Cell Theranostics."

242.    On Monday, April 25, 2022, J.B. contacted Terry Colip and demanded that his $200,000 loan be repaid. Terry Colip responded that "[y]our interest is in Cell Theranostics, Ltd. not Cell>Pont [sic]," claimed that "Cell>Point has no equity interest in Cell Theranostics," and stated that "[t]he SEC case is with Cell>Point not Cell Theranostics," again without disclosing that the Cell Theranostics Entities were found to have engaged in securities fraud and enjoined from committing additional securities fraud.

243.    Defendants representations to J.B. concerning his $200,000 note investment were false and misleading because (1) Defendants were not placing the funds into the Cell>Point Company to make it look stronger, but rather directed the money directly into Terry Colip's bank account so it could be immediately spent and misappropriated; and (2) the Cell>Point companies did not have a meeting arranged in Soul South Korea with the Altan fund to work out the final terms of a pre-IPO investment. In fact, Altan Capital had determined the Cell>Point Companies were not a suitable investment by no later than December 2021.

244.    Defendants representations to J.B. concerning the $50,000 solicitation for a note was false and misleading because Defendants were not working with Altan Capital on the final

terms of a pre-IPO/ crossover round investment, as Altan Capital had already determined the Cell>Point Companies were not a suitable investment.

245.    The above disclosures and representations regarding the use of funds and an investment from Altan Capital were false and misleading when made and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading, as Defendants each knew that (1) they were not obtaining a loan from J.B. to make the company look stronger, as the money would never be placed into the account of any of the Cell>Point Companies, and (2) they were not working with Altan Capital on the final terms of a pre-IPO/ crossover round investment. Defendants were also negligent in making these false and misleading statements.

246.    Defendants omitted to state material facts that were necessary to render their disclosures and representations concerning the use of J.B.'s funds and meeting with Altan Capital not misleading. These omissions include the fact that J.B.'s funds were being directed into Terry Colip's personal bank account, that Defendants were not working with Altan Capital on the final terms of a pre-IPO/ crossover round investment, that there was a pending request by the SEC to freeze the assets of Defendants at the time of J.B.'s $200,000 investment, that the Cell>Point Companies had defaulted on earlier notes, and that the Court found Defendants were engaging in securities fraud and enjoined them from continuing to engage in securities fraud, making it unlikely the Cell>Point Companies could go public or obtain a significant investment to pay for an IPO.

247.    Defendants' false and misleading statements concerning the use of J.B.'s funds and working with Altan Capital on an investment to fund an IPO were material to investors

making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about how their funds will be used, whether the company is actually working on the final terms of a deal that would provide it with funding to pursue an IPO, that there was a pending request by the SEC to freeze the assets of Defendants that, if granted, would have made it difficult if not impossible to repay J.B.'s loan, that the Cell>Point Companies had defaulted on earlier notes, and Defendants were already found to have engaged in securities fraud, making it unlikely they could take the Cell>Point Companies public or obtain any significant investment to pay for an IPO.

248.    Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose, Defendants misled investors.

### 3.   Misleading Statements and Omissions to W.W.

249.    On March 14, 2022, Terry Colip sent an email to W.W. soliciting an investment on behalf of the Cell>Point Companies and with the knowledge and assistance of Greg Colip.

250.    That email stated that "Cell Theranostics [was] working on completing its $25 Million pre-IPO institutional round and plan[ned] to be a public company before the end of this year" and represented that the Cell>Point Companies were raising money from individual investors: "A few members asked if they could purchase additional shares in Cell Theranostics at the same terms as the institutions which is approximately 50% of the IPO price.  The answer is yes."

251.    W.W. responded and asked if there was additional information to review, as well as the "stage and risk." Terry Colip then emailed W.W. a Cell Theranostics PPM and a Cell Theranostics presentation Deck and stated, among other things, the "plan is to complete the

Phase 3 lung cancer trial before the IPO later this year" and "[t]he risk would be the IPO price is lower than expected, however, I don't see it being 50% lower."

252.    Both the PPM and Deck represented that John Raby was the CEO of CT Ltd.

253.    The PPM disclosed the instant enforcement action, but represented that there was a D&O insurance carrier covering the costs of defending the case: "Cell>Point, Greg R. Colip and Terry A. Colip and their D&O insurance carriers believe they have strong defenses to all of the SEC's claims and plan to mount a vigorous defense and seek dismissal of the complaint."

254.    On March 15, 2022, Terry Colip emailed investor W.W. claiming to have "received a message from the Greystone Group that they would like to take us public on the London AIM exchange."

255.    On March 16, 2022, Terry Colip emailed investor W.W. representing that "Cell>Point received approval for a $500,000 Covid 10 IDLE loan which is scheduled to fund in two weeks." Though Terry Colip referenced an earlier loan, he did not disclose that it (or other loans) were in default: "One of my investors just made a $100K loan to Cell>Point secured by the SBA proceeds for 10% interest but more importantly a kicker of 10,000 Cell Theranostic [sic] shares. I could do the same for you if you were interested.  It does not need to be $100K."

256.    Terry Colip further stated "[a]lso, you are looking at most a 2 ½ week loan."

257.    W.W. responded and asked if there was "any chance the 500K Covid IDLE loan won't happen in 2 weeks." Terry Colip replied to W.W. on March 16 and claimed that he "called the SBA this morning then [sic] confirmed [he] should have the wire before April 1st." He further stated that "[i]t takes about 90 days after loan approval to receive funds," and that the

only identifiable risk was that the Company would receive the $500,000 in three weeks instead of two: "The only risk I see is the SBA takes an extra week to fund."

258.    On or about March 18, 2022, W.W. and Terry Colip signed a Loan Agreement dated March 16, 2022, for a $100,000 loan to Cell>Point, which was to be repaid by April 1, 2022, with "10% annual interest plus 50,000 shares of Cell Theranostics, Ltd which Cell> Point, LLC currently owns."

259.    On March 18, Investor W.W.'s wire of $100,000 arrived in Cell>Point's bank account. $10,000 was immediately transferred into Terry Colip's personal bank account, and another $8,000 was transferred into that same account over the next six days. Id. Additionally, on March 21, a wire of $76,591.00 was transferred out of Cell>Point's bank account to settle another lawsuit involving Cell>Point, Terry Colip and Greg Colip.

260.    On April 1, 2022, Cell>Point did not make any repayment and defaulted on the loan from investor.

261.    Defendants' representations regarding the CEO of CT Ltd., the claimed D&O insurance policy, and the SBA loans were false and misleading when made and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading, as Defendants each knew that (1) Jon Raby was not the CEO of CT Ltd; (2) the Cell>Point Companies did not have a D&O insurance policy; (3) the SBA loan proceeds did not take 90 days to fund, as Defendants had been expecting the funds to arrive in the months prior; (4) the SBA did not confirm that the Cell Point Companies would receive the wire before April 1st; and (5) Defendants knew there was a significant risk the funds would not be obtained in

three weeks because they had been trying to access the funds for over three months. Defendants were also negligent in making these false and misleading statements.

262.    Defendants omitted to state material facts that were necessary to render their representations concerning the ability to repay W.W. not misleading, as Defendants had been attempting to obtain the SBA loan proceeds since December 2021; J.B.'s $200,000 note was in default (as was D.Y.'s $100,000 note from more than six months earlier) after the SBA funds did not arrive when Defendants expected; the Court found each Defendant was engaging in securities fraud and enjoined them from continuing to engage in securities fraud, making it unlikely that the Company could raise funds to pay for an IPO that would cause the CT Ltd. shares obtained in connection with the $100,000 investment to increase in value.

263.    These false and misleading statements and omissions concerning W.W.'s $100,000 note investment were material to investors making investment decisions because they substantially altered the total mix of information. A reasonable investor would want accurate information about the CEO of CT Ltd; (2) whether the Cell>Point Companies have a D&O insurance policy given they are currently in litigation; (3) whether the SBA loan proceeds had been expected earlier and were delayed (at best); (4) whether earlier notes had been defaulted on; and (5) whether the Cell>Point Company had been found to have engaged in – and prohibited from continuing – securities fraud when the bulk of the profits from the $100,000 loan investment would come from CT Ltd. shares that would supposedly increase in value during the purported IPO.

264.    Because of Defendants' false and misleading statements, and the material information Defendants failed to disclose, Defendants misled investors.

**G.      Defendants are Each Liable for Their Misstatements and Omissions.**

265.    All of the misrepresentations and omissions detailed above were made in connection with the offer, purchase, or sale of securities issued by the Cell>Point Companies.

266.    Greg Colip and Terry Colip each made or directed each misrepresentation and omission detailed above.

267.    Both Greg Colip and Terry Colip determined the content of and had ultimate authority over the PPMs, as well as the Investor Decks, Quarterly Reports, Ad Hoc Updates, and emails used to solicit prospective investors.

268.    Throughout the Relevant Period, Greg Colip and Terry Colip were acting within the scope of their apparent authority to make representations on behalf of the Cell>Point Companies—throughout the Relevant Period for Cell>Point, and from the date of their respective creation through April 2022 for the Cell Theranostics Entities—and did in fact make representations described above on behalf of the Cell>Point Companies.

269.    The scienter of Greg Colip and Terry Colip is imputed to the Cell>Point Companies.

**H.      Defendants Obtained Money or Property From Their Misconduct.**

270.    Defendants each obtained money by means of the misrepresentations and omissions detailed above.

271.    During the Relevant Period, the Cell>Point Companies received more than $10 million in funds from investors from the sale of units and notes and combinations of the two.

272.    Terry Colip and Greg Colip received compensation and loans against deferred compensation, both of which were entirely funded by investor capital.

273.     Cell>Point, Terry Colip and Greg Colip's attorneys in this enforcement action has been funded by investor capital.

**III.     Defendants Engaged in Deceptive Conduct to Conceal Their Fraud From Investors.**

274.     In addition to creating and disseminating the false and misleading statements identified above, Defendants engaged in other deceptive conduct. After fraudulently inducing investors to fund the Cell>Point Companies, Defendants engaged in deceptive acts to prevent investors and investigators from discovering the truth about the Cell>Point Companies' fraud.

275.     Terry Colip and Greg Colip wrote, reviewed, and/or disseminated the false and misleading statements described above to current investors. These statements were designed to lull them into believing that the Cell>Point Companies were successfully advancing development of Oncardia, negotiating with foreign investments firms on multi-million dollar investments to fund an IPO, and working with investment bank on that IPO, that would purportedly bring a return to investors.

276.     In addition, Terry Colip sent numerous emails and made oral statements to investors that made other false or misleading lulling statements, including, for example:

a.     an April 2019 statement by Terry Colip to an investor, that the investor circulated to multiple additional investors, stating that "cancer imaging is 2/3 done and 'knocking it out of the park'";

b.     a March 2020 email from Terry Colip to another investor, that the investor distributed to multiple other investors, stating: "We have wonderful technology with Oncardia and we are meeting our phase 3 clinical trial endpoints"; and

        c.      a recorded August 2020 call with a longtime investor group during which Terry Colip described good progress imaging patients and projected filing for FDA approval within six months.

        d.      orally telling M.G. on or around March 1, 2022, that the Cell>Point Companies were "finishing up the work to have Alton [sic] Capital fund the crossover round (private to public) of about $30 million."

        e.      emailing S.G. on or around April 21, 2022, stating that "UBS was working with [Cell>Point] on a pre-IPO round" investment and falsely stating that the SEC mistakenly believed otherwise because it did not request the Cell>Point companies' email communications with UBS.

277.    Terry Colip made false and misleading statements to at least three investors with the knowledge and expectation that they would disseminate the false and misleading statements in connection with soliciting investments in Cell>Point.

278.    On at least two occasions, Terry Colip instructed investors to disregard Cell>Point's audited financial statements as meaningless for a pre-revenue company like Cell>Point, and instead encouraged the investors to focus on Cell>Point's (falsely represented) clinical trials and intellectual property, including, for example:

        a.      a March 2019 email to a longtime investor who asked for financial statement information stating "[i]n terms of P&L and B/S it would not tell you much. As with any biotech we are using every dollar of cash to push trials while we sell Oncardia"; and

        b.      a July 2019 email to an investor responding to his accountant's concerns about Cell>Point's financial condition stating "[t]he value of pre-revenue biotech is three things.

(1) technology, (2) patent life and (3) where you are in clinical trials. On those three value points we are doing well."

### IV.   Greg Colip Aided and Abetted Cell>Point's and Terry Colip's Fraud.

279.    As described above, Greg Colip acted knowingly, or recklessly, and negligently in making false and misleading statements to current and prospective Cell>Point investors and engaged in deceptive acts.

280.    Greg Colip also aided and abetted the Cell>Point's and/or Terry Colip's making of false and misleading statements to investors and deceptive acts by providing substantial assistance through the conduct described above.

### V.   Terry Colip and Greg Colip Aided and Abetted the Cell Theranostics Entities' Fraud.

281.    As described above, Terry Colip acted knowingly, or recklessly, and negligently in making false and misleading statements to current and prospective Cell Theranostics Entities investors and engaged in deceptive acts.

282.    Terry Colip also aided and abetted the Cell Theranostics Entities' making of false and misleading statements to investors and deceptive acts by providing substantial assistance through the conduct described above.

283.    As described above, Greg Colip acted knowingly, or recklessly, and negligently in making false and misleading statements to current and prospective Cell Theranostics Entities investors and engaged in deceptive acts.

284.    Greg Colip also aided and abetted the Cell Theranostics Entities' making of false and misleading statements to investors and deceptive acts by providing substantial assistance through the conduct described above.

## FIRST CLAIM FOR RELIEF

**Fraud—Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Against All Defendants)**

285.    The SEC realleges and incorporates by reference paragraphs 1 to 284 as though fully set forth herein.

286.    By virtue of the foregoing, from no later than 2016 through at least April 2022, Cell>Point, Greg Colip, and Terry Colip, and from the date of their respective creation through at least April 2022, the Cell Theranostics Entities, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon another person.

287.    By reason of the conduct described above, the Cell>Point Companies, Greg Colip, and Terry Colip, directly or indirectly, violated, and unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

**Fraud—Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for the Cell>Point Companies' Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] (Alternatively, against Greg Colip and Terry Colip)**

288.    The SEC realleges and incorporates by reference paragraphs 1 to 284, as though fully set forth herein.

289.    By virtue of the foregoing, from no later than 2016 through at least April 2022, Greg Colip and Terry Colip exercised control over Cell>Point, and from the date of their respective creation through at least April 2022, exercised control over the Cell Theranostics Entities, which, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

290.    Accordingly, Greg Colip and Terry Colip are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for the Cell>Point Companies' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

**Fraud—Aiding and Abetting Cell>Point's and Terry Colip's Violation of Exchange Act
Section 10(b) and Rule 10b-5 Thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
(Alternatively, against Greg Colip)**

291.    The SEC realleges and incorporates by reference paragraphs 1 to 284, as though fully set forth herein.

292.    By virtue of the foregoing, from no later than 2016 through at least April 2022, Greg Colip provided knowing and substantial assistance to Cell>Point and to Terry Colip, who, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

293.    Accordingly, Greg Colip aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

**Fraud – Aiding and Abetting the Cell Theranostics Entities' Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Alternatively, against Terry Colip and Greg Colip)**

294.    The SEC realleges and incorporates by reference paragraphs 1 to 284, as though fully set forth herein.

295.    By virtue of the foregoing, from no later than the date of their respective creation through at least April 2022, Terry Colip and Greg Colip provided knowing and substantial assistance to the Cell Theranostics Entities, who, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

296.    Accordingly, Terry Colip and Greg Colip aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

**FIFTH CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities—Violations of Securities Act Section 17(a)**
**[15 U.S.C. § 77q(a)]**
**(Against All Defendants)**

297.    The SEC realleges and incorporates by reference paragraphs 1 to 284, as though fully set forth herein.

298.    By virtue of the foregoing, Cell>Point, Greg Colip, and Terry Colip from no later than 2016 through at least April 2022, and the Cell Theranostics Entities from the date of their respective creation through at least April 2022, have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

299.    Accordingly, the Cell>Point Companies, Greg Colip, and Terry Colip violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SIXTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities—Aiding and Abetting the Cell>Point's and Terry Colip's Violations of Securities Act Section 17(a)**
**[15 U.S.C. § 77q(a)]**
**(Alternatively, against Greg Colip)**

300.    The SEC realleges and incorporates by reference paragraphs 1 to 284, as though fully set forth herein.

301.    By virtue of the foregoing, from at least 2016 through at least April 2022, Greg Colip provided knowing and substantial assistance to Cell>Point and to Terry Colip, who, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

302.    Accordingly, Greg Colip aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SEVENTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities—Aiding and Abetting the Cell Theranostics Entities' Violations of Securities Act Section 17(a)**
**[15 U.S.C. § 77q(a)]**
**(Alternatively, against Terry Colip and Greg Colip)**

303.    The SEC realleges and incorporates by reference paragraphs 1 to 284, as though fully set forth herein.

304.    By virtue of the foregoing, from the date of their respective creation through at least April 2022, Terry Colip and Greg Colip provided knowing and substantial assistance to the Cell Theranostics Entities, who, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

305.    Accordingly, Terry Colip and Greg Colip aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

## **I.**

Find that each of the Defendants committed the violations alleged in this Complaint;

## **II.**

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

**III.**

Order that Terry Colip and Greg Colip be permanently prohibited from acting as an officer or director of any public company;

**IV.**

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint, plus post-judgment interest;

**V.**

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], in an amount to be determined by the Court, plus post-judgment interest;

**VII.**

Grant such other relief as this Court may deem just or appropriate.

**<u>JURY DEMAND</u>**

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted this 16th day of May 2022.

By:   <u>s/ Mark L. Williams</u>
      Mark L. Williams
      Zachary T. Carlyle
      Gregory Kasper
      Attorneys for Plaintiff
      UNITED STATES SECURITIES AND
      EXCHANGE COMMISSION
      Denver Regional Office

1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000