IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 21-cv-1574-PAB-KLM

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

          v.

CELL>POINT, L.L.C.,
CELL THERANOSTICS, LTD,
CELL THERANOSTICS, INC.,
GREG RUSSELL COLIP, and
TERRY ALLEN COLIP,

      Defendants.

---

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS CELL>POINT, L.L.C., GREG RUSSELL COLIP, AND TERRY ALLEN COLIP

---

## Table of Contents

I.    PRELIMINARY STATEMENT ................................................................................1

II.   STATEMENT OF FACTS ....................................................................................2

    A.  The Defendants ...........................................................................................2

    B.  Defendants Offered and Sold Management Units and Notes to Investors ......................4

    C.  Defendants' Offers and Sales of Securities from January 1, 2016 to February 2021.......5

       i.     PPMs ...........................................................................................................5

      ii.    Investor Decks .............................................................................................6

     iii.    Quarterly Reports.........................................................................................6

    D.  Representations to Investors and Prospective Investors about Amounts of Capital
        Investments and Founder Contributions into Cell>Point.................................................7

    E.  Actual Amounts of Capital Investments into Cell>Point .................................................9

    F.  Actual Amounts of Founder Contributions into Cell>Point ...........................................10

III.  ARGUMENT......................................................................................................11

    A.  Summary Judgment Standard ......................................................................................11

    B.  Defendants Committed Securities Fraud .....................................................................12

       i.     Cell>Point, Terry Colip, and Greg Colip Materially Overstated Amounts
           of Capital Investments and Founder Contributions into Cell>Point in
           violation of Rule 10b-5(b) and § 17(a)(2)..................................................13

      ii.    Cell>Point, Terry Colip, and Greg Colip Acted with Scienter and
           Negligently in Violation of Rule 10b-5(b) and § 17(a)(2), Respectively ................17

     iii.    The Material Misstatements were in the Offer or Sale and in Connection with the
           Purchase or Sale of Cell>Point's Securities in Violation of § 17(a)(2) and Rule 10b-
           5(b), Respectively ......................................................................................18

     iv.    Cell>Point, Terry Colip, and Greg Colip Used Interstate Commerce ....................21

      v.    There was a Causal Line Between Cell>Point, Terry Colip, and Greg Colip's
           Deceptive Statements and Receipt of Money or Property .......................................21

## Table of Authorities

**Cases**

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ................................................ 18

*Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973 (10th Cir. 1996) ................................................. 19

*Chicago Ins. Co. v. Hamilton, 09-cv-01815* (LTB) (MJW), 2010 WL 2541133 (D. Colo. May 26, 2010)  3

*Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082 (10th Cir. 2020) ............................................ 19-20

*Janus Capital Group, Inc. v. First Derivative Traders,* 131 S.Ct. 2296 (2011) ................................. 12, 13

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) ............................................... 20

*Robare Group, Ltd. v. SEC*, 922 F.3d 468 (D.C. Cir. 2019) ..................................................... 18

*SEC v. Aqua Vie Beverage Corp.*, 2007 WL 2025231 (D. Idaho July 9, 2007) ............................... 15

*SEC v. Big Apple Consulting*, 783 F.3d 786 (11th Cir. 2015) ................................................... 12

*SEC v. Blavin*, 760 F.2d 706 (6th Cir.1985) ........................................................... 19

*SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022) ........................................... 12, 19

*SEC v. Henderson*, 2022 WL 313015 (N.D. Ill. Mar. 17, 2022) ........................................... 16

*SEC v. Intelliquis Int'l, Inc.*, 2003 WL 23356426 (D. Utah Dec. 11, 2003) ............................. 14

*SEC v. Jankovic*, 2017 WL 1067788 (S.D.N.Y. Mar. 21, 2017) ........................................... 16, 17

*SEC v. Langford*, 2011 WL 13228240 (N.D. Ala. Aug. 8, 2011) ....................................... 20-21

*SEC v. Levin*, 2014 WL 11878357 (S.D. Fla. Oct. 6, 2014) ........................................... 14

*SEC v. Mahabub*, 343 F. Supp. 3d 1022 (D. Colo. 2018) ........................................ 12, 17, 18

*SEC v. Mahabub*, 2017 WL 6555039 (D. Colo. Dec. 22, 2017) ........................................... 19

*SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233 (11th Cir. 2012) ................................... 19

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ......................................................... 15

*SEC v. Thompson*, 732 F.3d 1151–57 (10th Cir. 2013) ........................................... 11

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012) ........................................... 12, 18-19

*SEC v. Smart,* 2011 WL 2297659 (D. Utah June 8, 2011) ........................................... 21

*United States v. Naftalin*, 441 U.S. 768 (1979) ......................................................... 19

Plaintiff Securities and Exchange Commission ("SEC") moves under Fed. R. Civ. P. 56 and D.C.COLO.LCivR 56.1 for summary judgment against defendants Cell>Point, LLC ("Cell>Point" or the "Company"), Greg Colip, and Terry Colip (collectively, "Defendants") on the SEC's First and Fifth Claims for Relief: violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 ("Securities Act"), namely Rule 10b-5(b) and Section 17(a)(2). Dkt. No. 140, Amended Complaint, filed July 18, 2022 ("AC") at ¶¶ 285-287; 297-299. This Motion is supported by the exhibits to the Motion, the concurrently filed Declarations of Anne C. Romero ("Romero Decl.") and Ty Cottrill ("Cottrill Decl."), and exhibits attached thereto.

## I.    **PRELIMINARY STATEMENT**

From January 2016 through April 2022, over 150 investors purchased more than $10 million in securities of Cell>Point, which was under the control of Greg Colip and Terry Colip. The undisputed facts demonstrate that Defendants made a series of false and misleading statements in connection with these security offerings and sales, including misrepresenting the amount of money raised by Cell>Point as well as the amount of money contributed to the Company by Greg Colip, Terry Colip, and the Company's other founder, its Chief Technology Officer (collectively, the "Founders"). In short, in order to induce investments into the Company, the Defendants misstated the amount of money raised by Cell>Point (a pre-revenue company that was allegedly endeavoring to bring radiopharmaceutical drugs to market) by more than $50 million, and falsely stated that the Founders had put in over $30 million into the company when they, by their own admission, had not put in anywhere near this amount of money and in fact had taken out millions more from the company than they had put in. *See* AC at ¶ 4.

Based on these misstatements, the SEC seeks summary judgment on its claims that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, and Section 17(a)(2) of the Securities Act. There can be no genuine dispute that Defendants made these representations about the amounts of money raised by Cell>Point and the amounts of money contributed to Cell>Point by the Founders, that these amounts were misstated by tens-of-millions of dollars, and that these amounts – which if true would have provided much needed capital to the Company and caused Greg Colip and Terry Colip to have "skin in the game" and an incentive for the Company to succeed – were material to investors.

Though this motion deals with only a fraction of Defendants' fraud on Cell>Point investors, by granting summary judgment it will simplify (if not obviate the need for) trial given the SEC will be entitled to seek millions of dollars in remedies.[1]

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Defendants

1.    **Cell>Point, LLC** ("Cell>Point"), is a Delaware Limited Liability Company headquartered in Centennial, Colorado. Dkt. No. 152, Answer and Jury Demand of Cell>Point, L.L.C., Cell Theranostics Ltd., and Cell Theranostics, Inc., filed August 31, 2022 ("CP Ans.") at ¶ 16; AC at ¶ 16.

2.    Cell>Point is a privately-held radiopharmaceutical company that purports to be developing diagnostic and therapeutic products. CP Ans. at ¶ 16; AC at ¶ 16.

---

[1] The SEC is moving for summary judgment only on liability and not remedies. If this motion is granted, the SEC will, at the appropriate time, seek remedies arising from these violations including "disgorgement of all ill-gotten gains" and "civil penalties pursuant to Section 21(d) of the Securities Act [ ] and Section 20(d) of the Exchange Act [ ]." AC at ¶ 12.

3.      Cell>Point is a pre-revenue company; it has never had revenue since its founding in 2001. Ex. 1, Prelim. Inj. Hr'g. Tr. 51:9-22.

4.      Cell>Point's assets consisted predominantly of five technology platforms based on Patent and Technology License Agreements with the Board of Regents of the University of Texas System on behalf of the M.D. Anderson Cancer Center. Ex. 2, Decl. of G. Colip [Doc. No. 56-1] at 1.

5.      Cell>Point's patent and technology license agreements with University of Texas System and M.D. Anderson Cancer Center ("M.D. Anderson") were terminated because of unpaid fees. Ex. 3, Third Contempt Hr.'g Tr. 60:25-61:12.

6.      The Founders (Greg Colip, Terry Colip, and Jerry Bryant) have been managing members of Cell>Point since the Company's founding in 2001. CP Ans. at ¶ 35; AC at ¶ 35.

7.      **Greg Colip** is a founder, Manager, and the CEO of Cell>Point, and has served in those roles since 2001. G.C. Ans. at ¶ 19;[2] AC at ¶ 19; *see also* CP Ans. at ¶ 35 ("Defendant Cell>Point admits that CEO Greg Colip…").

8.      **Terry Colip** is a founder, Manager, and the CFO of Cell>Point, and has served in those roles since 2001. CP Ans. at ¶ 20; Dkt. No. 153, Answer and Jury Demand of Terry Colip ("T.C. Ans.") at ¶ 20; AC at ¶ 20.

---

[2] Though Greg Colip does not explicitly admit that he is the CEO of Cell>Point, he does not deny the allegation. Pursuant to Fed.R.Civ.P. 8(b)(6), this allegation – and others that are similarly not denied – are deemed admitted. *See, e.g.*, *Chicago Ins. Co. v. Hamilton*, 09-cv-01815 (LTB) (MJW), 2010 WL 2541133, at *3 (D. Colo. May 26, 2010) ("Neither filing admits or denies the allegations asserted against Defendants in Plaintiff's Complaint as required by Fed.R.Civ.P. 8(b). Accordingly, all allegations in Plaintiff's Complaint are therefore deemed admitted pursuant to Rule 8(b)(6) of the Federal Rules of Civil Procedure."), *report and recommendation adopted*, 09-cv-01815, 2010 WL 2540963 (D. Colo. June 18, 2010), *aff'd*, 422 Fed. Appx. 740 (10th Cir. 2011).

**B.  Defendants Offered and Sold Membership Units and Notes to Investors.**

9.       From January 2016 through at least February 2021 (the "Relevant Period"),[3] Cell>Point offered and sold notes to investors. CP Ans. at ¶ 44; AC at ¶ 44.

10.      Cell>Point offered and sold LLC membership interests ("units") in Cell>Point to investors during the Relevant Period. CP Ans. at ¶ 44; T.C. Ans. at ¶ 44; G.C. Ans. at ¶ 44; AC at ¶ 44.

11.      Cell>Point has primarily financed its operations from funds raised from the sale of units and the issuance of notes, and since 2001 has raised at least $56 million from over 500 investors, including at least $10 million from over 150 investors during the Relevant Period. CP Ans. at ¶ 26; AC at ¶ 26; Romero Decl. at ¶¶ 4, 5, Exs. A, B.

12.      Investors in Cell>Point units invested money in a common enterprise. CP Ans. at ¶ 46; AC at ¶ 46.

13.      Cell>Point's Private Placement Memoranda ("PPMs") for its offers and sales of units to investors state on the first page that the units are "[s]ecurities" and note that ""THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933…" Cottrill Decl. at ¶ 4.

14.      The PPMs also state on the first page that "the day-to-day operations and the investment management of the Company is conducted by its Managing Members…with the support of Company Executives. The investors will be Members…of the Company." *Id.*

---

[3] The Relevant Period is the time period during which the misstatements at issue in this Motion were made and is the same Relevant Period in the initial Complaint. *See* Dkt. No. 1 at ¶ 1.

**C.  Defendants' Offers and Sales of Securities from January 1, 2016 to February 2021.**

15.     Terry Colip was the primary contact for individuals or entities interested in investing and he communicated with those individuals by e-mail, telephone, and during events. CP Ans. at ¶ 47; T.C. Ans. at ¶ 47; AC at ¶ 47; *see also* CP Ans. at ¶ 13 ("Defendants admit that certain acts, practices, transactions and courses of business alleged in the Amended Complaint were affected, directly or indirectly, by making use of the means or instrumentalities of communication in interstate commerce…").

16.     Most of the time, Terry Colip met potential investors in person and provided a package that included a Private Placement Memorandum ("PPM"), an investor deck, and other materials (collectively, the "offering materials"). Ex. 4, T. Colip Inv. Tr. at 137:7-138:5.

17.     Terry Colip prepared the Cell>Point offering materials and is responsible for raising money from investors on behalf of Cell>Point. Ex. 4, T. Colip. Inv. Tr. at 29:24-30:13.

**i.  PPMs**

18.     Terry Colip and Greg Colip each were drafters of Cell>Point's PPMs. Ex. 4, T. Colip Inv. Tr. at 319:24-321:4; Ex. 5, G. Colip Inv. Tr. at 55:6-56:10.

19.     Terry Colip and Cell>Point made sure that every investor received a PPM before investing, but did not track which investor received which version of the PPM. Ex. 4, T. Colip Inv. Tr. at 136:12-137:12, 322:16-19.

20.     Cell>Point used at least nineteen versions of its PPM during the Relevant Period, including versions dated: January 16, 2016; November 1, 2016; April 3, 2017; July 3, 2017; September 1, 2017; June 1, 2018; October 1, 2018; October 2, 2018; January 2, 2019; February 10, 2019; April 1, 2019; April 2, 2019; June 1, 2019; September 1, 2019; October 1, 2019;

January 2, 2020; February 1, 2020; June 1, 2020; and October 21, 2020. CP Ans. at ¶ 57; AC at ¶ 57.

### ii. Investor Decks

21.     Terry Colip prepared Investor Decks and provided them to prospective Cell>Point investors during the Relevant Period. Ex. 4, T. Colip Inv. Tr. at 134:5-135:10; *see also* T.C. Ans. at ¶ 62; AC at ¶ 62.

22.     Cell>Point utilized at least eight Investor Decks during the Relevant Period, including versions dated January 2019, March 2019, May 2019, September 2019, October 2019, November 2019, March 2020. CP Ans. at ¶ 63; AC at ¶ 63.

### iii. Quarterly Reports

23.     Approximately every three months, Terry Colip and Greg Colip prepared reports ("Quarterly Reports") that focused on Cell>Point's activities over the past quarter and plans for the future. CP Ans. at ¶ 67; AC at ¶ 67.

24.     Greg Colip drafted sections of the Quarterly Reports related to strategic transactions and typically reviewed the reports prior to publication. CP Ans. at ¶ 68; G.C. Ans. at ¶ 68; AC at ¶ 68.

25.     Terry Colip drafted sections of the Quarterly Reports and reviewed the reports. CP Ans. at ¶ 68; T.C. Ans. at ¶ 68; AC at ¶ 68.

26.     Terry Colip disseminated the quarterly reports to certain investors by email and published them on a password-protected website available to Cell>Point investors. CP Ans. at ¶ 70; T.C. Ans. at ¶ 70; G.C. Ans. at ¶ 70; AC at ¶ 70.

**D.  Representations to Investors and Prospective Investors about Amounts of Capital Investments and Founder Contributions into Cell>Point.**

27.     Terry Colip uploaded to Vimeo.com a 23 minute video showing a November 2019 Investor Deck (with Terry Colip's narration) soliciting investments and showing the following slide:



Cottrill Decl. at ¶¶ 15-16.

28.     According to Terry Colip's narration on the video disseminated on Vimeo, "out of the $104.2 million raised to date [since inception], 32% of that has been provided by the Founders." Cottrill Decl. at ¶ 17.

29.     Nearly all PPMs from November 1, 2016 to June 1, 2020 stated that "capital and contributions from the founders and passive investors have exceeded $[amounts ranging from $83.1 million to $91 million] with $[amounts ranging from $51 million to $64.1 million] used for improving and clinically evaluating [Oncardia]." Cottrill Decl. at ¶ 5.

30.     Each PPM from January 16, 2016 to April 2, 2019 stated under "Management Compensation" that "the [Founders] have contributed approximately $32.1 million in cash and units to cover clinical trials." Cottrill Decl. at ¶ 6.

31.     Each PPM from June 1, 2019 to June 1, 2020 stated under Management Compensation that "the [Founders] have contributed approximately $32.1 million to the Company booked as loans to cover clinical trials." Cottrill Decl. at ¶ 7.

32.     The October 21, 2020 PPM stated under "Management Compensation" that "the [Founders] have contributed approximately $38.9 million in cash and units to the Company booked as loans." Cottrill Decl. at ¶ 8.

33.     The January 2019 Investor Deck stated that "$90.2 million (US) has been contributed and raised to date from Founding Partners [and other investors]. . . . $63.1 million has been invested in our lead agent Oncardia;" "$90.2 million (Provided by Founding Partners, Oncologists, Radiologists, Cardiologists (including pension funds), strategic investors, [and other investors]" and "Total Contributions by Founding Partners - $38 million." Cottrill Decl. at ¶ 9.

34.     The March 2019 and May 2019 Investor Decks stated that "Total Contributions by Founding Partners - $38 million." Cottrill Decl. at ¶ 10.

35.     The September 2019 and October 2019 Investor Decks stated that "Capital Raised to Date: $90.1 Million." Cottrill Decl. at ¶ 11.

36.     The March 2020 Investor Deck stated that "Capital Raised to Date: $104.2 Million;" "Contributions by Founders: $37.9 million;" and included the slide from Terry Colip's Vimeo.com video set forth above. Cottrill Decl. at ¶ 12.

37.     The May 2020 Investor Deck stated that "Capital Raised to Date: $104.2 Million" and included the slide from Terry Colip's Vimeo.com video set forth above. Cottrill Decl. at ¶ 13.

38.     Each Quarterly Report from the first quarter of 2016 through the second quarter of 2019 stated: "Contributions to date from founding and passive members have exceeded" amounts ranging from $83.4 million to $94 million. Cottrill Decl. at ¶ 14.

### E.   Actual Amount of Capital Investments into Cell>Point.

39.     As of July 6, 2020, Cell>Point had raised $63,253,269.12 since its inception, which resulted in $55,259,462.12 of "Total Equity Capital Net Sales" after accounting for money spent by Cell>Point on "stock repurchases" and "Unit Sales" by the Founders. Ex. 6, July 6, 2020, Cell>Point Letter to SEC, at SEC-CELLPOINT-E-0000051-52, 64 (entries including and between "Total Members Contributions" and "Total Equity Capital Net Sales").

40.     As of December 31, 2020, Cell>Point had raised approximately $55,738,420 from sales of equity, net of repurchases from unit holders. Ex. 7, Waller Dep. Tr. at 36:17-37:13, 50:25-51:6; Ex. 8, LL.10 Cell Point Equity Rollforward.xlsx (Dep. Ex. 7), at p. 14/14, ln. 624, col. K.

41.     As of December 31, 2020, Cell>Point had raised approximately $1.3 million in cash by issuing debt ("notes payable"). Ex. 7, Waller Dep. Tr. at 50:2-17, 51:7-13; Ex. 9, AA.00 Notes Payable Lead Sheet – Cell Point.xls (Dep. Ex. 9), at p. 2, ln. "Subtotal [AA.25] Notes Payable", ln. 20004 "Accrued Interest Payable."

42.     Cell>Point's financial statements for 2017 to 2020 were audited by Eide Bailly, LLP, and Clay Waller is an Eide Bailly partner who worked on the audits. Ex. 7, Waller Dep. Tr. at 11:11-13:5, 13:23-14:4.

43.     Clay Waller confirmed that to his knowledge there was no other money raised by Cell>Point as of December 31, 2020, other than approximately $57 million comprised of $55,738,420 from sales of equity and $1.3 million from issuing debt. Ex. 7, Waller Dep. Tr. at 11:20-12:1, 51:14-19, 52:7-12.

**F.  Actual Amount of Founder Contributions into Cell>Point.**

44.     According to Cell>Point, "[f]or the period beginning May 2001, the founding members'

contributions (cash and value of units contributed to the company) were $7,865,827.80…" Ex.

10, Oct. 31, 2022, email from G. Colip to SEC, "Partial Discovery Response from Cell Point."

(As noted below, the SEC does not credit this claim and relies on it only for purposes of this

motion).

45.     Cell>Point's equity account records show, for each investor in Cell>Point units, the

amount that they contributed to Cell>Point for units, net of payments the investors received from

the company for repurchases of units. Ex. 7, Waller Dep. Tr. at 24:7-27:2, 32:18-34:7, 38:3-20.

46.     If Founders Greg Colip, Terry Colip, and Jerry Bryant contributed more money for

Cell>Point units than they were paid for Cell>Point units, their equity account balances should

be positive. Ex. 7, Waller Dep. Tr. at 38:3-25, 39:19-40:25.

47.     As of December 31, 2020, the Founders had negative equity account balances in the

following amounts: Greg Colip (-$493,690); Terry Colip (-$1,756,265.64); Jerry Bryant (-

$1,452,122.60). Ex. 7, Waller Dep. Tr. at 38:3-12; Ex. 8, LL.10 Cell Point Equity

Rollforward.xlsx (Dep. Ex. 7), at p. 2/14, ln. 17-19, col. K.

48.     As of December 31, 2020, Terry Colip had loaned $271,555 to Cell>Point and Greg

Colip had loaned $33,301 to Cell>Point in exchange for notes that required Cell>Point to pay

back these amounts with interest. Ex. 7, Waller Dep. Tr. at 45:19-48:15, 50:2-18; Ex. 9, AA.00

Notes Payable Lead Sheet – Cell>Point.xls (Dep. Ex. 9), at p. 2, ln. 20027 (G. Colip), ln. 2032

(T. Colip).

49.     Clay Waller confirmed that to his knowledge Terry Colip and Greg Colip did not loan

any cash to Cell>Point beyond these amounts. Ex. 7, Waller Dep. Tr. at 49:5-50:1.

50.     Founders Terry Colip, Jerry Bryant, and Greg Colip confirmed to Eide Bailly that, as of December 31, 2020, the Founders *owed* Cell>Point the following amounts of principal totaling $11,074,376 for loans they had taken out from the Company: Terry Colip ($5,065,221); Jerry Bryant ($3,066,818); Greg Colip ($2,942,337). Ex. 11, Note Receivable Confirmation Requests (Dep. Ex. 10), at EB-000415 (T. Colip), EB-000416 (J.Bryant), EB-000420 (G.Colip); Ex. 7, Waller Dep. Tr. at 54:17-56:10, 58:2-59:25.

51.     During the Relevant Period, Cell>Point received approximately $10,203,477 in investor proceeds and $11,702,361 of total deposits and made disbursements to the Founders in the following amounts (totaling $4,348,662): Terry Colip ($2,965,716); Greg Colip ($643,358); Jerry Bryant ($739,588). Romero Decl. at ¶¶ 4-6, Exs. A, C (detail net of any Founder "loan" deposits).

52.     The payments from Cell>Point to the Founders were funded by millions of dollars of investor proceeds due to the fact that there was no other source of funds sufficient to make the disbursements. *See* Romero Decl. at Ex. A.

III.    **ARGUMENT**

1. **Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *SEC v. Thompson*, 732 F.3d 1151, 1156–57 (10th Cir. 2013) (quotation omitted). On summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Id.* (quotation omitted). A factual dispute is not "genuine" if the nonmovant "can do no more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted).

## 2.  Defendants Committed Securities Fraud

The SEC seeks summary judgment on its claims that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and Section 17(a)(2) of the Securities Act. AC at 74 (First Claim), 78 (Fifth Claim).

"To establish a violation under § 10(b) of the Exchange Act and Rule 10b-5, the SEC must establish that Appellants 'made: (1) a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by [means of interstate commerce].' " *SEC v. GenAudio Inc.*, 32 F.4th 902, 921 (10th Cir. 2022) (quoting *SEC v. Smart,* 678 F.3d 850, 856-57 (10th Cir. 2012)).

Though courts typically employ these same elements to analyze whether a Securities Act Section 17(a)(2) violation occurred, there are differences. First, a violation of Section 17(a)(2) does not depend on a purchase of a security because the rule makes it unlawful to engage in fraud "in the offer or sale of any securities…" 15 U.S.C. § 77q(a). Second, "negligence may substitute for scienter." *SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1042 (D. Colo. 2018), *aff'd sub nom. GenAudio Inc.*, 32 F.4th 902. *See also* Dkt. No. 93, Order ("PI Order") at 13. Third, because 17(a)(2) declares it unlawful "to obtain money or property by means of any untrue statement of a material fact…," 15 U.S.C. § 77q(a)(2), the SEC must prove "a causal link between the violator's deceptive statements and receipt of money or property." *Mahabub*, 343 F. Supp. 3d at 1043.

Thus, "the elements of a § 17(a)(2) claim are as follows: (1) a misrepresentation or omission (2) of material fact (3) made[4] at least negligently (4) in the offer or sale of any

---

[4]  Section 17(a)(2) makes it unlawful to "obtain money or property *by means of* any untrue statement of material fact." 15 U.S.C. § 77q(a)(2). Therefore, "the [Supreme] Court's definition of 'to make' in Rule 10b-5 does not apply to § 17(a)(2)." *SEC v. Big Apple Consulting*, 783 F.3d

securities (5) using any means of interstate commerce or the mails, and (6) a causal link between the violator's deceptive statements and receipt of money or property." *Id.*

### i. Cell>Point, Terry Colip, and Greg Colip Materially Overstated Amounts of Capital Investments and Founder Contributions into Cell>Point in Violation of Rule 10b-5(b) and § 17(a)(2).

Defendants made material misstatements when they misstated the amount of capital raised by nearly $50 million, and when they overstated their own investments into Cell>Point by tens-of-millions of dollars.

First, Defendants made[5] material misstatements about the amount of money they had raised to fund the Company in Cell>Point PPMs, Investor Decks, and Quarterly Reports. The undisputed facts show that Defendants represented in Cell>Point's PPMs throughout the Relevant Period that "capital and contributions from the founders and passive investors have exceeded" amounts ranging from $83.1 million to $91 million. SOF 29. Similarly, Defendants stated in Investor Decks that Cell>Point had raised amounts ranging from $90.1 million to $104.2 million. SOF 33, 35-37. In Quarterly Reports throughout the Relevant Period, Defendants represented that "[c]ontributions to date from founding and passive members have exceeded" amounts ranging from $83.4 million to $94 million. SOF 38. Furthermore, in a video

---

786, 797 (11th Cir. 2015); *see Janus Capital Group, Inc. v. First Derivative Traders,* 131 S.Ct. 2296, 2302 (2011).

[5] Under Rule 10b–5(b), "the maker of the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders,* 131 S.Ct. 2296, 2302 (2011). Greg Colip, as Manager and CEO of Cell>Point, SOF 7, and Terry Colip, as Manager and CFO of Cell>Point, SOF 8, were, along with Cell>Point, "makers" of the statements in Cell>Point's PPMs, Investor Decks, and Quarterly Reports. By virtue of their positions with the Company and their roles in creating and disseminating the documents, the Colips had ultimate authority over the statements in Cell>Points documents and their dissemination to investors. *See also* SOF 15-19, 21, 23-26.

disseminated on Vimeo.com in November 2019, Terry Colip represented that Cell>Point had "raised to date" more than $104 million. SOF 27, 28.

However, the undisputed facts also show that the Company raised only approximately $57 million, SOF 39-43, tens-of- millions of dollars less than Defendants represented to investors and prospective investors. SOF 27, 28, 33, 35-38.

"A misrepresentation of fact is material if there is a substantial likelihood that a reasonable investor would have viewed it as 'having significantly affected the 'total mix' of information made available.'" *SEC v. Intelliquis Int'l, Inc.*, 2003 WL 23356426, at *9 (D. Utah Dec. 11, 2003) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, (1976)). "In other words, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to invest his money in a particular security." *Id.* (internal quotations omitted).

*"*Summary judgment on the issue of materiality is appropriate where the omissions and misrepresentations are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.'" *Id.* (quoting *TSC Indus., Inc.,* 426 U.S. at 450). "Courts have found that misrepresentations or omissions are material as a matter of law where the representations are related to the revenue of a particular investment, how an investor's funds are being used, or the risk of a particular investment." *SEC v. Levin*, 2014 WL 11878357, at *16 (S.D. Fla. Oct. 6, 2014).

Given that Cell>Point is a pre-revenue company, SOF 3, and primarily financed its operations from funds raised from investors through the sale of membership units and the issuance of notes, SOF 11, there can be no dispute that the overstatement by tens of millions of dollars of the amount raised was important to investors. Whether it had raised $83.1 - $104.2

million as represented, SOF 27, 28, 33, 35-38, which would have given it access to $26-47 million more than the $57 million it actually raised, was in and of itself material and also drastically impacted the risk of the investment. *See, e.g., SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.") (citing cases); *SEC v. Aqua Vie Beverage Corp.*, 2007 WL 2025231, at *6 (D. Idaho July 9, 2007), *aff'd sub nom. S.E.C. v. Gillespie*, 349 Fed. Appx. 129 (9th Cir. 2009) (awarding summary judgment upon finding information that "bore directly on [defendant]'s financial condition and prospects" was material).

As a pre-revenue company, SOF 3, Cell>Point was dependent on investments into the company in order to operate with the hopes of eventually obtaining revenues (and a return for investors). Thus, the amount of investments "drastically impacted the risk of the investment" because without this capital it could not operate. *Murphy*, 626 F.2d at 653. Indeed, the effects of this misrepresentation have been laid bare: Cell>Point's patent and technology license agreements, which predominantly made up Cell>Point's assets, were terminated because of unpaid fees. SOF 4-5.

Second, Defendants made material misstatements in Cell>Point's PPMs and Investor Decks about the amounts contributed to the Company by the Founders. The undisputed facts demonstrate that Defendants represented in Cell>Point's PPMs that the Founders contributed approximately $32.1 million to $38.9 million to the Company, SOF 30-32, and stated in Investor Decks that the Founders had contributed $37.9 million to $38 million to the Company. SOF 33 36.

However, "the founding members' contributions (cash and value of units contributed to the Company) were $7,865,827.80." SOF 44. Though the SEC does not credit this claim and

relies on it only for purposes of this motion, and while the Colips were not able to produce documentation supporting this claim,[6] even accepting it as true would still make their earlier representations of contributing more than $30 million to the Company materially false and misleading. For the reasons stated above, these were funds that the investors were led to believe were accessible to the pre-revenue company, but were not. Moreover, the less money the Colips had invested into the company, the less invested they were in ensuring a return on investments into Cell>Point, increasing the risk of an investment into the Company. *See, e.g.*, *SEC v. Jankovic*, 2017 WL 1067788, at *11–12 (S.D.N.Y. Mar. 21, 2017) (finding that "[r]easonable minds could not differ as to whether" certain misstatements were material when they "legitimized" a start-up company by, among other things, misrepresenting  certain individuals "had skin in the game in the form of equity stakes in" the company); *SEC v. Henderson*, 2022 WL 313015, *11 (N.D. Ill. Mar. 17, 2022) (misrepresentations about sources of financial support were material because the Defendant "used them to make his joint venture appear legitimate and well-funded, to make the investments look safe, and to persuade solicited individuals to invest.").

Additionally, when the Colips made the inaccurate claims about the Founders' contributions into the company, they also made material omissions by failing to disclose that they had *taken out* more money from the Company than they now claim to have put in. As of December 31, 2020, the Founders had taken out loans of more than $11 million, which is far more than the $7,865,827.80 Cell>Point now claims they contributed. SOF 44, 50, 51. Thus, even accepting the Defendants' investment figure as true, investors were misled into believing that the Founders were so confident in the success of the Company that they put in more than

---

[6] The testimony and work papers of Cell>Point's external auditor do not support that the Colips "contributed" anywhere near $7.8 million to the Company. SOF 45-49.

$30 million of their own money, when in fact they did not have the confidence to keep *any* of their money invested in the Company. This would be material to an investor, *SEC v. Jankovic*, 2017 WL 1067788 at *11–12, and increased the risk of the investment.[7]

### ii. Cell>Point, Terry Colip, and Greg Colip Acted with Scienter and Negligently in Violation of Rule 10b-5(b) and § 17(a)(2), Respectively.

"Scienter has been defined as a mental state embracing intent to deceive, manipulate, or defraud," and "willful or reckless behavior satisfies the scienter requirement." PI Order at 15 (internal quotations omitted). Recklessness occurs where the defendant "acted with reckless indifference to a set of facts." *Id.* (cleaned up). *See also Mahabub*, 343 F. Supp. 3d at 1045 (finding that "recklessness" means "'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'") (quoting *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001)).

There can be no dispute that Defendants acted with scienter. The Colips are Founders of Cell>Point, with Greg Colip serving as Manager and CEO, SOF 7, and Terry Colip serving as Manager, CFO, and the primary contact for investors. SOF 8, 15. In those roles, they knew or were reckless in not knowing how much money was raised, how much money they had contributed, and what they had said about investments into the Company. There is no reasonable basis to overstate the amount of money the pre-revenue company raised by *as much as $50 million dollars*. Similarly, the Colips knew or were reckless in not knowing how much money

---

[7] The risk associated with the Colips' lack of investment – and unwillingness to invest – in the Company have surfaced throughout this litigation. The Colips have refused to put even one dollar toward a $100,000 outstanding sanction levied against the Company (and themselves), *see Doc. # 202,* or put their own money toward debts owed to M.D. Anderson because it is not their money that would be (and has been) lost by the collapse of Cell>Point and the revocation of its patent and technology license agreements. SOF 4-5.

they (and the other founder) had put into the Company when they overstated the amount by some $30 million and when they omitted to disclose that they had taken out more money from the Company than they now claim to have put in. *See, e.g.*, *Mahabub*, 343 F. Supp. 3d 1022, 1046 (finding that defendant "could not have reasonably failed to perceive that he was simply making things up as he wrote the relevant documents. As a matter of law, he was *at least* reckless.") (emphasis in original) (citing *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000) ("Even if we indulge the defendants and assume arguendo that they believed in these guarantees, we nevertheless must examine the foundation such a belief would have rested upon. A good faith belief is not a 'get out of jail free card.' It will not insulate the defendants from liability if it is the result of reckless conduct.")).[8] Since Cell>Point acted through the Colips, their scienter can be imputed to Cell>Point. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) (finding that scienter of a company's senior officers "may be attributed to the corporation itself ... when those senior officials were acting within the scope of their apparent authority").

### iii. The Material Misstatements were in the Offer or Sale and in Connection with the Purchase or Sale of Cell>Point's Securities in Violation of § 17(a)(2) and Rule 10b-5(b), Respectively.

The undisputed facts also show that Defendants made misstatements "in connection with the purchase or sale of any security" for purposes of Section 10(b) and Rule 10b-5, and "in the offer or sale of any securities" for purposes of Section 17(a). This element "'should be construed flexibly, not technically and restrictively.'" PI Order at 15 (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)). "The 'in connection with' requirement [of Section 10(b)] is broadly interpreted

---

[8]  For these same reasons, the Colips were negligent for vastly overstating the amount of money raised by, and their investments into, Cell>Point. *See Robare Group, Ltd. v. SEC*, 922 F.3d 468, 477 (D.C. Cir. 2019) (Negligence – sufficient to show a violation of Section 17(a)(2) – "is the failure to exercise reasonable care under all the circumstances.") (quoting Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (2010)).

and covers any fraud that 'coincide[s] with a securities transaction.'" *Smart*, 678 F.3d at 857

(quoting Wolfson, 539 F.3d at 1256). "Indeed, [the Tenth Circuit has] held that

misrepresentations made to induce a party to purchase a security *or to influence an investment*

*decision* are made in connection with the purchase or sale of a security." *Id*. (emphasis in

original) (internal quotations and citation omitted). Similarly, the terms "offer" and "sale" as

used in 17(a) "are expansive enough to encompass the entire selling process" and "[do] not

require that the fraud occur in any particular phrase of the selling transaction." *United States v.*

*Naftalin*, 441 U.S. 768, 773 (1979). The SEC need not prove reliance or injury because "it is a

well-established principle that the SEC, as a government agency, need not prove that a securities

buyer or seller relied on, and was injured by, a violator's misleading statements." *SEC v.*

*GenAudio Inc.*, 32 F.4th 902, 952-53 (10th Cir. 2022). *See also SEC v. Morgan Keegan & Co.,*

*Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985).[9]

    During the Relevant Period, including after the offering materials were distributed to

investors, Cell>Point offered and sold units and notes, raising at least $10 million from over 150

investors. SOF 9-11, 19-22, 26. There can be no dispute that these units are securities, the

definition of which includes investment contracts. PI Order at 13 (citing *Foxfield Villa Assocs.,*

*LLC v. Robben*, 967 F.3d 1082, 1090 (10th Cir. 2020)). "An investment contract has three parts:

(1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be

---

[9] Because this is not a private securities suit, the SEC need not prove "a causal connection
between the allegedly deceptive act or omission and the alleged injury." *Arst v. Stifel, Nicolaus
& Co.*, 86 F.3d 973, 977 (10th Cir. 1996). *See also, e.g.*, *SEC. v. Mahabub*, 15-CV-2118-WJM-
MLC, 2017 WL 6555039, at *7–8 (D. Colo. Dec. 22, 2017) (recognizing the Tenth Circuit's
"discussion of causation and injury was meant as a reference to private enforcement lawsuits,
and not as a new limitation on SEC enforcement actions.").

derived from the entrepreneurial or managerial efforts of others." PI Order at 13 (quoting *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1090 (10th Cir. 2020) (cleaned up). The undisputed facts show that Cell>Point explicitly stated in each PPM that the units *are securities*, SOF 13, and that investors in Cell>Point units invested money in a common enterprise with a reasonable expectation that returns would be derived from the efforts of Cell>Point and its managers. SOF 12, 14. *See* PI Order at 13 ("Defendants offered membership interests and shares with the expectation that profits would be disbursed after an initial public offering. The Court is satisfied that defendants' offerings of shares and membership interests are investment contracts.").

Likewise, Cell>Point admits that it offered and sold notes to investors, SOF 9, and there can be no genuine dispute that the notes offered and sold by Cell>Point are securities. "[A]n instrument denominated a 'note' is presumed to be a 'security,' and that presumption may be rebutted by a showing that the note resembles a different category of instrument." PI Order at 13 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990)) (cleaned up). There is no evidence in the record that rebuts the presumption that the notes offered and sold by Cell>Point are securities. *See* PI Order at 13 ("Additionally, where defendants offered loans in the forms of notes, the Court is satisfied the presumption that notes are securities has not been rebutted.").

Further, the undisputed facts demonstrate that Defendants made the representations outlined above in PPMs and other documents during the Relevant Period in connection with offers and sales of securities that raised at least $10 million from over 150 investors, SOF 9-11, 19-22, 26, more than satisfying the required nexus.

#### iv.  Cell>Point, Terry Colip, and Greg Colip Used Interstate Commerce.

There is no dispute that Defendants used the means of interstate commerce. This concept is given "broad interpretation in the application of the federal securities laws." *SEC v. Langford*, 2011 WL 13228240, *3 n.3 (N.D. Ala. Aug. 8, 2011). The "use of the telephone and internet to sell securities can establish that interstate commerce was used." PI Order at 14 (citing *S.E.C. v. Smart*, 2011 WL 2297659, at *18 (D. Utah June 8, 2011). Defendants admit that Terry Colip, on behalf of Cell>Point, communicated with prospective investors by email and telephone and admit that "acts, practices, transactions and courses of business alleged in the Amended Complaint were affected, directly or indirectly, by making use of the means or instrumentalities of communication in interstate commerce." SOF 15; *see also* PI Order at 14 ("Plaintiff introduced evidence defendants used email and phone calls to solicit investments. The Court finds that the SEC has proved this element.")

#### v.  There was a Causal Line Between Defendant's Deceptive Statements and Receipt of Money or Property.

Finally, for purposes of Section 17(a)(2), there is indisputably a causal link between Defendants' misstatements, which surrounded and occurred throughout the time it offered and sold Cell>Point units, and receipt of money. The misstatements described herein were not one-off claims, but rather consistent and repeated representations included in every PPM, Investor Deck, and Quarterly Report, which were included to make Cell>Point appear legitimate and persuade investors to invest in the Company.

Moreover, Defendants indisputably raised at least $10 million from over 150 investors during the Relevant Period, and during this same period the Colips received disbursements of approximately $3.6 million from the Company that were funded by investments. SOF 11, 51, 52.


Respectfully submitted,


*s/ Zachary T. Carlyle*
Mark L. Williams
Zachary T. Carlyle
Attorneys for Plaintiff U.S. SEC
Denver Regional Office
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000