IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-01574-PAB-SBP

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.


CELL>POINT, LLC,
GREG COLIP,
TERRY COLIP,
CELL THERANOSTICS, LTD., and
CELL THERANOSTICS, INC.,

     Defendants.

---

## ORDER

---

The matters before the Court are Plaintiff United States Securities and Exchange Commission's Motion for Remedies and Final Judgment [Docket No. 296], Plaintiff's Unopposed Motion to Amend Pleadings to Dismiss Remaining Claims of the Amended Complaint [Docket No. 300], the Motion to Intervene and Response to Plaintiff's Motion for Remedies and Final Judgment [Docket No. 304] filed by JBA Enterprises, LLC, and Plaintiff United States Securities and Exchange Commission's Motion for the Court's Consideration of a Referral to the United States Attorney's Office [Docket No. 311]. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.    BACKGROUND[1]

Cell>Point is a privately held radiopharmaceutical company, headquartered in

Centennial, Colorado, that purports to be developing diagnostic and therapeutic

products, including the radiopharmaceutical product Oncardia.  Docket No. 290 at 2–3,

5 n.10.  Cell>Point is a pre-revenue company which has raised over $56 million from

investors to cover the cost of developing its products.  *Id.* at 3–4.  Terry Colip and Greg

Colip are founding members of Cell>Point.  *Id.* at 4.  Terry Colip is Cell>Point's CEO,

and Greg Colip is Cell>Point's CFO.  *Id.*

On June 10, 2021, the United States Securities and Exchange Commission

("SEC") filed this lawsuit against defendants Cell>Point, LLC ("Cell>Point"), Greg Colip,

and Terry Colip (collectively, "defendants"), bringing claims (1) against all defendants for

fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act"),15 U.S.C. § 78j(b), (2) against the individual defendants for aiding and

abetting violations of the Exchange Act, (3) against all defendants for fraud in the offer

or sale of securities under § 17(a) of the Securities Act of 1933 ("Securities Act"), 15

U.S.C. § 77q(a), and (4) against the individual defendants for aiding and abetting

violations of the Securities Act.  Docket No. 1 at 38–42, ¶¶ 156–70.  On July 18, 2022,

the SEC amended its complaint to add defendants Cell Theranostics, Ltd. and Cell

Theranostics, Inc. as wholly-owned subsidiaries of Cell>Point, LLC.  Docket No. 140 at

77, 79–80, ¶¶ 294–96, 300–05.  The SEC added the Cell Theranostics entities in their

claims for alleged violations of the Exchange Act and the Securities Act and added two

---

[1] The Court assumes the parties' familiarity with the background facts and procedural history of this dispute.  Additional information may be found in the Court's previous orders.  *See, e.g.*, Docket Nos. 290, 291.

claims against the individual defendants for aiding and abetting the Cell Theranostics entities' alleged violations of the Exchange Act and the Securities Act.  *Id.*

On July 21, 2023, the SEC moved for summary judgment on its first and fifth claims against Cell>Point, Terry Colip, and Greg Colip, namely, violations of § 10(b) of the Exchange Act and Rule 10b-5 (claim 1) and violations of § 17(a)(2) of the Securities Act and Rule 10b-5(b) (claim 5).  Docket No. 239.  On March 15, 2024, the Court granted the SEC's motion for summary judgment on claims one and five.  Docket No. 290.  The Court found that, from January 2016 through February 2021, defendants raised over 10 million dollars from 150 investors.  *Id.* at 3–4.  The Court determined that, in communications with investors seeking to raise capital to pursue clinical trials for Oncardia, such as Private Placement Memoranda ("PPM") and investor decks, defendants made fraudulent misstatements by overstating by millions of dollars the value of contributions made by the founders of Cell>Point.  *Id.* at 10–12.

On May 10, 2024, the SEC filed an unopposed motion seeking to amend its complaint by dropping claims two, three, four, six, and seven and by amending the complaint to exclude claims against the Cell Theranostics entities.  Docket No. 300; *see also* Docket No. 305-2.  That same day, the SEC filed its motion seeking remedies and final judgment based on the Court's granting summary judgment on claims one and five. Docket No. 296.  Defendants responded to the SEC's motion for remedies, Docket No. 303, and the SEC replied.  Docket No. 310.  On June 3, 2024, JBA Enterprises, LLC filed a motion to intervene in this action, seeking leave to respond to the SEC's motion for remedies.  Docket No. 304.  The SEC responded to JBA Enterprises, LLC's motion to intervene.  Docket No. 312.

On June 21, 2024, the SEC filed a motion asking the Court to consider referring defendants to the United States Attorney's Office for criminal contempt proceedings based on defendants' violations of the Court's civil contempt orders.  Docket No. 311; *see also* Docket No. 138 (first contempt order); Docket No. 195 (second contempt order); Docket No. 291 (third contempt order).  Defendants did not respond.

## II.    MOTION TO INTERVENE AND MOTION TO AMEND

The Court will first address the motion to intervene.  Docket No. 304.  In the motion to intervene, JBA Enterprises, LLC ("JBA") states that it represents a group of investors who defendants have defrauded.  *Id.* at 2, ¶ 3.  JBA asserts that it has been awarded $1,719,253.25 in a separate action in the District Court of Arapahoe County, Colorado against defendants.  *Id.*, ¶ 7.  It claims that, "[p]ursuant to Federal Rule of Civil Procedure 24(a)(2)[,] JBA has an 'intervention of right' because JBA claims an interest relating to the property or transaction that is the subject of the action."  *Id.* at 4, ¶ 17.  However, in its response, the SEC states that "Section 21(g) of the Exchange Act gives the SEC a statutory right to prevent private parties . . . from seeking to coordinate or consolidate their private actions with an SEC enforcement action" and that the SEC does not consent to JBA's intervention.  Docket No. 312 at 6, 8.  On June 25, 2024, JBA filed a notice in which it states that, "[d]ue to the lack of consent by the SEC regarding JBA's Motion to Intervene, JBA hereby files this notice of withdrawal of JBA's Motion to Intervene and Response to Plaintiff's Motion for Remedies and Final Judgment."  Docket No. 313 at 1–2.  Therefore, the Court will deem the motion to intervene as withdrawn.

Next, the Court will address the motion to amend the complaint.  The SEC states that

4

the Commission now moves the Court, to dismiss the following claims and portions of claims for which the Court has not previously granted partial summary judgment (collectively, the "Remaining Claims"):

(1) First Claim for Relief against Cell Theranostics, Ltd. ("CT, Ltd.") and Cell Theranostics, Inc. ("CT, Inc.") (the "Cell Theranostics Entities") alleging violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder, for the period of in or around February 2021 through April 2022; alleging the same violations against Cell>Point, Greg Colip, and Terry Colip for the period of March 2021 through April 2022; and alleging violations of Rule 10b-5(a) and (c) against Cell>Point, Greg Colip, and Terry Colip for the period of January 2016 through April 2022;

(2) Second Claim for Relief against, alternatively, Greg Colip and Terry Colip alleging control person liability under Exchange Act Section 20(a) for Cell>Point's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder for the period of January 2016 through April 2022;

(3) Third Claim for Relief against, alternatively, Greg Colip alleging aiding and abetting Cell>Point and Terry Colip's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder for the period of January 2016 through April 2022;

(4) Fourth Claim for Relief against, alternatively, Terry Colip and Greg Colip alleging aiding and abetting the Cell Theranostics Entities' violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, for the period of in or around February 2021 through April 2022;

(5) Fifth Claim for Relief against the Cell Theranostics Entities alleging violations of Securities Act Section 17(a), for the period of in or around February 2021 through April 2022; and alleging the same violations against Cell>Point, Greg Colip and Terry Colip for the period of March 2021 through April 2022; and alleging violations of Section 17(a)(1) and 17(a)(3) against Cell>Point, Greg Colip and Terry Colip for the period of January 2016 through April 2022;

(6) Sixth Claim for Relief against, alternatively, Greg Colip alleging aiding and abetting Cell>Point's and Terry Colip's violations of Securities Act Section 17(a) for the period of January 2016 through April 2022; and

(7) Seventh Claim for Relief against, alternatively, Terry Colip and Greg Colip alleging aiding and abetting the Cell Theranostics Entities' violations of Section 17(a) of the Securities Act for the period of in or around February 2021 through April 2022.

Docket No. 300 at 2–3.  The SEC attaches to the motion to amend a stipulation signed by defendants wherein they agree to the amendments listed above.  Docket No. 300-1 at 4.  On June 7, 2024, pursuant to D.C.COLO.LCivR 15.1(a), the SEC filed a copy of its proposed second amended complaint which is amended as described in the motion to amend and the stipulation signed by the parties.  *See* Docket No. 305-1.  The SEC states that, if the motion to amend "is granted, the parties would proceed to a remedies phase and final judgment on the two Claims for which the Court has already granted partial summary judgment, and which are the subject of the SEC's Motion for Judgment and Remedies."  Docket No. 300 at 3.

A party may amend its pleadings once as a "matter of course" within twenty-one days of serving the pleading.  Fed. R. Civ. P. 15(a)(1)(A).  Rule 15(a)(2) provides that, "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2); *see also Scull v. Mgmt. & Training Corp.*, 2013 WL 1657065, at *3 (D.N.M. Mar. 29, 2013).  Defendants have provided written consent.  Docket No. 300-1 at 4.  Therefore, the Court grants the motion to amend the complaint.  The Court agrees that the second amended complaint contains only claims on which the Court has granted summary judgment, and the Court will consider the SEC's motion for remedies and final judgment.

## III.   MOTION FOR REMEDIES

The SEC argues that the Court should order defendants to disgorge their net profits, including pre-judgment interest, and to pay civil penalties.  *See* Docket No. 296 at 4–12.  The SEC also argues that the Court should enjoin defendants from future violations of the securities laws and from serving as an officer or director of a public company.  *See* Docket No. 296 at 12–15.  The Court considers each of the SEC's

requested remedies.

## A. <u>Disgorgement and Prejudgment Interest</u>

"Generally, disgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'"  *Kokesh v. SEC*, 581 U.S. 455, 458–59 (2017) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. a)).  "Disgorgement is not a remedy provided for in the Securities Act or Exchange Act, but is instead a remedy the SEC routinely seeks through district courts' inherent equity jurisdiction."  *SEC v. Mahabub*, 411 F. Supp. 3d 1163, 1169 (D. Colo. 2019) (citing *Kokesh*, 581 U.S. at 458), *aff'd sub nom. SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022).  The Supreme Court has explained that, although disgorgement is not mentioned in the securities acts, "courts determined that the SEC had authority to obtain what it called 'restitution,' and what in substance amounted to 'profits' that 'merely depriv[e]' a defendant of 'the gains of . . . wrongful conduct.'"  *Liu v. SEC*, 591 U.S. 71, 75 (2020) (quoting *SEC v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301, 1307–08 (2d Cir. 1971)).  "Over the years, the SEC has continued to request this remedy, later referred to as 'disgorgement,' and courts have continued to award it."  *Id.* at 75–76.  The Tenth Circuit has characterized disgorgement as "remedial rather than punitive."  *GenAudio*, 32 F.4th at 944 ("The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." (quoting *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006)); *SEC v. Cavanagh*, 445 F.3d 105, 116 & n.25 (2d Cir. 2006) (noting that, "[b]ecause the remedy is remedial rather than punitive, the court may not order disgorgement" exceeding the "amount of money acquired through wrongdoing")).  The Court in *Liu* concluded that a "disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief

7

permissible under [35 U.S.C.] § 78u(d)(5)."  *Liu*, 591 U.S. at 75.

"Disgorgement need only be a reasonable approximation of profits causally

connected to the violation."  *GenAudio*, 32 F.4th at 945 n.22 (quoting *SEC v. Patel*, 61

F.3d 137, 139 (2d Cir. 1995)).  "Once a reasonable approximation is shown, 'the burden

shifts back to the defendant[s] to demonstrate that the disgorgement figure [is] not a

reasonable approximation.'"  *Id.* (quoting *SEC v. Teo*, 746 F.3d 90, 105 (3d Cir. 2014);

*SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) ("The SEC is entitled to

disgorgement upon producing a reasonable approximation of a defendant's ill-gotten

gains. . . .  Exactitude is not a requirement; so long as the measure of disgorgement is

reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct

created that uncertainty." (quotation, alteration, and citations omitted)).

The SEC argues that, during the relevant period,[2] defendants raised $10,203,477

from investors based on fraudulent misstatements.  Docket No. 296 at 5.  Of that

amount, defendants returned $1,489,177 to investors as redemption payments.  *Id.*

Cell>Point transferred another $2,541,490[3] to Terry Colip and $643,658 to Greg Colip.

*Id.* at 5–6.  The SEC asserts that Cell>Point retained $5,529,152 of the ten million

dollars raised from investors.  *Id.* at 6.  The SEC argues that Cell>Point should be

ordered to disgorge $5,529,152, that Terry Colip should be ordered to disgorge

$2,541,490, and that Greg Colip should be ordered to disgorge $643,658.  *Id.* at 5–8.

---

[2] In its order granting partial summary judgment, the Court defined the relevant period as January 2016 through February 2021.  Docket No. 290 at 3.

[3] The SEC states that, in fact, Cell>Point transferred $2,965,716 to Terry Colip, but that Terry Colip provided Cell>Point $424,226 in short-term loans, which Cell>Point repaid.  Docket No. 296 at 6 n.5.  "The SEC has deducted that amount from the $2,965,716 transferred to Terry Colip to calculate net payments to Terry Colip of $2,541,490."  *Id.*

In support of its motion for remedies, the SEC filed the declaration of Anne Romero.  Docket No. 297.  Ms. Romero is a certified public accountant employed by the SEC and is a senior accountant assigned to the investigation in this case.  *Id.* at 1, ¶ 1.  Ms. Romero's declaration states that she examined Cell>Point's bank account records from Bank of the West, FirstBank, Bank of America, and Great Western Bank from January 1, 2016 to February 28, 2021.[4]  *Id.* at 2, ¶ 2.  Ms. Romero identified that Cell>Point deposited $10,203,477 received from investors into these accounts.  *Id.*, ¶ 5.  Attached to Ms. Romero's declaration is a summary table that lists 227 "investor deposits" between January 14, 2016 and January 25, 2021.  Docket No. 298.  The table itemizes each deposit by the date, the name of the investor, and the amount deposited.  *Id.*  Ms. Romero's declaration states that she identified these deposits by examining "periodic bank statements, copies of checks, inter-bank transfer detail, copies of deposit slips, and Cell>Point detailed equity roll forwards."  Docket No. 297 at 2, ¶ 5.  Ms. Romero does not explain how she determined that these deposits were investments in Cell>Point.  *See id.*  Defendants, however, have the burden to "demonstrate that the disgorgement figure [is] not a reasonable approximation."  *GenAudio*, 32 F.4th at 945 n.22 (citation omitted).  Defendants' response does not address the SEC's argument that defendants raised $10,203,477 from investors based on fraudulent misstatements.  *See* Docket No. 303.  Rather, defendants maintain that money from these investments was spent on legitimate business expenses and, therefore, Cell>Point should not be required to disgorge any money.  *Id.* at 9–14 (citing *Liu*, 591 U.S. at 71).  Because

---

[4] The Court's order on the SEC's motion for summary judgment defined the relevant period to be from January 2016 through February 2021.  Docket No. 290 at 3.

defendants do not contest the point, the Court will assume that the deposits listed in the summary table attached to Ms. Romero's declaration are investments in Cell>Point. *See id.* (the SEC is required only to present a "reasonable approximation" of defendants' wrongful gain).

The SEC does not connect each of the investor deposits to a particular misrepresentation made by defendants, such as identifying the PPM or investor deck that the investor received before making the deposit. *See* Docket Nos. 296, 297, 298. Instead, the SEC relies on the Court's holding that it was an undisputed fact that each "PPM from January 16, 2016 to April 2, 2019 stated . . . 'the [founders] have contributed approximately $32.1 million in cash and units to cover clinical trials.'" Docket No. 296 at 6 (emphasis omitted) (quoting Docket No. 290 at 5). As such, the SEC's motion relies on the assumption that each of the deposits listed in Ms. Romero's declaration constituted investments that were made based on misrepresentations in the PPMs.

In the Court's summary judgment order, the Court found that the relevant period was from January 2016 to February 2021. Docket No. 290 at 3. The Court found that each PPM and investor deck overstated the founder's contributions by millions of dollars and that Terry Colip ensured that every investor received a PPM before investing. *Id.* at 4–5. Finally, it was an undisputed fact that Cell>Point received $10,203,477 in investment during this period. *Id.* at 8. In their response to the motion for remedies, defendants do not contest that they received $10,203,477 in investment during the relevant period or that these investments were made after investors were presented with the misstatements in the PPMs. *See* Docket No. 303. Instead, they attempt to relitigate the issue of whether the information in the PPMs was accurate. *Id.* at 6.

Given the Court's findings in its order on the motion for summary judgment and the fact
that defendants do not contest the SEC's approximation of their ill-gotten gains, the
Court finds that $10,203,477 is a "reasonable approximation" of defendants' profits from
the fraud.  *GenAudio*, 32 F.4th at 945 n.22; *Calvo*, 378 F.3d at 1217 ("The SEC is
entitled to disgorgement upon producing a reasonable approximation of a defendant's
ill-gotten gains. . . .  Exactitude is not a requirement; so long as the measure of
disgorgement is reasonable." (quotation, alteration, and citations omitted)).

### 1.  *Cell>Point*

The SEC maintains that a "reasonable approximation of Cell>Point's net profit
resulting from the fundraising misstatements is $5,529,152, which is the total amount
raised from investors during the Relevant Period minus the funds Cell>Point returned to
investors and the funds transferred to the Colips."  Docket No. 296 at 6.  Exhibit A to
Ms. Romero's declaration tracks the gross deposits into Cell>Point's bank accounts
during the relevant period.  Docket No. 297-1.  It also tracks disbursements out of these
accounts.  *Id.*  The exhibit includes a table that lists the total amount disbursed from
Cell>Point bank accounts either made to certain individuals (e.g. "Bryant, Jerry") or
made on certain expenses (e.g. "Office Rent").  *Id.*  The table includes the following
sums:

- Terry Colip, $2,965,716
- Greg Colip, $643,658
- Jerry Bryant, $739,588
- Richard Bearden, $390,348
- David J. Yang, Ph.D., $100,771
- Dr. David Rollo, $38,300
- William M. Mantia, $5,306
- Vyripharm, $40,883

- Payroll, $1,607,093[5]
- Investor redemptions/payments, $1,489,177
- Legal, $788,009
- Audit Fees, $255,867
- Insurance, $190,967
- Office Rent, $103,760
- Consulting, $82,023
- Misc business expenses (e.g., IT services, office supplies, postage, filing fees), $78,330
- Advertising/Promotion, $58,759
- Loan repayments to other parties $46,752
- Charitable contributions, $46,674
- Utilities, $39,661
- Bank fees $15,037
- Research & Development, $2,073,859
- Personal - jewelry, $24,500

*See id.*  The SEC deducts the distributions made to Terry and Greg Colip, but claims that Cell>Point should be required to disgorge the rest of its profits from the fraud. Docket No. 296 at 6.

In *Liu*, the Supreme Court "granted certiorari to determine whether § 78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing."  *Liu*, 591 U.S. at 78.  The Court concluded that the district court erred when it "declined to deduct expenses on the theory that they were incurred for the purposes of furthering an entirely fraudulent scheme."  *Id.* at 92.  While the Court acknowledged that, "when the 'entire profit of a business or undertaking' results from the wrongdoing, a defendant may be denied 'inequitable deductions' such as for personal services," *id.* (quoting *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 203 (1881)), the Court explained that this "exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains 'under another

---

[5] The SEC indicates that over 75% of these payroll disbursements were made to Terry Colip, Greg Colip, and Jerry Bryant.  Docket No. 297-1.

name.'" *Id.* (quoting *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 803 (1869)).

The Court provided guidance on how to distinguish between circumstances "where a

defendant's expenses might be considered wholly fraudulent" and the circumstances in

*Liu*. *Id.* The Court noted that "some expenses from petitioners' scheme went toward

lease payments and cancer-treatment equipment. Such items arguably have value

independent of fueling a fraudulent scheme." *Id.* Ultimately, the Court held that "courts

must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5). A

rule to the contrary that 'makes no allowance for the cost and expense of conducting a

business' would be 'inconsistent with the ordinary principles and practice of courts of

chancery.'" *Id.* at 91–92 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–46 (1888);

citing *S.E.C. v. Brown*, 658 F.3d 858, 861 (8th Cir. 2011), *abrogated by Liu*, 591 U.S. 71

(declining to deduct even legitimate expenses like payments to innocent third-party

employees and vendors)).

 The SEC claims that, "[w]here the use of funds contravened the purpose for

which they were invested, they are not 'legitimate expenses' under *Liu*." Docket No.

296 at 5 (citing *SEC v. Yang*, 2022 WL 3278995, at *1 (9th Cir. 2022)). In *Yang*, the

Ninth Circuit held that

> HealthPro used funds raised from investors in the Suncor Lynwood project to pay
> down a construction loan related to a different project, the Suncor Fontana
> facility. This expenditure of investor funds on another project was prohibited by
> the Suncor Lynwood offering documents and contravened the purpose for which
> the funds were invested. These expenses were therefore illegitimate
> under *Liu*. The fact that the other project was also engaged in the development
> of a nursing home facility does not change this result.

*Yang*, 2022 WL 3278995, at *1. Other courts have similarly held that, when investment

proceeds are spent for purposes that have not been disclosed to investors and do not

appear related to the purpose for which they have been invested, the defendant may not reduce disgorgement by that amount.  *See, e.g.*, *Sec. & Exch. Comm'n v. Laura*, 739 F.Supp.3d 6, 16 (E.D.N.Y. 2024) ("Laura has not produced contemporaneous documentation to demonstrate that the expenses the SEC characterizes as improper actually served a legitimate business purpose or that investors were aware that their funds would be spent, for example, on gym memberships and home furniture."); *see also Sec. & Exch. Comm'n v. Griffithe*, 2021 WL 6551385, at *2 (C.D. Cal. Nov. 18, 2021), *aff'd sub nom. Sec. & Exch. Comm'n v. Russell*, 2023 WL 4946603 (9th Cir. Aug. 3, 2023) ("However, the yacht payments cannot be plausibly characterized as legitimate business expenses, regardless of Russell's argument that the boat was used to house employees.").

The SEC argues that all of the money received from investors by Cell>Point should be disgorged because none of it was spent on clinical trials for Oncardia. Docket No. 296 at 5.  The SEC notes that, in each of the solicitations made to investors, defendants represented that the money raised would be used to "cover clinical trials" for Oncardia.  *Id.* at 6.  The SEC says that the parties have stipulated to the fact that clinical trials for Oncardia stopped in 2014 and have not been resumed.  *Id.* (citing Docket No. 268 at 7, ¶ 1 (stipulations in final pretrial order)).

To support its assertion that investor proceeds were required to be spent on clinical trials for Oncardia, the SEC attaches the declaration of Ty Cottrill, who is a SEC attorney assigned to this case.  Docket No. 299 at 1–2, ¶¶ 1–2.  Mr. Cottrill's declaration asserts that "[e]ach of the nineteen Cell>Point PPMs the SEC received states: 'The net proceeds . . . will be used to fund the Phase 3 Oncardia® Oncology trial, the Phase 2b/3

Oncardia® Cardiology trial, license preparation and provide general working capital."
*Id.* at 2, ¶ 4.  Each PPM also states that "[t]he proceeds will be primarily used to fund
various clinical trial studies."  *Id.* at 3, ¶ 5.  The first PPM is dated January 16, 2016, and
the last PPM is dated October 21, 2020.  *Id.*

  The Court finds that the SEC has failed to demonstrate that defendants may not
deduct any business expenses under *Liu*.  *Yang* is distinguishable from the
circumstances of this case.  In *Yang*, the offering documents specifically prohibited
using the invested money for the purposes for which it was later used.  *Yang*, 2022 WL
3278995, at *1 ("This expenditure of investor funds on another project was prohibited by
the Suncor Lynwood offering documents.").  Here, although the PPMs state that the
investments will be "primarily used to fund" the clinical trials of Oncardia, the PPMs also
state the investment may be used to provide "general working capital."  Docket No. 299
at 2–3, ¶¶ 4–5.  The SEC has not shown why payments made on expenses like "Office
Rent," "Insurance," and "Utilities," Docket No. 297-1, would not be anticipated by
investors as part of the expenses that would be paid through "general working capital."
Docket No. 299 at 3, ¶ 5.  Similarly, the SEC has not shown that disbursements made
on such expenses "contravened the purpose for which the funds were invested," *Yang*,
2022 WL 3278995, at *1, given that, although these expenses were not related solely to
the clinical trials of Oncardia, they may have been necessary expenses for clinical trials
to occur.  As such, the SEC's argument "makes no allowance for the cost and expense
of conducting a business," as required by *Liu*.  *Liu*, 591 U.S. at 91–92 (noting that lease
payments likely constitute legitimate business expenses).  Therefore, the Court will
consider whether defendants have demonstrated that there are legitimate business

expenses that must be deducted from the Court's disgorgement order.  However,

although the SEC's filings list disbursements made by Cell>Point during the relevant

period, it is defendants' burden to demonstrate what they believe the company's

legitimate expenses were.  *GenAudio*, 32 F.4th at 945 n.22 ("Once a reasonable

approximation is shown, the burden shifts back to the defendants to demonstrate that

the disgorgement figure is not a reasonable approximation." (citation, quotation, and

alterations omitted)).  The Court will not independently consider disbursements made

during the relevant period that have not been claimed by defendants as legitimate

business expenses.

Defendants identify six categories of expenses that Cell>Point incurred during

the relevant period that should be deducted from the amount Cell>Point should be

ordered to disgorge, namely, research and development, audit expenses, tax

preparation expenses, compensation paid to Jerry Bryant, office operating expenses,

and patent prosecution and annuity costs.  Docket No. 303 at 9–14.

Defendants claim that Cell>Point spent $6,371,767 on research and

development.  Docket No. 303-1. Defendants do not contest the fact that clinical trials

for Oncardia have not resumed since 2014.  Docket No. 303 at 7.  Instead, they argue

that further research and development were necessary before resuming clinical trials

and that money raised by investors was spent on this research.  *Id.* at 6–8.  Defendants

maintain that, had they not undertaken further research before clinical trials, the clinical

trials would have halted before completion.  *Id.* at 10.  Defendants' response references

various studies they claim were undertaken to help Oncardia re-enter clinical trials, such

as a "physician IND head & neck cancer study at the University of Chicago."  *Id.* at 7,

11.

To support the fact that Cell>Point spent over six million dollars on research and development, defendants attach a table identifying research expenses by year. Docket No. 303-1. The entirety of the table is reproduced below

**R&D EXPENSES**

| Year | Expense | Expense minus 3.2% |
|------|---------|--------------------|
| 2016 | $634,358 | $614,059 |
| 2017 | $1,349,128 | $1,305,955 |
| 2018 | $1,581,846 | $1,531,227 |
| 2019 | $1,446,009 | $1,399,737 |
| 2020 | $1,571,063 | $1,520,789 |
| Total Expenses for Oncardia | | **$6,371,767** |

*Id.* Defendants provide no other evidence of Cell>Point's research and development expenses. Defendants provide no contracts with third parties who allegedly conducted the studies referenced in defendants' response. Defendants attach no reports associated with the research defendants claim was conducted. Defendants provide no receipts for the supplies purchased to conduct its research, or any other documentation to substantiate their claim that Cell>Point spent $6,371,767 on research and development during the relevant period. As such, while defendants claim to have spent over six million dollars on research from 2016 to 2020, they have made no effort to prove these expenses. For the Court to reduce the amount Cell>Point must disgorge below the reasonable approximation of defendants' ill-gotten gains, defendants "must

17

provide 'concrete and credible evidence' to demonstrate the value of [their] business expenses and that those expenses furthered a legitimate business purpose.'" *Sec. & Exch. Comm'n v. Miller*, 2024 WL 4534512, at *9 (D. Md. Oct. 21, 2024) (quoting *CFTC v. Tayeh*, 848 F. App'x 827, 830 (11th Cir. 2021) (unpublished)); *see also Sec. & Exch. Comm'n v. Putnam*, 2024 WL 4135684, at *15 (D. Utah Sept. 10, 2024) ("Defendants have the burden in proving the claimed expenses" (citing *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1251 (10th Cir. 2020)). Defendants have failed to meet their burden of proving this expense, and the Court will not reduce the amount Cell>Point must disgorge on this basis.

Defendants' support for their assertions that Cell>Point spent $1,227,411 on patent prosecution and patent annuity costs, $261,600 on audit expenses, $235,000 on tax preparation expenses, and $149,132 on office operating expenses are all equally as unsupported as defendants' claimed research and development expenses. *See* Docket No. 303 at 11–14; *see also* Docket Nos 303-2, 303-3, 303-5, 303-6. For each of the claimed expenses, defendants attach a table that asserts that Cell>Point spent a certain amount on each expense during the relevant period, but defendants provide no other documentation to support the expenses. *See* Docket Nos 303-2, 303-3, 303-5, 303-6. For the reasons discussed above, the Court finds that defendants have failed to prove these are legitimate business expenses and will not reduce the amount Cell>Point must disgorge based on these alleged expenses. *Miller*, 2024 WL 4534512, at *9 ("The defendant must provide concrete and credible evidence to demonstrate the value of his business expenses and that those expenses furthered a legitimate business purpose." (quotation and citation omitted)).

Defendants claim that Cell>Point should not be required to disgorge the money paid to Jerry Bryant as compensation.  Docket No. 303 at 12.  The entirety of defendants' argument is that "Exhibit D sets forth the compensation paid to Mr. Bryant during the Relevant Period.  Mr. Bryant is no longer a managing member of the company as he left the company to work exclusively with Vyrpharm Enterprises, LLC." *Id.*  To support the fact that compensation paid to Mr. Bryant was a legitimate business expense, defendants attach a document that states "[c]ompensation paid to Jerry Bryant over the Relevant Period: $739,588" and cites Ms. Romero's declaration as the source of this figure.  Docket No. 303-4.

Defendants do not identify what specific work Mr. Bryant performed for Cell>Point or why $739,588 is a reasonable amount for Mr. Bryant to be paid for his work.  However, Jerry Bryant was a co-founder of Cell>Point with Terry and Greg Colip.  Docket No. 290 at 4.  The SEC has not brought claims against Mr. Bryant.  *See* Docket No. 140.  Moreover, the SEC has conceded the accuracy of defendants' assertion that he was paid $739,588.  Therefore, the Court will reduce the amount Cell>Point must disgorge by $739,588.  *See Liu*, 591 U.S. at 91–92 (citing with disapproval *S.E.C. v. Brown*, 658 F.3d 858, 861 (8th Cir. 2011) for declining to deduct even legitimate expenses like payments to innocent third-party employees and vendors).  Accordingly, the Court will order Cell>Point to disgorge a total of $4,789,564.

### 2.  *Terry Colip and Greg Colip*

The SEC argues that Terry Colip should be ordered to disgorge $2,541,490 and that Greg Colip should be ordered to disgorge $643,658.  Docket No. 296 at 7–8.  The SEC states that Terry Colip received $2,965,716 in disbursements from Cell>Point, but that he transferred $424,226 back into Cell>Point bank accounts, whereas Cell>Point

19

disbursed $643,658 to Greg Colip, who made no transfers back to Cell>Point, *id.* (citing

Docket No. 297-1); that "investor proceeds represented 87% of the $11,702,361 . . .

deposited into Cell>Point's accounts during the Relevant Period," *id.* at 8; and that "the

$2,541,490 of net profits Terry Colip received from Cell>Point [and the $643,658 of net

profits Greg Colip received from Cell>Point] are 'causally connected' to [their] Section

10(b) and Section 17(a) violations, as the payments were made with monies

indisputably raised through [their] misstatements." *Id.* (citing Docket No. 290 at 18–19

("Given the consistency and pervasiveness of defendants' misrepresentations, the

centrality of these misrepresentations to the value of the company relied upon by

investors, and the quantity of investment received during the relevant period, the SEC

has shown a causal link between the defendants' deceptive statements and the

investment Cell>Point received.")).  As such, the SEC argues that $2,541,490 and

$643,658 represent a reasonable approximation of Terry Colip's and Greg Colip's

profits from the fraud, respectively.  *Id.*

The Court finds that the SEC has failed to demonstrate that $2,541,490 is a

reasonable approximation of Terry Colip's profits from the fraud and that $643,658 is a

reasonable approximation of Greg Colip's profits from the fraud.  "In the context of an

offering of securities in violation of the securities laws, the proper starting point for a

disgorgement award is the total proceeds received from the sale of the securities."

*AmeriFirst Funding,* 2008 WL 1959843, at *2 (citing *Manor Nursing Ctrs., Inc.*, 458 F.2d

at 1104).  The SEC acknowledges that, while Cell>Point raised over ten million dollars

from investors due to defendants' fraudulent misrepresentations, the company received

over eleven and a half million dollars in total deposits during the relevant period, and

that investor proceeds constituted 87% of the total amount of money Cell>Point received during the relevant period.  Docket No. 296 at 8.  The SEC provides no support for the proposition that the commingling of the ten million dollars raised by Cell>Point by fraud with the other money raised during the same period permits the SEC to claim the combined sum as a reasonable approximation of the profits from defendants' violations of securities law.  Therefore, the Court finds that a reasonable approximation of Terry Colip's profits from the fraud is $2,211,096.30, which is 87% of the total disbursements made to him during the relevant period, excluding the sum he reinvested in the company.  The Court finds that a reasonable approximation of Greg Colip's profits from the fraud is $559,982.46, which is 87% of the total disbursements made to him during the relevant period.

As to the proper amount that Greg Colip should disgorge, defendants assert that the "entire amount of the money paid to Greg Colip during the Relevant Period was in the form of compensation," which defendants state is $643,658.  Docket No. 303 at 16.  This is the same sum proposed by the SEC for Mr. Colip to disgorge.  Docket No. 296 at 8.  Defendants claim that Greg Colip's "average annual compensation was $128,731," which they claim is significantly less than the compensation paid to comparable executives at other biotechnology companies.  Docket No. 303 at 17.  In support, defendants attach the declaration of Mr. Colip, in which he states that, "[d]uring the 5-year Relevant Period, I drew a total of $643,658 in compensation."  Docket No. 303-9 at 1, ¶ 7.  Neither defendants' explanation nor their factual support demonstrate that Mr. Colip should not be required to disgorge the disbursements made to him by Cell>Point.

Ms. Romero's declaration states that, in addition to the $643,658 made in disbursements to Greg Colip and the $2,541,490 disbursed to Terry Colip, Cell>Point had payroll expenses of $1,607,093 during the relevant period. Docket No. 297-1. The declaration states that over 75% of these payroll disbursements were made to Terry Colip, Greg Colip, and Jerry Bryant. *Id.* Defendants do not address the $1,607,093 in payroll payments Cell>Point made to Greg Colip, Terry Colip, and others during the relevant period or why defendants do not include Greg Colip's portion of the payroll expenditures as part of the total compensation paid to Greg Colip. *See* Docket No. 303. Nor do defendants refute the SEC's assertion that over 75% of these payroll expenses were paid to Terry Colip, Greg Colip, and Jerry Bryant. *See id.* The SEC does not argue that Terry or Greg Colip should be ordered to disgorge the amount they received from Cell>Point's payroll disbursements. Docket No. 296 at 7–8. Although defendants appear to claim that the $643,658 paid to Greg Colip was compensation above and beyond the money he received as part of the company's payroll disbursements, they do not explain why Greg Colip received these additional payments, what work these payments were made for, and why this work was beyond the scope of the work for which Mr. Colip received payroll disbursements. Moreover, the Court finds that Greg Colip's declaration, without any documentary support substantiating the amount he received as compensation and what the compensation was for, is insufficient to meet defendants' burden to produce "concrete and credible evidence" of the value of defendants' business expenses and of demonstrating that those expenses furthered a legitimate business purpose. *Miller*, 2024 WL 4534512, at *9.

Defendants claim that Greg Colip spent $10,157.27 on travel expenses from 2016 to 2017, for which he was never repaid. Docket No. 303 at 15 ("Greg Colip has not been reimbursed for business expenses for several years beginning prior to 2016 and that continues to this day."); Docket No. 303-8. In support of these travel expenses, defendants attach a table summarizing transportation, lodging, and meal expenses Mr. Colip incurred during travel to Thailand, South Korea, and China, as well as during travel within the United States. Docket No. 303-8. The table lists categories of expenses and the amount spent on each type of expense. *Id.* ("$1,402.20 . . . Meals"). The table provides no further information regarding these expenses. Defendants attach no other support for these travel expenses. The table is insufficient to meet the defendants' burden to produce "concrete and credible evidence" of the value of the travel expenses and to demonstrate that the expenses furthered a legitimate business purpose. *Miller*, 2024 WL 4534512, at *9. As such, defendants have not shown that the disbursements made to Greg Colip were legitimate business expenses or that he has incurred legitimate business expenses that should be subtracted from his profits from the fraud. The Court will order Greg Colip to disgorge $559,982.46 as his profits from the fraud.

As to the proper amount that Terry Colip should disgorge, defendants maintain that Terry Colip made significant investments into Cell>Point in order to keep the company operating and that Terry Colip was entitled to recover that investment from the company when it was able to repay him. Docket No. 303 at 14–15. They further claim that Terry Colip has not been fully repaid for the money he has loaned to the company. *Id.* at 14.

Defendants appear to contest the amount the SEC claims Mr. Colip transferred

back to Cell>Point.  *See* Docket No. 303-7.  In a table listing Terry Colip's allegedly

unreimbursed personal loans to Cell>Point, defendants assert that Terry Colip

contributed $590,984.93 from 2016 to 2020 to Cell>Point.  *Id.*  However, for the reasons

already discussed, a table summary that constitutes only assertions of fact, without

further support of the allegations in the table, does not constitute concrete and credible

evidence of defendants' business expenses.  *Miller*, 2024 WL 4534512, at *9.  As such,

defendants have not properly refuted the SEC's assertion that Terry Colip loaned

Cell>Point $424,226.  Docket No. 296 at 7.  Moreover, the SEC has already deducted

these loans from the amount Mr. Colip should be required to disgorge.  Therefore, it is

immaterial whether Terry Colip has been repaid for these loans.  Finally, defendants

provide no explanation for the remaining $2,541,490 Terry Colip received in

disbursements in addition to payroll disbursements.  *See id.* at 7–8.  Therefore, the

Court finds that the money Terry Colip loaned to Cell>Point does not serve as a

legitimate business expense that reduces the amount he should be required to

disgorge.

Defendants next argue that, although the "SEC correctly shows $2,541,490 that

was distributed to Terry Colip during the Relevant Period," Terry Colip should be

allowed to keep $643,658 of these disbursements as compensation for his work.

Docket No. 303 at 17.  Defendants maintain that, "[b]y any reasonable standard, the

compensation paid to Terry Colip should be no greater than the compensation paid to

Greg Colip during the Relevant Period,"[6] that Greg Colip was paid $643,658 during the relevant period, and that "Mr. Colip believes it is fair and reasonable to allow $643,658 as compensation for the Relevant Period." *Id.* First, defendants' argument again ignores the compensation Terry and Greg Colip were paid as a part of payroll disbursements. Second, the Court has rejected defendants' argument that $643,658 represents the amount Greg Colip was properly compensated during the relevant period. Third, even assuming Terry Colip was entitled to some compensation for his work for Cell>Point and that the compensation would be a legitimate business expense, defendants provide no support for the proposition that this compensation should be valued at $643,658. Therefore, defendants have failed to substantiate deductions from the amount the Court finds the SEC has shown to be a reasonable approximation of Terry Colip's profits from the fraud. The Court will order Terry Colip to disgorge $2,211,096.30.

### 3. Prejudgment Interest

The SEC argues that the Court should order defendants to pay prejudgment interest in the amounts of $1,775,853.88 as to Cell>Point, $847,813.09 as to Terry Colip, and $204,695.86 as to Greg Colip, calculated quarterly from 2016 to April 30, 2024, using the Internal Revenue Service ("IRS") underpayment rate for federal income tax. Docket No. 296 at 8–9 (citing Docket No. 297 at 3–4, ¶ 9); *see also* Docket No. 297-3; *SEC v. Erwin*, No. 13-cv-03363-CMA-KMT, 2021 WL 3206325, at *5 (D. Colo. July 29, 2021) (explaining that, "[g]enerally, disgorgement includes prejudgment interest

---

[6] Defendants appear to have misstated their argument. Rather, their argument appears to be that Terry Colip's compensation should be no less than the compensation paid to Greg Colip. *See* Docket No. 303 at 17.

to ensure that wrongdoers do not profit from their illegal conduct," and calculating

prejudgment interest based on the rate used by the IRS for underpayment of federal

income tax). Defendants do not respond to the SEC's argument that they should pay

prejudgment interest or the amount the SEC asserts should be paid. *See* Docket No.

303.

   The SEC's calculations of prejudgment interest are based on the total sum the

SEC asserts should be disgorged. *See* Docket No. 297 at 3–4, ¶ 9. However, the

Court has found that the amount that the defendants must disgorge is less than the

amount requested by the SEC. Therefore, the Court will reduce the amount of pre-

judgment interest each defendant must pay by the proportion the Court has reduced the

amount each defendant must disgorge. The Court recognizes that this is an imperfect

reflection of prejudgment interest calculated quarterly using the IRS's rate for

underpayment of federal income tax from 2016 to 2024. However, to promote judicial

efficiency and to avoid additional briefing on the SEC's motion for remedies, the Court

finds that a proportional reduction is a reasonable method of reducing the amount of

prejudgment interest defendants will be required to pay. *See U.S. S.E.C. v. Maxxon,*

*Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006) ("Disgorgement is by nature an equitable

remedy as to which a trial court is vested with broad discretionary powers." (citing *SEC*

*v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474–75 (2d Cir. 1996) ("The district court has

broad discretion not only in determining whether or not to order disgorgement but also

in calculating the amount to be disgorged.")). Therefore, the Court finds that Cell>Point

shall be required to pay $1,538,312.89 in prejudgment interest, that Terry Colip shall be

required to pay $737,597.39 in prejudgment interest, and that Greg Colip shall be

required to pay $178,085.40 in prejudgment interest.

### B. Civil Penalties

The SEC asks the Court to impose a civil penalty against "each Defendant in amounts equal to their respective pecuniary gain." Docket No. 296 at 9. The SEC does not state what it believes the amount of the civil penalty should be. *Id.* Instead, the SEC cross-references those sections of its brief discussing the amount it believes defendants should be required to disgorge. *See id.* Defendants do not respond to the SEC's argument that they should be required to pay civil penalties in addition to disgorgement. *See* Docket No. 303 at 9–12. Instead, defendants appear to rely on the same arguments they make regarding whether and what amount defendants should be required to disgorge as profits from the fraud. *Id.* Because the Court has rejected defendants' arguments, the Court will reject them again here.

Section 20(d)(1) of the Securities Act of 1933 and section 21(d)(3)(A) of the Securities Exchange Act of 1934 provide that the SEC may seek, and a court may impose, civil monetary penalties for securities violations. If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," a court may impose a "third tier" penalty, which may be the "gross amount of pecuniary gain to such defendant as a result of the violation." *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)(iii).

The SEC's cross-reference to its arguments regarding disgorgement fails to account for the difference between the Court's ability to order the equitable relief of disgorgement equivalent to "a wrongdoer's net profits," *Liu*, 591 U.S. at 75, and a statutory civil penalty equivalent to the "gross amount of pecuniary gain to such

27

defendant as a result of the violation." *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii);

*see also Sec. & Exch. Comm'n v. de Maison*, 2021 WL 5936385, at *3 n.1 (2d Cir. Dec.

16, 2021) (rejecting defendant's argument that "her gross pecuniary gain should be

limited to the net profits calculated by the SEC").  The Court interprets the SEC's motion

not to be arguing that the Court should order a civil penalty equivalent to the amount

each defendant must disgorge, but rather as arguing that defendants should be required

to pay civil penalties equivalent to their gross pecuniary gain from the fraud, which the

SEC argues is $5,529,152 for Cell>Point, $2,541,490 for Terry Colip, and $643,658 for

Greg Colip.  Docket No. 296 at 5–8.

Penalties "are designed to deter future violations of the securities laws and

thereby further the goals of 'encouraging investor confidence, increasing the efficiency

of financial markets, and promoting the stability of the securities industry.'"  *SEC v.

Universal Exp., Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (quoting *SEC v.

Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998)).  "[W]hereas disgorgement 'merely

restores [the] defendant to his original position without extracting a real penalty for his

illegal behavior,'" *id.*, civil penalties arise from "the perceived need to punish the

defendant rather than to restore the victim."  *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S.

109, 124 (2024).  As the court in *GenAudio* explained, courts typically consider the

following factors when imposing civil penalties under the securities laws:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter,
> (3) the repeated nature of the violations, (4) defendants' failure to admit
> to their wrongdoing; (5) whether defendants' conduct created substantial
> losses or the risk of substantial losses to other persons; (6) defendants'
> lack of cooperation and honesty with authorities, if any; and (7) whether
> the penalty that would otherwise be appropriate should be reduced due to
> defendants' demonstrated current and future financial condition.

*GenAudio*, 32 F.4th at 954 (quoting *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730

(S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)).

      The SEC argues that the first six of the seven *GenAudio* factors weigh in favor of

a third-tier penalty because the "conduct by all Defendants here was egregious,

spanned many years, continued into this litigation, and remains fully unacknowledged or

remediated by Defendants." Docket No. 296 at 10. As to the first factor, the SEC

argues that the defendants' violations of securities laws were egregious because they

"overstated the amount of their capital contributions by tens of millions of dollars to paint

a fabricated picture of a successful medical-technology company" and "[t]heir lies were

told across numerous types of media Cell>Point disseminated, including nineteen

PPMs." *Id.* at 11. As to the second factor, the SEC maintains that defendants had a

high degree of scienter because "[t]here are no plausible benign explanations for

overstating Cell>Point's financial condition and the Colips' supposed personal stakes,

except to deceive investors and project a fabricated version of Cell>Point's finances."

*Id.* As to the third factor, the SEC argues that defendants' lies regarding the value of

Cell>Point were not only frequently repeated throughout the relevant period, but were

also "adjusted upward over time to give the impression of a growing company." *Id.*

      The Court agrees that the first three factors weigh in favor of a substantial

penalty. As the Court explained in its order granting the SEC's motion for partial

summary judgment, defendants overstated the value of investment made in Cell>Point

by tens of millions of dollars. *See* Docket No. 290 at 5–6, 12. This overstatement

constituted a third of all the investment that defendants represented to investors had

been contributed to Cell>Point. *Id.* Moreover, these lies were told to investors

repeatedly for five years.  *Id.*  Finally, in granting partial summary judgment, the Court found that the undisputed facts showed that the defendants had acted with scienter because they made the misrepresentations willfully or recklessly.  *Id.* at 14–17.

As to the fourth factor, the SEC argues that defendants have never admitted wrongdoing.  Docket No. 296 at 11.  The Court agrees that nothing in the record indicates that the defendants have acknowledged their wrongdoing.  Instead, the defendants' response to the motion for remedies maintains that the defendants have done nothing improper and that they were unaware that they were making misrepresentations in the PPMs or other investment materials.  Docket No. 303 at 6.

Not only have defendants not acknowledged their wrongdoing, but they have continued their wrongful conduct throughout these proceedings.  On February 14, 2022, the Court entered a preliminary injunction enjoining defendants from violating securities laws.  Docket No. 93 at 19–22.  On July 13, 2022, the Court issued an order holding Greg Colip and Terry Colip in civil contempt of the Court's February 14, 2022 order for lying to investors in order to receive a $100,000 loan.  Docket No. 138 at 7, 20.  The Court ordered Terry Colip, Greg Colip, and Cell>Point to pay $100,000 based on the amount they obtained from an investor in violation of the Court's order enjoining violations of securities law.  *Id.* at 19.  The Court further ordered that defendants provide any potential investor with copies of the Court's preliminary injunction order and of the order holding them in contempt.  *Id.* at 20.  On December 28, 2022, the Court found defendants in contempt of the first contempt order.  Docket No. 195 at 21.  The Court ordered defendants to repay $124,106 to investors who they had failed to inform of this litigation.  *Id.* at 18.  The Court further ordered the defendants to disclose to potential

investors the Court's second contempt order, in addition to the Court's previous orders.
*Id.* at 17–19.

On March 15, 2024, the Court held defendants in contempt yet again.  Docket
No. 291 at 12.  Contrary to the Court's clear instructions in the first and second
contempt orders, as well as instructions given by the Court during hearings on the
SEC's motions to hold defendants in contempt, defendants made a "capital call" without
making any of the necessary disclosures to investors.  *Id.* at 8–11.  Moreover, despite
evidence produced by the SEC that defendants had the means to pay the sanction from
the second contempt order, at that time defendants had made no payments towards the
sanction.  *Id.* at 11–12.  To date, the contempt sanction remains unpaid.

Finally, in its reply, the SEC provides credible evidence that defendants continue
to violate the Court's contempt orders by failing to make disclosures about this case to
potential investors.  Docket No. 310 at 3 (citing Docket No. 310-1 at 2).  While the Court
would nevertheless issue the same civil penalties without this evidence, this factor also
strongly supports the imposition of a civil penalty.  Without a civil penalty to deter future
violations, defendants may violate the securities laws again.  The fact that defendants
refuse to accept responsibility for their actions and continue to violate the Court's orders
makes it likely that they will continue to violate the law.  *See Lybrand*, 281 F. Supp. 2d
at 729 ("A monetary penalty is designed to serve as a deterrent against securities law
violations.").

The fifth factor also supports a penalty.  As the SEC notes, "there have been
substantial losses here."  Docket No. 296 at 12.  The SEC's financial analysis shows
that, during the relevant period, Cell>Point raised over ten million dollars from investors,

which constituted eighty-seven percent of the $11,702,361 in total deposits made into
Cell>Point bank accounts, but that, during that same period, Cell>Point spent
$11,825,038, leaving the company with a remaining balance of -$115,697.  Docket No.
297-1.  As defendants have acknowledged, clinical trials for Oncardia ended in 2014.
*See* Docket No. 303 at 5 ("The fact that clinical trial studies had been paused by the
company in December 2014 were communicated to investors.").  As such, there is no
evidence that investors will recover any portion of their investment.

The sixth factor supports a penalty because the SEC states that defendants
"have failed to cooperate with or be honest with authorities" and defendants provide no
evidence of cooperation.  Docket No. 296 at 11.  Moreover, the SEC has repeatedly
corrected defendants' misrepresentations to the Court regarding defendants' ability to
pay the civil penalty imposed by the Court in the second contempt order.  *See*, *e.g.*,
Docket No. 200.  Therefore, defendants have not only been dishonest with the SEC, but
also with the Court.

The seventh factor is whether defendants' ability to pay should reduce the
penalty.  *See GenAudio*, 32 F.4th at 954.  The SEC concedes that defendants' ability to
pay weighs against imposing a large civil penalty.  *See* Docket No. 296 at 11 ("Six of the
foregoing seven factors generally considered in the penalty analysis strongly support
the imposition of a substantial sanction here (the exception being Defendants' current
financial condition).").  The SEC's financial analysis for Cell>Point during the relevant
period indicates that Cell>Point has little to no means of paying a civil penalty, and the
Court perceives no reason to believe that Cell>Point's financial condition has changed.
*See* Docket No. 297-1.  On March 5, 2024, the Court received a notice that Terry Colip

was in Chapter 11 bankruptcy proceedings.  Docket No. 285 at 2.  Although the Court

has since received notice that the bankruptcy proceedings have been dismissed,

Docket No. 316, defendants represent that both Terry and Greg Colip are in financial

distress.  *See* Docket No. 303 at 15–16 ("[Terry] Colip is in bankruptcy and effectively in

financial ruin . . . .  Greg Colip has also taken loans from family to pay Miles Dewhirst

and JBA Enterprises, LLC.").  The SEC does not contest this point.  *See* Docket No.

310.

Even assuming that defendants do not have the ability to pay a penalty, this

factor, although a major consideration, is not dispositive.  *See GenAudio*, 32 F.4th at

954–55 (noting that "[t]he major factor weighing against a penalty . . . would be [Mr.]

Mahabub's claimed financial straits," yet underscoring that Mr. "Mahabub's ability to pay

is only one factor among many," which favor a penalty) (quoting *Mahabub*, 411 F. Supp.

3d at 1175).  The court in *Mahabub* noted the defendant's repeated lies, failure to

concede wrongdoing, and the substantial amount of loss he caused investors, and

ordered a sizeable penalty even though the defendant claimed that he only had $4.94 in

his bank account.  *See Mahabub*, 411 F. Supp. 3d at 1175; *GenAudio*, 32 F.4th at 954.

In *GenAudio*, the court noted that, even if an inability to pay is one of the most

important factors, 32 F.4th at 955 (quoting *SEC v. Gunn*, 2010 WL 3359465, at *10 &

n.25 (N.D. Tex. Aug. 25, 2010)), "there is no dispute that this factor should not be

deemed categorically and uniformly the determinative one in the analysis."  *Id.* (citing

*SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) ("[N]othing in the securities laws

expressly prohibits a court from imposing penalties . . . in excess of a violator's ability to

pay. . . .  [Defendant] cites no decisional law stating that the securities laws impliedly

prohibit a district court from imposing penalties . . . in excess of a violator's ability to pay, and we have located none.  At most, ability to pay is one factor to be considered in imposing a penalty.")); *see also id.* ("Here, the district court determined – after thoughtful consideration of the relevant factors – that Mr. Mahabub's purported inability to pay should not tilt the decisional balance against the imposition of a penalty.  We discern no abuse of discretion in the court's decision.").

"Although each tier establishes a maximum penalty per violation, the amount of any civil penalty rests squarely in the discretion of the court."  *Universal Exp.*, 646 F. Supp. 2d at 567 (citation omitted).  Courts frequently impose civil penalties equal to disgorgement, for instance.  *See, e.g.*, *SEC v. BIC Real Est. Dev. Corp.*, 2017 WL 1740136, at *6 (E.D. Cal. May 4, 2017) (collecting cases).  Other courts reduce penalties after considering the relevant factors.  *See, e.g.*, *SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 828 & n.5 (S.D. Cal. 2021) ("[T]he Court exercises its discretion to reduce the SEC's requested civil penalties" and, "[a]s the balance of factors do not overwhelmingly favor a reduction, the Court finds that a modest twenty percent reduction is reasonable.").

In imposing a civil penalty, the Court may also consider the extent to which other aspects of the relief and/or judgment issued in the case will have the desired deterrent effect.  *Universal Exp.*, 646 F. Supp. 2d at 568; *SEC v. Bronson*, 246 F. Supp. 3d 956, 978 (S.D.N.Y. 2017) ("Defendants will be required to pay multiple millions in disgorgement and prejudgment interest and have been permanently enjoined from engaging in further violations of § 5 of the Securities Act or trading in penny stocks. These penalties lessen the responsibility of the fine to provide a retributive and

deterrent effect." (quotation and citation omitted)), *aff'd*, 756 F. App'x 38 (2d Cir. 2018) (unpublished); *SEC v. Nadel*, 2016 WL 639063, at *26 (E.D.N.Y. Feb. 11, 2016), *report and recommendation adopted*, 206 F. Supp. 3d 782 (E.D.N.Y. 2016); *SEC v. Svoboda*, 409 F. Supp. 2d 331, 348 (S.D.N.Y. 2006) (viewing defendant's financial submissions "with skepticism," but determining that imposition of over $3 million in civil penalties on top of $2.2 million "already imposed . . . and the $300,000 fine assessed . . . goes too far"); *SEC v. Neurotech Dev. Corp.*, 2011 WL 1113705, at *6 (E.D.N.Y. Feb. 28, 2011) (finding defendant's "current situation and the other remedies awarded against him . . . [warrant] a reduced penalty [which] would serve the purpose of deterring future conduct"); *SEC v. Mortenson*, 2013 WL 991334, at *9 (E.D.N.Y. Mar. 11, 2013) ("Under the circumstances of this case, I find the appropriate third-tier civil penalty to be an amount equal to one-half of the disgorgement amount."); *but see Mahabub*, 411 F. Supp. 3d at 1175 (imposing penalty equivalent to the gross amount of pecuniary gain against individual and corporate defendants; *SEC v. Spongetech Del. Sys., Inc.*, 2015 WL 5793303, at *11 (E.D.N.Y. Sept. 30, 2015) (imposing maximum third-tier civil penalties, and noting that, despite defendant's submission of a financial affidavit in support of his inability to pay a penalty, "he has failed to make any showing regarding his actual financial condition . . . [and] has not supported his claims with any documentation.").

Although the Court finds the imposition of a third-tier penalty to be appropriate, a penalty equal to defendants' gross pecuniary gain would no better punish defendants' wrongdoing or deter future violations of the securities laws than would a lesser penalty, especially given the disgorgement that the Court has already ordered and defendants'

likely inability to pay a civil penalty.  Accordingly, the Court will impose a civil penalty
equal to one-half of each defendant's gross pecuniary gains, which is $2,764,562.50 for
Cell>Point, $1,270,745.50 for Terry Colip, and $321,829 for Greg Colip.  In total,
defendants will be required to pay $10,774,779.76 in disgorgement, prejudgment
interest, and civil penalties.

### C.  Permanent Injunction

The SEC seeks to permanently enjoin the defendants from committing future
violations of the securities laws.  Docket No. 296 at 12–14.  "An injunction based on the
violation of securities laws is appropriate if the SEC demonstrates a reasonable and
substantial likelihood that the defendant, if not enjoined, will violate securities laws in the
future."  *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).  Determining the
likelihood of future violations "requires analysis of several factors, such as the
seriousness of the violation, the degree of scienter, whether defendant's occupation will
present opportunities for future violations and whether defendant has recognized his
wrongful conduct and gives sincere assurances against future violations."  *Id.*; *see also*
Docket No. 93 at 17 (order granting SEC's motion for preliminary injunction).  As the
Court has noted, defendants have continued to violate securities laws throughout this
litigation, despite an enforcement action by the SEC and after repeated admonishments
and contempt sanctions imposed by the Court.  Given the nature of defendants'
securities violation, defendants' unwillingness to accept responsibility, and their ongoing
disregard for the law, defendants have shown that they are likely to commit future
violations of securities law if not enjoined and that a permanent injunction is appropriate.
*See SEC v. Cap. Holdings, LLC*, No. 03-cv-0923-REB-CBS, 2008 WL 5381464, at *1
(D. Colo. Dec. 19, 2008).  Accordingly, the Court will permanently enjoin defendants

from violating Sections 17(a), 5(a), 5(c) of the Securities Act, and Section 10(b) and

Rule 10b-5 of the Exchange Act.

### D.  **Director/Officer Bar**

The SEC requests an order permanently prohibiting Terry Colip and Greg Colip

from acting as directors or officers of any publicly traded company.  Docket No. 296 at

14.  Such relief is authorized by § 21(d)(2) of the Exchange Act, which states that

> the court may prohibit, conditionally or unconditionally, and permanently or for
> such period of time as it shall determine, any person who violated section 78j(b)
> of this title [*i.e.*, Exchange Act § 10(b)] or the rules or regulations thereunder
> [*e.g.*, Rule 10b-5] from acting as an officer or director of any [publicly traded
> company] if the person's conduct demonstrates unfitness to serve as an officer or
> director of any [publicly traded company].

*Mahabub*, 411 F. Supp. 3d at 1176 (quoting 15 U.S.C. § 78u(d)(2)).  "Courts typically

consider six factors when deciding whether to impose such a bar: (1) the egregiousness

of any underlying securities law violation, (2) the defendant's repeat offender status, (3)

the defendant's role or position at the time of the violation, (4) the degree of scienter, (5)

the defendant's economic stake in the violation, and (6) the likelihood that misconduct

will occur again."  *S.E.C. v. Wolfson*, 2006 WL 1214994, at *10 (D. Utah May 5, 2006),

*aff'd*, 249 F. App'x 701 (10th Cir. 2007) (unpublished) (citing *Patel*, 61 F.3d at 141).

Relying on its arguments regarding civil penalties, the SEC argues that the

factors identified in *Wolfson* weigh in favor of barring Terry and Greg Colip from serving

as directors or officers of a public company.  Docket No. 296 at 14.  The SEC claims

that the "Colips have served in senior roles at Cell>Point for decades and used those

positions to fraudulently raise tens of millions of dollars and benefit themselves over

investors."  *Id.*  The SEC asserts that, "with respect to their economic stake, the

attached financial records show that the Colips (and in particular Terry Colip) directed

more money to themselves than to any legitimate (or illegitimate) scientific endeavor." *Id.*

Defendants do not respond to the SEC's arguments that the egregiousness of their violations, their repetitive fraudulent conduct, their scienter, their senior roles, and their likelihood of recidivism all weigh in favor of barring Terry and Greg Colip from serving as a director or officer of a public company in the future. *See* Docket No. 303. Instead, defendants maintain that such a bar is unnecessary because the notoriety of the proceedings in this case has the same effect as an order prohibiting Terry and Greg Colip from serving as directors or officers. *Id.* at 18 ("The posting of the original complaint on the internet has served to effectively destroy the reputations of Greg Colip and Terry Colip long before today. Any search performed by any person makes this statement absolutely clear and the information will exist on the internet in perpetuity. There is little chance either individual would be considered for an officer or director position in a public company.").

Defendants state that "[n]either the court nor the SEC should harbor any concern that either Defendant would be found crossing any line in the future." *Id.* The Court has reason to be concerned. Defendants provide no support for the proposition that a director and officer ban pursuant to 15 U.S.C. § 78u(d)(2) is inappropriate or unnecessary where the defendant's reputation has been damaged such that he is unlikely to be hired by a publicly traded company. Moreover, the nature of Terry and Greg Colip's fraud, their roles in the fraud, their refusal to accept responsibility, their refusal to comply with the Court's orders, and their refusal to pay any portion of the contempt sanction all demonstrate that Terry and Greg Colip are likely to engage in

further misconduct and that a director and officer bar is appropriate in this case. Therefore, the Court will permanently and unconditionally prohibit Terry Colip and Greg Colip from acting as an officer or director of any publicly traded company.

## IV.    MOTION TO REFER FOR CRIMINAL CONTEMPT PROCEEDINGS

The SEC requests that the Court consider referring defendants to the United States Attorney's Office for criminal contempt proceedings.  Docket No. 311.  Section 401(3) of Title 18 provides that a "court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."  Federal Rule of Criminal Procedure 42 states that "[a]ny person who commits criminal contempt may be punished for that contempt after prosecution on notice," but that the "court must request that the contempt be prosecuted by an attorney for the government."  Fed. R. Crim. P. 42(a).  The SEC requests that the Court refer defendants to the United States Attorney's Office for their continued violations of the Court's civil contempt orders.  Docket No. 311 at 1.

The Court has issued three contempt orders in this case.  Docket Nos. 138, 195, 291.  On July 13, 2022, the Court issued the first contempt order.  Docket No. 138.  The Court found defendants in contempt of the Court's preliminary injunction, Docket No. 93, by soliciting loans using false representations regarding Cell>Point's intent to continue clinical trials of Oncardia and regarding an initial public offering for Cell>Point.  Docket No. 138 at 7.  The Court sanctioned defendants $100,000 for the investment Cell>Point received under false pretenses.  *Id.* at 21.  In addition, the Court ordered that "defendants shall inform any person who defendants ask to provide a loan or investment to Cell>Point, Cell Theranostics, Inc., or Cell Theranostics, Ltd., or any

person who intends to invest or loan money to such entities, for any purpose, of this litigation and shall provide copies of the Court's order from February 14, 2022 and this order." *Id.* at 20.

On December 28, 2022, the Court issued the second contempt order, finding that defendants had disobeyed the Court's first contempt order by failing to inform potential investors of this litigation. Docket No. 195 at 15–16. In addition to requiring the defendants to refund $124,106 to four investors, *id.* at 21, the Court ordered defendants to provide copies of the Court's preliminary injunction, first contempt order, and second contempt order to potential investors. *Id.* at 18. The Court ordered defendants to include the following text as part of the communications containing the copies of the Court's previous orders:

> **The Court in *SEC v. Cell>Point, LLC, et al.*, 21-cv-01574-PAB-KLM (D. Colo.), has ordered that the attached documents be supplied to any person who is considering an investment or providing money to Cell>Point, LLC, Cell Theranostics, Inc., or Cell Theranostics, Ltd.**

*Id.* at 18–19.

On March 15, 2024, the Court issued the third contempt order, finding defendants in contempt of the Court's second contempt order by failing to pay the $124,106 sanction. Docket No. 291 at 11–12.

The SEC claims that defendants are still violating the Court's contempt orders. Docket No. 311 at 6–10. The SEC maintains that Terry Colip has continued to solicit investments in Cell>Point without including the necessary disclosures required by the Court's first and second contempt orders. *Id.* at 6–7. The SEC alleges that Greg Colip has continued to violate the Court's second and third contempt orders by failing to make

payments towards the second contempt sanction, despite having the means to make such payments. *Id.* at 9–10.

The Court will not refer defendants to the United States Attorney's Office for criminal contempt proceedings. The Court has determined that the defendants must pay over ten million dollars in disgorgement and civil penalties. The Court will also permanently enjoin defendants from future violations of securities laws and from serving as a director or officer of a publicly traded company. The Court finds these remedies to be adequate in this case. Moreover, defendants remain in civil contempt until they pay the second contempt sanction. *United States v. Pro. Air Traffic Controllers Org., Loc. 504*, 703 F.2d 443, 445 (10th Cir. 1983) ("civil contempt continues until terminated by compliance" (citing *Shillitani v. United States,* 384 U.S. 364, 368–69 (1966)). Therefore, the motion is denied.

## V.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion to Intervene and Response to Plaintiff's Motion for Remedies and Final Judgment [Docket No. 304] is deemed to be withdrawn. It is further

**ORDERED** that Plaintiff United States Securities and Exchange Commission's Motion for the Court's Consideration of a Referral to the United States Attorney's Office [Docket No. 311] is **DENIED**. It is further

**ORDERED** that Plaintiff's Unopposed Motion to Amend Pleadings to Dismiss Remaining Claims of the Amended Complaint [Docket No 300] is **GRANTED** and that Docket No. 305-1 is the operative complaint in this case. It is further

**ORDERED** that the Clerk of Court shall file the Second Amended

Complaint [Docket No. 305-1] as a separate docket entry.  It is further

**ORDERED** that Plaintiff United States Securities and Exchange

Commission's Motion for Remedies and Final Judgment [Docket No. 296] is

**GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that defendant Cell>Point, LLC shall disgorge $4,789,564 in

profits and shall pay $1,538,312.89 in prejudgment interest and a civil penalty of

$2,764,562.50.  It is further

**ORDERED** that defendant Terry Colip shall disgorge $2,211,096.30 in

profits and shall pay $737,597.39 in prejudgment interest and a civil penalty of

$1,270,745.50.  It is further

**ORDERED** that defendant Greg Colip shall disgorge $559,982.46 in

profits and shall pay $178,085.40 in prejudgment interest and a civil penalty of

$321,829.  It is further

**ORDERED** that defendants Cell>Point, LLC, Terry Colip, and Greg Colip

are permanently enjoined from violating Section 17(a) of the Securities Act, 15

U.S.C. § 77q(a); Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a)

and (c); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); and Rule 10b-5 of

the Exchange Act, 17 C.F.R. § 240.10b-5.  It is further

**ORDERED** that defendant Terry Colip is permanently and unconditionally

barred from serving as a director or an officer of any publicly traded company.  It

is further

**ORDERED** that defendant Greg Colip is permanently and unconditionally

barred from serving as a director or an officer of any publicly traded company.  It is further

       **ORDERED** that plaintiff United States Securities and Exchange Commission shall file a proposed order, within 14 days, detailing how, when, and to whom the disgorgement and civil penalties shall be paid.

       DATED February 27, 2025.

                     BY THE COURT:

                     PHILIP A. BRIMMER
                     Chief United States District Judge